UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMBAC ASSURANCE CORPORATION and THE SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION, | ) ) ) ) |
| Plaintiffs, | ) ) No. _____ |
| v. | ) **COMPLAINT** |
| U.S. BANK NATIONAL ASSOCIATION, | ) ) |
| Defendant. | ) ) ) |

Plaintiffs Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation (the "Segregated Account," and together with Ambac Assurance Corporation, "Ambac"), by and through their attorneys Patterson Belknap Webb & Tyler LLP, for their complaint against Defendant U.S. Bank National Association ("U.S. Bank") allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of U.S. Bank's duties as the Trustee of five residential mortgage-backed securities ("RMBS") Trusts:  Harborview Mortgage Loan Trust ("Harborview") 2005-2, Harborview 2005-8, Harborview 2005-12, Harborview 2005-13 and Harborview 2005-16 (together, the "Trusts").  U.S. Bank is the Trustee of each of the Trusts.

2.      In violation of contractual, statutory, and common-law obligations to the Trusts—and to Trust beneficiaries, including Ambac—U.S. Bank allowed claims worth hundreds of millions of dollars against Countrywide Home Loans Inc. ("Countrywide") and Bank of America Corporation to lapse.  In addition, it failed to enforce the Trusts' remedies against Countrywide Home Loans Servicing LP ("Countrywide Servicing") and the Trusts'

sponsor, Greenwich Capital Financial Products, Inc. ("GCFP"). U.S. Bank's failure to act constitutes violations of both its express contractual duties before an event of default has occurred and its heightened duties that are triggered when an event of default has occurred and is continuing.

3. Each of the Trusts is a RMBS trust backed by loans originated and sold by Countrywide, which made dozens of representations and warranties to the Trusts about the creditworthiness of the mortgage loans. In 2011, as the statute of limitations was running down on the Trusts' claims against Countrywide, it was well known that during the run-up to the financial crisis Countrywide had abandoned its underwriting guidelines and originated loans based on fraud and misrepresentation. U.S. Bank itself had made such allegations against Countrywide in a lawsuit involving another Harborview trust issued in the same year as the Trusts at issue here and backed by similar collateral. And for one of the Trusts at issue in this suit, U.S. Bank had already demanded that Countrywide repurchase hundreds of loans for breach of representations and warranties. Further, U.S. Bank knew that Countrywide and GCFP had failed to deliver to the Trusts the documentation necessary to establish that the Trusts had legal ownership of the securitized loans. Despite this, and despite its awareness that the Trusts were losing hundreds of millions of dollars as borrowers defaulted on their loans, U.S. Bank did nothing to enforce the Trusts' rights.

4. U.S. Bank owed heightened, fiduciary duties to the Trusts because multiple events of default, as defined by the governing documents, had occurred on the Trusts. First, Countrywide failed to provide the necessary mortgage documentation in response to exception reports prepared by or on behalf of U.S. Bank. Second, Countrywide Servicing had committed widespread violations of prudent servicing standards by engaging in so-called robo-

signing in foreclosure proceedings, in part to cover up the fact that the Trusts did not possess complete mortgage documents to establish legal ownership.  And third, as to Harborview 2005-8, Countrywide had been notified by U.S. Bank that over 20% of the loans in the Trust breached representations and warranties, yet Countrywide failed to cure or repurchase the breaches.

5.      Under the Trusts' governing documents, New York statutory law, and New York common law, after the occurrence of an Event of Default U.S. Bank was required to manage the Trusts' assets, including claims against third parties, as a prudent person would do in the management of his own affairs.  This heightened duty required U.S. Bank to put the Trusts' interests ahead of its own and to act with undivided loyalty to preserve the Trusts' valuable claims against Countrywide, Countrywide Servicing, and GCFP.

6.      No prudent person or fiduciary would have failed to file—let alone failed to investigate—claims worth hundreds of millions of dollars.  Yet U.S. Bank has failed to take action against third parties for harm caused to these Trusts, and let lapse the statute of limitations on the claims against Countrywide and GCFP for breaches of representations and warranties and for failure to deliver documents.

7.      In addition, U.S. Bank has an express contractual obligation at all times— even before an event of default has occurred—to enforce the Trusts' rights (i) against Countrywide, to repurchase loans that breach representations and warranties and loans that are missing key documents, (ii) against GCFP, to repurchase loans that are missing key documents, and (iii) against Countrywide Servicing for violations of the contractual servicing standards. U.S. Bank failed to live up to its contractual obligations, whether or not an event of default had occurred.

9595726

8.     U.S. Bank's failure to fulfill its obligations has caused significant harm to Ambac, which issued financial guaranty insurance policies to certain certificateholders in the Trusts.  Because U.S. Bank did not enforce Countrywide's obligation to make the Trusts whole, the Trusts suffered shortfalls which caused Ambac to incur claims under the policies.  Ambac now brings this suit to recover damages against U.S. Bank for its breach of contractual, fiduciary and statutory duties as Trustee of the five Harborview Trusts.

9.     Ambac also seeks redress for U.S. Bank's improper treatment of "Recoveries" received by the Trusts to the detriment of Ambac.  U.S. Bank's incorrect accounting for recoveries has caused Ambac harm by affecting the amount and timing of insurance claims payments Ambac has paid and deferred, and it will continue to cause Ambac harm in the future if not corrected.

## PARTIES

10.     Defendant U.S. Bank is a national banking association, organized and existing under the laws of the United States, with the main office designated by its Articles of Association in Cincinnati, Ohio.

11.     Plaintiff the Segregated Account is a segregated account that was established on March 24, 2010 pursuant to Wis. Stat. § 611.24, with the approval of the Office of the Commissioner of Insurance of the State of Wisconsin (the "Commissioner").

12.     Upon the Verified Petition of the Commissioner, the Circuit Court for Dane County, Wisconsin, placed the Segregated Account into statutory rehabilitation under Wis. Stat. §§ 645.31 and 645.32 on March 24, 2010.  Pursuant to Wis. Stat. § 611.24(3)(e), the Segregated Account is a separate Wisconsin insurer with the legal capacity and authority to sue in its own name and right.  Ambac Assurance Corporation allocated the Policies and claims at

4

issue in this action to the Segregated Account pursuant to the Plan of Operation for the Segregated Account attached to the Commissioner's Verified Petition (the "Plan of Operation").

13.     The Commissioner is the court-appointed Rehabilitator of the Segregated Account.  As Rehabilitator, the Commissioner has the authority to prosecute the claims in this action on behalf of the Segregated Account.

14.     Plaintiff Ambac Assurance Corporation is a Wisconsin-domiciled stock insurance corporation authorized to transact surety and financial guaranty insurance.  Ambac Assurance Corporation maintains its principal place of business in New York, New York.  Under the Plan of Operation, Ambac Assurance Corporation performs specified management services for the Segregated Account and retains the right to receive any cash recoveries relating to the policies and claims that were allocated to the Segregated Account, including the Policies and claims at issue in this action.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims asserted occurred in this District and U.S. Bank resides and transacts business in this District.

17.     This Court has personal jurisdiction over U.S. Bank because U.S. Bank has offices and regularly transacts or transacted business within the state, and it engaged in purposeful conduct within the state by signing contracts that created New York common law trusts, governed by New York law, and by assuming the duties as Trustee of those New York trusts.

## FACTUAL ALLEGATIONS

**I.      The Harborview Trusts**

18.     This action concerns five Harborview Trusts, each backed by first-lien mortgage loans originated by Countrywide.  Ambac issued a financial guaranty insurance policy ("Policy") to each Trust that guarantees principal and interest payments to certain classes of certificates.

**A.      Overview of the Harborview Transactions**

19.     Like all RMBS transactions, the Trusts each aggregate a pool of mortgage loans and issue securities backed by the cashflows from those mortgage loans to investors, known as certificateholders.  By purchasing certificates issued by the Trusts, certificateholders acquire rights to the cashflow generated by the payments made by borrowers of the mortgage loans.  Certificates are divided into classes, or tranches, with each class of certificates entitled to a different payment priority.  To decrease the risk to certificateholders of a shortfall of mortgage payments to the trust, and therefore to make the certificates more marketable, some RMBS securitizations include a financial guaranty insurance policy.  Under such a policy, the certificate insurer agrees, in exchange for a premium, to make specified payments of principal and interest to insured certificates in the event the cashflows from the underlying mortgage loans are insufficient.

20.     Payments to certificateholders, and Ambac's obligations under its Policies, depend on whether the mortgage loans backing the Trusts supply sufficient cashflow.  The credit quality and characteristics of the mortgage loans  are therefore of the utmost importance to certificateholders and to Ambac as Certificate Insurer.  The quality of the mortgage loans depends on, among other factors, how the loans were originated, the underwriting guidelines used to approve the loans, the originator's compliance with those underwriting guidelines, the

6

quality and value of the mortgaged property, and compliance with applicable laws.  To assure the Trustee, Ambac, and investors of the quality and characteristics of the mortgage loans deposited in the securitization, Countrywide made dozens of representations and warranties about the mortgage loans, which U.S. Bank as Trustee is responsible for enforcing.

21.     The servicing of the mortgage loans also affects the cashflows produced by the loans.  Servicing encompasses the administration of the loans, including collecting monthly principal and interest payments from the borrower and remitting those payments to the securitization trust, following up on delinquencies, and foreclosing in the event of a default.  The Harborview Trusts were serviced by Countrywide Servicing.  As Trustee, U.S. Bank is required to enforce Countrywide Servicing's duty to comply with its servicing obligations to the Trusts.

22.     The obligations of the different parties to the Harborview transactions, including U.S. Bank's duties as Trustee, are set forth in a series of interrelated contracts.

**B.     The Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA")**

23.     Countrywide, as seller and servicer, sold and assigned its interest in the mortgage loans to GCFP pursuant to a Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA"), dated April 1, 2003, as amended on November 1, 2004.[1]  All of the loans in the five Trusts were sold by Countrywide to GCFP pursuant to the MMLPSA.  GCFP, now known as RBS Financial Products, Inc., served as the sponsor for the Harborview transactions.

24.     Under the MMLPSA, Countrywide assumed obligations to GCFP and made representations and warranties to GCFP about the quality and characteristics of the loans it

---

[1] The other transaction documents refer to the MMLPSA as the Servicing Agreement or the Purchase Agreement.

sold.  As described below in paragraphs 34-35 the right to enforce those obligations,

representations, and warranties was later assigned by GCFP to the Trusts.

25.    In section 7.02 of the MMLPSA, Countrywide made numerous

representations and warranties about the loans it sold to GCFP (the "Loan-Level Warranties"),

including that

- each loan was underwritten generally in accordance with
  Countrywide's underwriting guidelines in effect at the time of
  origination;

- no fraud was committed by Countrywide in the origination of the
  loans and, to the best of Countrywide's knowledge, no fraud was
  committed by the borrower or any other person involved in the
  loan's origination;

- the origination practices used by Countrywide "have been in all
  respects legal, proper, prudent and customary" and Countrywide
  "ha[d] no knowledge of any circumstances [] or condition" with
  respect to the loans "that can reasonably be expected to cause the
  Mortgage Loan to become delinquent"; and

- the information contained in the Mortgage Loan Schedule was
  "complete, true and correct."

26.    Countrywide also provided a warranty in the MMLPSA that the Mortgage

Note, the Assignment of Mortgage and other required documents were delivered to the

Custodian in compliance with the Custodial Agreement, and that, as of the closing date of the

sale, GCFP was in possession of "a complete Mortgage File," which included, for each loan, the

original Mortgage Note endorsed in blank, with all intervening endorsements showing a

complete chain; a duly executed Assignment of Mortgage; and recorded originals of any

intervening assignments, showing a complete chain of title.  MMLPSA § 7.02(xxxix), Ex. 5

(specifying contents of Mortgage File).  The MMLPSA requires that Countrywide deliver certain

8

Mortgage Loan Documents to a designated Custodian for each loan it sold to GCFP.  MMLPSA § 6.03.

27.     Taken together, Countrywide's Loan-Level Warranties provided GCFP, and later the Trustee, Ambac, and investors, comfort that the securitized loans had been (i) underwritten in accordance with guidelines that were designed to assess the borrower's ability and willingness to repay the loan; (ii) underwritten in accordance with guidelines that were designed to ensure the quality of the mortgage collateral; (iii) originated without fraud; and (iv) described accurately in the Mortgage Loan Schedule.  Countrywide's promise to transfer the Mortgage File and its representation that GCFP was in possession of the mortgage documents ensured that, if the borrower defaulted, the Trust would be recognized as the legal owner of the loan and that the Trustee would have standing to bring a foreclosure action.

28.     The MMLPSA also sets forth the remedies for Countrywide's breach of any of its representations and warranties.  If Countrywide discovers or is given notice of a breach of a Loan-Level Warranty that materially and adversely affects the value of the related mortgage loan, and such breach cannot be corrected or cured within 90 days, Countrywide must repurchase the loan at the Repurchase Price specified in the MMLPSA.  MMLPSA § 7.03.  In addition, Exhibit 5, setting forth the required contents of each Mortgage File, provides that if certain documents are not delivered, Countrywide must use its best efforts to cure the missing document and, if it cannot, to repurchase the loan.  MMLPSA Ex. 5 at 3.

29.     In section 7.01 of the MMLPSA, Countrywide made additional representations and warranties, including that "[n]o written statement, report or other document prepared and furnished or to be prepared and furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of

material fact or omits to state a material fact necessary to make the statements contained therein not misleading."  MMLPSA § 7.01(ix) (the "No Untrue Statement Warranty").

30.     If Countrywide breaches a representation and warranty set forth in section 7.01 of the MMLPSA, including the No Untrue Statement Warranty, the remedy is that  "all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by [Countrywide] at the Repurchase Price."  MMLPSA § 7.03.

31.     Under the MMLPSA, Countrywide retained the right to service the mortgage loans after they were sold to GCFP.  Countrywide assigned its servicing rights to Countrywide Servicing, which was acquired by Bank of America on July 1, 2008, and, in April 2009, was renamed BAC Home Loan Servicing, LP.  In July 2011, BAC Home Loan Servicing, LP was merged with Bank of America, N.A ("BANA").  (Countrywide Servicing acted as Servicer until September or October 2013 when Nationstar Mortgage was substituted as Servicer.)  Countrywide Servicing's obligations as Servicer are set forth in detail in the "Servicing Addendum" attached as Exhibit 9 to the MMLPSA.  *See* MMLPSA § 11, Ex. 9.

**C.     The Mortgage Loan Purchase Agreements, Pooling and Servicing Agreements, and Reconstituted Servicing Agreements**

32.     To effectuate each of the Harborview transactions, GCFP pooled several thousand  loans it had acquired from Countrywide and transferred them to a securitization trust. This process took place in two steps.  In the first step, GCFP conveyed a pool of loans to Greenwich Capital Acceptance, Inc. (the "Depositor") through a Mortgage Loan Purchase Agreement ("MLPA").[2]  In the second step, the Depositor conveyed the loans to a Trust through

---

[2] The MLPAs for each of the five Trusts contain substantially similar provisions, and citations to the MLPA in this Complaint refer to the MLPAs for each of Harborview 2005-2, 2005-8, 2005-12, 2005-13 and 2005-16.

a Pooling Agreement or Pooling and Servicing Agreement ("PSA") between the Depositor, GCFP and U.S. Bank.[3]   The PSAs are governed by New York law.  PSA § 12.04.

33.     To ensure that the loans were properly acquired by the Harborview Trusts, the MMLPSA, MLPA, and PSA all require that certain key documents be transferred from Countrywide to GCFP and from GCFP to the Depositor and then to the Trusts.  *See* MMLPSA § 6.03; MLPA § 2.02; PSA § 2.01.  These documents include the mortgages, notes, and appropriate assignments for each of the securitized loans, all of which are necessary to establish that the Trusts have ownership of the loans and which give the Trusts legal standing to foreclose on the loans, if necessary.

34.     In addition, as part of the transfers that created the Trusts, GCFP assigned its rights against Countrywide and Countrywide Servicing to U.S. Bank as Trustee so that they could be exercised for the benefit of the Trust fund and Trust beneficiaries.  The MLPAs and PSAs for each Trust assign to U.S. Bank the right and obligation to enforce Countrywide's representations and warranties, including the Loan-Level Warranties and the No Untrue Statement Warranty.  MLPA § 2.01; PSA § 2.01(a).

35.     Countrywide also restated its representations and warranties contained in the MMLPSA for the benefit of the Trusts in Reconstituted Servicing Agreements ("RSA") among GCFP, Countrywide, and Countrywide Servicing, and acknowledged by U.S. Bank.[4]  In each RSA, Countrywide and Countrywide Servicing acknowledged the assignment to U.S. Bank

---

[3] The contract is called a Pooling  and Servicing Agreement for Harborview 2005-2 and Harborview 2005-8 and a Pooling Agreement for Harborview 2005-12, 2005-13 and 2005-16.  Each Pooling and Servicing Agreement or Pooling Agreement contains substantially similar provisions, and citations to the PSA in this Complaint refer to the Pooling and Servicing Agreement or Pooling Agreement for each of Harborview 2005-2, 2005-8, 2005-12, 2005-13 and 2005-16.

[4] The RSAs for each of the five Trusts contain substantially similar provisions, and citations to the RSA in this Complaint refer to the RSAs for each of Harborview 2005-2, 2005-8, 2005-12, 2005-13 and 2005-16.

9595726

of the right under the MMLPSA to enforce Countrywide's and Countrywide Servicing's obligations, including the obligation to give notice of and to cure or repurchase noncompliant loans. The RSAs are governed by New York law. RSA at 4.

36. The PSAs and RSAs for the Harborview Trusts provide that Countrywide Servicing will service the securitized loans pursuant to the terms of the MMLPSA. PSA § 3.01; RSA at 2. To protect the Trusts, the PSAs further provided that U.S. Bank, as Trustee, "shall enforce the provisions of the [MMLPSA] in respect of the Servicer." PSA § 3.01.

**D.      Ambac's Financial Guaranty Insurance Policies**

37. For each Trust, Ambac agreed to issue an irrevocable financial guaranty insurance policy to certain classes of certificateholders pursuant to a Commitment Letter between Ambac and Greenwich Capital Markets, Inc. The Policies were issued concurrently with the closing of each transaction and are summarized in the table below.

| Trust | Closing Date | Number of Loans at Closing | Total Certificate Face Value | Ambac-Insured Certificates | Original Face Value of Ambac-Insured Certificates |
|-------|--------------|----------------------------|------------------------------|----------------------------|----------------------------------------------------|
| 2005-2 | 4/12/2005 | 5,301 | $1,896,236,200 | Class 2-A-1C | $175,000,000 |
| 2005-8 | 7/29/2005 | 7,093 | $2,478,326,350 | Class 1-A1B<br>Class 1-A2C<br>Class 2-A1B<br>Class 2-A2B | $432,623,000 |
| 2005-12 | 9/30/2005 | 2,503 | $889,500,200 | Class 1-A1B<br>Class 2-A1B | $224,480,000 |
| 2005-13 | 9/30/2005 | 3,242 | $1,039,298,200 | Class 1-A1B<br>Class 2-A1C | $177,052,000 |
| 2005-16 | 11/30/2005 | 2,439 | $1,648,805,400 | Class 2A-1C2 | $166,727,000 |

38. As Certificate Insurer, Ambac is an express third-party beneficiary of the PSA for each Trust. PSA § 12.10. In addition, the PSAs and the Policies issued by Ambac

12

provide that Ambac is subrogated to the rights of the insured certificateholders and has the right to exercise all rights of the holders of insured certificates under the PSA.  PSA §§ 4.05(d), 12.03.

39.    The contracts establishing the Harborview Trusts thus establish the basic risk allocation with respect to each transaction.  To the extent Countrywide sold defective loans for inclusion in the Trusts or failed to provide the necessary documentation for the securitized loans, neither Ambac nor certificateholders bear any increased risk from those loans remaining in the Trusts; that risk remains with Countrywide.  Countrywide's representations and warranties, and its corresponding promise to cure or repurchase breaching loans, were material to the Trusts' formation and material to assessing the risk associated with the mortgage loans backing the certificates.

## II.    U.S. Bank's Obligations as Trustee of the Harborview Trusts

40.    U.S. Bank's obligations and duties as Trustee of the Harborview Trusts are established under the PSAs, New York common law, and the New York Streit Act.  In exchange for promising to fulfill these duties, U.S. Bank is compensated under the PSAs by receiving a monthly fee calculated as a percentage of the outstanding principal balance of the mortgage loans.  *See* PSA § 8.05.

### A.    U.S. Bank's Obligations Before an Event of Default

41.    First and foremost, U.S. Bank has an obligation to acquire and protect the Trust Fund for the benefit of all certificateholders.  *See* PSA §§ 2.01(a), 2.02.  U.S. Bank declared that it "holds or will hold all other assets included in the definition of 'Trust Fund' in trust for the exclusive use and benefit of all present and future Certificateholders."  PSA § 2.02. The assets in the Trust Fund comprise the mortgage loans as well as all of the rights conveyed to the Depositor under the MLPA, including the right to enforce Countrywide's repurchase obligations.  PSA § 1.01.

42.    As part of acquiring the Trust Fund, U.S. Bank undertook an obligation to provide certifications that it received all of the Mortgage Files and that they were complete.  The Trustee, or the Custodian on its behalf, "agrees, for the benefit of Certificateholders, to review each Mortgage File delivered to it," and to issue an interim certification within 90 days of the securitization closing date and a final certification within 180 days of closing certifying that (i) all documents required to be in the Mortgage File are present and (ii) that it reviewed such documents to ensure they had not been mutilated or damaged.  PSA § 2.02.

43.    Pursuant to the PSAs, U.S. Bank has the authority and the obligation to enforce Countrywide's obligation to cure or repurchase loans that breach Countrywide's Loan-Level Warranties or that are missing documents from the Mortgage File, and to repurchase all of the mortgage loans if Countrywide has breached the No Untrue Statement Warranty.  Section 2.03(a) of the PSAs provides that

> Upon its discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by [Countrywide] of any representation, warranty or covenant under the [MMLPSA] in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify [Countrywide] of such defect, missing document or breach and request that [Countrywide] deliver such missing document or cure such defect or breach within 90 days from the date that [Countrywide] was notified of such missing document, defect or breach, and if [Countrywide] does not deliver such missing document or cure such defect or breach in all material respects during such period, **_the Trustee shall enforce [Countrywide's] obligation under the [MMLPSA] and cause [Countrywide] to repurchase that Mortgage Loan from the Trust Fund_** at the Repurchase Price (as defined in the Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period.

(Emphasis added.)  U.S. Bank also has the right and obligation to enforce GCFP's representations, warranties, and covenants under the MLPA, including GCFP's obligation to

deliver all of the required mortgage documents to the Trusts.  PSA § 2.03(b); *see* MLPA § 2.02.

Finally, U.S. Bank is required to enforce Countrywide Servicing's obligations to properly service

the loans according to the requirements set forth in the MMLPSA.  PSA § 3.01.

44.     U.S. Bank was aware that Countrywide's representations and warranties—

and U.S. Bank's promise to enforce those representations and warranties—were fundamental

elements of the transaction.  Indeed, rights to enforce Countrywide's repurchase obligations are

expressly defined by the PSAs to be part of the Trust Fund that U.S. Bank must maintain for the

benefit of the Trust, the Certificateholders, and Ambac.

45.     At all times, U.S. Bank owes a duty to Trust beneficiaries to carry out its

duties under the PSAs, including its duty to enforce Countrywide's obligations, with due care.

**B.      U.S. Bank's Obligations After an Event of Default**

46.     Upon the occurrence of an Event of Default U.S. Bank assumes

heightened duties that require it to act as a prudent person and a fiduciary.

47.     First, under the PSAs, after an Event of Default has occurred, U.S. Bank

must "exercise such of the rights and powers vested in it by this Agreement, and use the same

degree of care and skill in their exercise, as a prudent man would exercise or use under the

circumstances in the conduct of his own affairs."  PSA § 8.01.

48.     Second, under New York common law, U.S. Bank has an obligation to act

prudently following an event of default to secure the basic purpose of the Trusts, that is,

protecting the assets of the Trusts and ensuring repayment of obligations due to the Trusts.

Following an event of default, U.S. Bank also owes a fiduciary duty to the Trusts' beneficiaries

that requires it to act with undivided loyalty, in the best interest of the Trusts, and to avoid any

action that would prioritize U.S. Bank's interests at the Trusts' expense.

49.     Third, the Streit Act, N.Y. Real Prop. Law § 124 *et seq.*, also imposes obligations on U.S. Bank as the trustee of a trust holding mortgage investments.  Under the Streit Act, following an event of default, U.S. Bank is required to "exercise such of the rights and powers vested in the trustee by [the trust] instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  N.Y. Real Prop. Law § 126(1).

50.     Moreover, under the PSAs, U.S. Bank must give Ambac and certificateholders notice of "any event which constitutes or which, with notice or lapse of time or both, would constitute an Event of Default."  PSA § 7.04(b).

## III.  U.S. Bank's Breach of Its Post-Event of Default Obligations to Act as Prudent Person and a Fiduciary

51.     Events of Default have occurred and continued on the Trusts from shortly after their closing dates to the present.  Despite these Events of Default, U.S. Bank has failed to act like a prudent person or a fiduciary to protect the assets of the Trusts and Trust beneficiaries.

### A.     Events of Default Based on Missing Mortgage File Documents

52.     U.S. Bank, and its Responsible Officers, as defined in the PSAs, had actual knowledge of the occurrence and continuance of an Event of Default since no later than 180 days after the closing date of each Trust based on Countrywide's failure to deliver complete mortgage files.

53.     The Harborview PSAs adopt the definition of Event of Default in the MMLPSA.  PSA § 1.01.  Under section 14.01(ii) of the MMLPSA, an Event of Default occurs upon the "failure on the part of [Countrywide or Countrywide Servicing] duly to observe or perform in any material respect any other of the covenants or agreements on the part of [Countrywide or Countrywide Servicing] set forth in this Agreement which continues

16

unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to [Countrywide or Countrywide Servicing] by the Purchaser or by the Custodian."

54.     As described above, Countrywide was obligated under the MMLPSA to provide a complete mortgage file to GCFP, including the Mortgage Note showing a complete chain of endorsements, and an executed assignment of mortgage, with proof of any intervening assignments.

55.     To ensure that the Trust acquired legal ownership of all the securitized loans and that it possessed all of the documentation necessary to bring a foreclosure action in the event of borrower default, the PSAs require U.S. Bank, as Trustee, to take certain steps to ensure that mortgage loan documents in the Mortgage Files were properly transferred.  Under the PSAs, the Mortgage File must include the original mortgage note, endorsed on its face or by allonge in blank or to the Trustee; the original mortgage; an original assignment of mortgage assigning the mortgage to U.S. Bank as trustee (unless the loan is registered in the Mortgage Electronic Registration Service, or MERS); and an original copy of any intervening assignment showing a complete chain of assignments (unless the loan is a MERS loan).  PSA § 2.01(i), (iii), (iv).  These documents are necessary to prove the Trusts' ownership of the note and mortgage or otherwise protect title.

56.     Under the PSA for each Trust, U.S. Bank agreed that it, or the Custodian acting on its behalf, would "review each Mortgage File" and deliver an interim certification 90 days after closing and a final certification 180 days after closing certifying that it had received all documents in the Mortgage File that were required to be delivered.

9595726

PSA § 2.02.  The final certification must, in addition to certifying that all Mortgage Files

have been reviewed, identify "any applicable exceptions," including missing documents.  *Id.*

57.    On information and belief, U.S. Bank knew, or based on its review should

have known, of numerous instances where it did not receive (i) the original mortgage note

with all intervening endorsements showing a complete chain of endorsement from

Countrywide to GCFP to the Depositor to the Trust, or a lost mortgage note affidavit, and a

duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the

original recorded mortgage for each loan that was not a MERS loan; (iii) the original

mortgage for MERS loans; and (iv) the original recorded assignment or assignment of the

mortgage together with all interim recorded assignments.

58.    Countrywide's failure to properly assign, record and transfer mortgages

and notes was well known by 2010 and 2011.  In 2010, for example, in an adversary proceeding

in New Jersey Bankruptcy Court that gained widespread media attention, a Countrywide

employee testified that Countrywide never transferred the original mortgage note to the

securitization trustee, and only executed an allonge just before the trustee initiated foreclosure

proceedings.  *Kemp v. Countrywide Home Loans, Inc.*, 440 B.R. 624 (D.N.J. Bankr. 2010).

59.    An investigation by *Fortune* in June 2011 of all the foreclosure actions

filed on Countrywide-originated loans in two New York counties found that of the 104 cases not

a single one contained a note that had been properly endorsed to the securitization trust.  Abigail

Field, "At Bank of America, more incomplete mortgage docs raise more questions," *Fortune*

(June 3, 2011), *available at* http://fortune.com/2011/06/03/at-bank-of-america-more-incomplete-

mortgage-docs-raise-more-questions/.

60.     In August 2011, the New York Attorney General sought to intervene in an Article 77 proceeding in New York state court seeking approval of a settlement between Countrywide and the Bank of New York as Trustee for 530 Countrywide RMBS trusts.  (The Harborview Trusts were not covered by the settlement at issue.)  The New York Attorney General alleged that "[t]he ultimate failure of Countrywide to transfer complete mortgage loan documents to the Trusts hampered the Trusts' ability to foreclose on delinquent mortgages, thereby impairing the value of the notes secured by those mortgages.  These circumstances apparently triggered widespread fraud, including [Bank of America's] fabrication of missing documents."  Verified Pleading in Intervention, *In re the App. of the Bank of N.Y.*, No. 651786/2011 (N.Y. Sup. Ct. Aug. 4, 2011), at ¶ 23.  The New York Attorney General further alleged that when Bank of New York reviewed the mortgage files in Countrywide trusts, it "identified great numbers of files that are incomplete and improperly documented."  *Id.* ¶ 26.

61.     On information and belief, the review of Mortgage Files for the loans securitized in the Harborview Trusts likewise revealed large numbers of missing documents which were, or should have been, listed as exceptions in the interim and final certifications required under the PSAs.  These missing Mortgage File documents and breaches of the warranty that the mortgage, note, and assignment were provided constituted breaches of Countrywide's obligations under the MMLPSA.  Given this knowledge by U.S. Bank of widespread missing documents in breach of Countrywide's MMLPSA warranty, U.S. Bank had an obligation under the PSAs to give notice to Countrywide of these defects and enforce Countrywide's obligation to repurchase the defective mortgage loans.  To the extent that U.S. Bank knew of and failed to give Countrywide notice of these breaches, it cannot hide behind this failure to give notice to assert the absence of an Event of Default.

9595726

B.     **Events of Default Based on Countrywide Servicing's Violations of Its Servicing Obligations**

62.     Countrywide Servicing's failure to comply with its servicing obligations, as described in the MMLPSA, gave rise to a second Event of Default on the Trusts. Under the MMLPSA, the Servicer must "employ procedures including collection procedures and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account giving due consideration to accepted mortgage servicing practices of prudent lending institutions." Servicing Addendum § 11.01. As described above, an Event of Default occurs under the Trusts' PSAs when Countrywide or Countrywide Servicing fails to perform any of its covenants under the MMLPSA.

63.     Countrywide Servicing has failed to service the loans in the Trusts in accordance with prudent servicing standards. It has engaged in widespread misconduct to cover up its affiliates' systemic failures in the origination of the mortgage loans and failure to properly assign the underlying mortgage loans to securitization trusts, including the Harborview Trusts.

64.     Such servicing failures are widespread, and have been the subject of government investigations and settlements as well as widely-reported private actions. U.S. Bank, in addition to its substantial business serving as a securitization trustee, was also an active mortgage servicer. As of December 31, 2011, U.S. Bank serviced $191.1 billion of residential mortgage loans, earning U.S. Bank $651 million in loan servicing fees; by 2016, U.S. Bank's servicing business had grown to include $232.6 billion of serviced loans. Through its participation in the residential servicing business in the years after the Harborview Trusts closed, U.S. Bank was well aware of the pervasive nature of servicer misconduct and of Countrywide Servicing's breaches of its obligations under the MMLPSA in particular. U.S. Bank also knew that under the PSAs it was obligated to enforce Countrywide Servicing's promises, and that it

could not avoid an Event of Default—and the resulting heightened duties on U.S. Bank itself—by shirking its own contractual duties to give Countrywide Servicing notice of its breaches.

65.     Countrywide's failures to supply complete mortgage files were well known.  For example, in support of its June 2011 Petition for judicial approval of a settlement with Countrywide and Bank of America as successor to Countrywide Servicing, Bank of New York Mellon stated that the settlement was necessary to resolve "wide-ranging and detailed" allegations by certificateholders that Countrywide Servicing violated its prudent servicing obligations in 530 RMBS trusts where it was servicer.  *See* Petition, *In re Bank of New York Mellon*, 651786/2011 (N.Y. Sup. Ct. June 29, 2011), at ¶¶ 28-34.  Among other things, the certificateholders alleged that Countrywide Servicing (i) failed to maintain accurate and adequate loan files in a manner consistent with prudent mortgage servicing standards; (ii) failed to demand that sellers cure document deficiencies in the mortgage records; (iii) incurred avoidable and unnecessary servicing fees as a result of its deficient record-keeping; (iv) overcharged by as much as 100% the costs for maintenance, inspection, and other services with regard to defaulted loans; and (v) held defaulted mortgage loans on the trusts' books rather than foreclose or liquidate them in order to maximize its own fees.  The certificateholders further alleged that Countrywide Servicing imposed on the trusts and the certificateholders the costs of curing allegedly predatory loans, which should have been borne by the seller.

66.     In addition on April 13, 2011, the Office of the Comptroller of the Currency ("OCC") issued a Consent Order finding that BANA, including in its role as successor to Countrywide Servicing, engaged in "deficiencies and unsafe or unsound practices in residential mortgage servicing and in [BANA's] initiation and handling of foreclosure proceedings" to cover up the fact that RMBS trusts lacked legal title sufficient to

foreclose upon underlying mortgage loans.  Consent Order,  *In re Bank of Am., N.A.*, No. AA-EC-11-12 (Apr. 13, 2011), *available at* https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

   67.    The Consent Order was based on an examination of BANA's foreclosure processes and a report issued in connection with an interagency review by the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS").  Interagency Review of Foreclosure Policies and Practices (2011), *available at* https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.  In the report, the regulators noted that their review of the mortgage servicers' loan files showed that there may be "disputes over note ownership or authority to foreclose."  *Id*. at 6.  The regulators also noted "concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages."  *Id*.  U.S. Bank was well aware of this investigation and the resulting report because U.S. Bank itself was one of the entities being investigated, and its servicing practices were the subject of an on-site review by regulators, just as BANA's were.  *Id*. at 1 n.1.  This same review later led the Federal Reserve Board to take formal enforcement action against U.S. Bank for its own servicing and foreclosure practices.

   68.    On December 1, 2011, the Massachusetts Attorney General commenced an action against BANA, among others, alleging "rampant violations" of state law in foreclosure proceedings related to the "robo-signing" scandal.  Compl., *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct. Dec. 1, 2011)  Specifically, when documents needed to foreclose on properties were missing from servicers' files, the servicers—including BANA—

engaged, on a widespread basis, in the practice of fraudulently generating and/or forging the execution of the requisite documentation.

69.     In June 2010, BAC Home Loan Servicing, LP agreed to the entry of a consent order requiring it to pay $108 million to settle claims of illegal servicing practices brought by the FTC.  Consent Order and Judgment, *Fed. Trade Comm'n v. Countrywide Home Loans, Inc., et ano*, No. 10-cv-4193 (C.D. Cal. June 7, 2010).  According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans.  Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts."  Press Release, Fed. Trade Comm'n, Countrywide Will Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy (June 7, 2010), http://www.ftc.gov/ news-events/press-releases/2010/06/countrywide-will-pay-108-million-overcharging-struggling.

70.     Under the PSAs, U.S. Bank is required to enforce the provisions of the MMLPSA against Countrywide Servicing.  PSA § 3.01.  And U.S. Bank is required to give Ambac and other certificateholders notice of any event, including defaults of Countrywide Servicing under the MMLPSA, which constitute, or which, with notice and a passage of time, would constitute an Event of Default.  PSA § 7.04(b).  U.S. Bank failed to give such notice of Countrywide Servicing's substantial breaches of its servicing obligations.  To the extent that U.S. Bank knew of and failed to give Countrywide Servicing notice of its violations, in breach of U.S. Bank's own contractual duties, it cannot hide behind this failure to assert the absence of an Event of Default.

C.    **Event of Default on Harborview 2005-8 Based on Countrywide's Failure to Repurchase Breaching Loans**

71.    An additional Event of Default occurred on the Harborview 2005-8 Trust based on Countrywide's failure to repurchase 466 loans that were specifically identified as breaching in notices sent to Countrywide by U.S. Bank in 2011.  These 466 loans made up approximately 20% of the Trust by principal balance, a material percentage.  Countrywide had been given notice that these loans suffered from breaches of representations and warranties or missing documents that required Countrywide to repurchase but, in violation of its contractual obligation under the MMLPSA, Countrywide failed to repurchase any of them.  Countrywide's failure to repurchase these loans constitutes a "failure . . . duly to observe or perform in any material respect" under the MMLPSA, and therefore constitutes an Event of Default.

72.    To the extent that U.S. Bank knew of and failed to give Countrywide additional notice that it was in breach of the MMLPSA following the end of the 90-day cure-or-repurchase period, such failure constituted a breach of U.S. Bank's contractual obligation to enforce Countrywide's repurchase obligation.  U.S. Bank therefore cannot hide behind this failure to assert the absence of an Event of Default.

D.    **U.S. Bank's Failure to Enforce Countrywide's Repurchase Obligations Following the Events of Default**

73.    After the occurrence of an Event of Default, U.S. Bank owed fiduciary duties to the Trusts and to Trust beneficiaries, including Ambac, to preserve the Trusts' assets. In addition, U.S. Bank was obligated under the PSAs to carry out all of its rights and powers under the contract as a prudent person would in the conduct of such person's own affairs.  These obligations required—at a minimum—that U.S. Bank investigate whether Countrywide's loans breached representations and warranties, demand that Countrywide repurchase the breaching

loans, and, if necessary, file suit or otherwise act to preserve the statute of limitations on the

Trusts' claims.

74.    By 2011, U.S. Bank was aware that the Trusts contained large numbers of

breaching loans, beyond those that U.S. Bank had already discovered contained missing or

defective Mortgage Files, and that Countrywide was taking no steps to comply with its

contractual repurchase obligation.

75.    U.S. Bank knew that the Trusts experienced astonishing losses beginning

soon after each securitization closed and continuing in the years that followed.  These loss

numbers were reflected in the monthly remittance reports that U.S. Bank itself prepared:

| Trust | Cumulative Realized Losses | |
|---|---|---|
| | January 2011 | March 2017 |
| 2005-2 | $56.4 million | $177.7 million |
| 2005-8 | $142.6 million | $403.7 million |
| 2005-12 | $62.4 million | $210.7 million |
| 2005-13 | $51.9 million | $158.6 million |
| 2005-16 | $122.0 million | $336.3 million |

76.    U.S. Bank knew that losses of the magnitude experienced by the Trusts

were a strong indicator that the loans had not been properly underwritten.  A prudent person and

a fiduciary faced with such extraordinary losses would have investigated a sample of loans to

determine whether they satisfied Countrywide's representations.  U.S. Bank has the contractual

right to obtain loan files from Countrywide so that it is able to perform a reunderwriting review

to determine whether the loans complied with representations and warranties.  U.S. Bank's

failure to do so violated its heightened post-Event of Default duties.

77.    U.S. Bank also knew what such a loan file review would reveal.  For

Harborview 2005-10—a trust that closed within the same year as the Trusts at issue in this

Complaint and was backed by similar Countrywide loans—an investor directed U.S. Bank to

obtain loan files from Countrywide and hired a consultant to undertake a review of a sample of

defaulted loans in late 2010. Its review found that 66% of the loans breached representations and

warranties made by Countrywide in the MMLPSA. Compl., *U.S. Bank National Association v.*

*Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. N.Y. Cty. Aug. 29, 2011), at

¶ 52. Based on these results, U.S. Bank concluded that Countrywide had "systematically failed

to apply the promised underwriting standards and guidelines to its origination practices" and that

"[t]hese same failures affect a significant percentage" of the loans that had not been reviewed.

*Id.* ¶ 65; *see also id.* at ¶ 73 (U.S. Bank's review "demonstrate[d] Countrywide's large scale

failure to abide by its underwriting guidelines in originating the Loans"). U.S. Bank had also

sent repurchase demands to Countrywide for over 450 loans in Harborview 2005-8, a further

indication that Countrywide's widespread underwriting failures infected the loans sold to GCFP

for inclusion in Harborview securitizations.

78. Reviews by third parties, which were available and known to U.S. Bank,

gave further evidence that Countrywide loans from this time period had systemic and pervasive

breaches of representations and warranties. As early as 2008, MBIA Insurance Corporation had

filed suit against Countrywide alleging that its loans in seventeen Countrywide securitizations

issued between 2005 and 2007 pervasively breached representations and warranties. MBIA

found that 91% of defaulted and delinquent loans "show[ed] material discrepancies from

underwriting guidelines." Second Am. Compl., *MBIA Ins. Corp. v. Countrywide Home Loans,*

*Inc.*, 602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009), at ¶ 80. MBIA's review of loan files revealed

"substantial breaches of Mortgage Loan Representations, including extraordinarily high

incidence of material deviations from underwriting guidelines. *Id.* at ¶ 78. In September 2010,

Ambac sued Countrywide over breaches of representations and warranties in seventeen

securitizations where—unlike in the Harborview Trusts—Ambac had direct contractual rights against Countrywide and did not need to rely on the trustee to seek damages. Ambac's review of loan files for defaulted loans in the seventeen Countrywide securitizations revealed that 97% breached representations and warranties. Compl., *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 651612/2010 (N.Y. Sup. Ct. Sept. 28, 2010), at ¶ 156.

79.    In addition, in October 2010, Countrywide's former Chief Executive Officer, Angelo Mozilo, paid a record $22.5 million penalty to the Securities and Exchange Commission ("SEC"), the largest penalty ever paid by a public company's senior executive in an SEC settlement. *Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Financial Penalty Against a Public Company's Senior Executive*, U.S. Securities and Exchange Commission, Press Release, Oct. 15, 2010, http://www.sec.gov/news/press/2010/2010-197.htm. In the press release announcing the settlement, the Director of the SEC's Enforcement Division described Countrywide as "buckling under the weight of increasing risky mortgage underwriting, mounting defaults and delinquencies, and a deteriorating business model." *Id.*

80.    Despite overwhelming information about the systemic failures of Countrywide's underwriting and the disastrous effect it had on the Harborview Trusts, U.S. Bank did nothing. In blatant violation of its fiduciary and prudent person duties, it did not investigate whether Countrywide's breaches of representations and warranties extended to the Harborview Trusts. Nor did it demand that Countrywide repurchase breaching loans that had specifically been identified in the Harborview 2005-8 Trust or otherwise. U.S. Bank did not even comply with its express contractual obligation to enforce Countrywide's repurchase obligation for loans where Countrywide had independently discovered breaches—even though, by August 2011, U.S.

Bank had already alleged in connection with the Harborview 2005-10 Trust that Countrywide was aware of breaches of representations and warranties throughout its mortgage portfolio.

81.     Worse, U.S. Bank's inaction came just as the statute of limitations on the Trusts' claims against Countrywide was running out, and U.S. Bank took no action to preserve the claims by seeking a tolling agreement with Countrywide.  U.S. Bank knew or should have known that there was a possibility that the statute of limitations on repurchase claims expired six years after the closing date of a securitization, and that its delay exposed the Trusts to risk of losing claims worth hundreds of millions of dollars.  While trustees and other RMBS plaintiffs argued that the statute of limitations accrued at a later date, a trustee acting in the same manner as a prudent person would in the conduct of his own affairs and acting as a fiduciary would have recognized the risk and acted to minimize the chance of losing the Trusts' valuable claims.  No prudent person or fiduciary would have allowed claims worth hundreds of millions of dollars to expire without at least conducting an investigation into their viability and seeking to obtain a tolling agreement.

## IV.   U.S. Bank's Breach of Its Pre-Event of Default Obligation to Enforce Countrywide's and GCFP's Repurchase Obligations

82.     Apart from the existence of an Event of Default, U.S. Bank violated its contractual obligations under the PSA which it was obligated to carry out with due care.  As described above, the PSAs provide that upon its discovery or receipt of notice of loans that breach representations and warranties Countrywide must cure or repurchase breaching loans, and that U.S. Bank "shall enforce" such obligation.  However, U.S. Bank failed to do so.

83.     As reported in securities filings made by GCFP (now known as RBS Financial Products, Inc.), 466 loans or nearly 20% of the loans in Harborview 2005-8 were subject to a repurchase demand no later than the fourth quarter of 2011.  Countrywide had

therefore been given notice that these loans suffered from breaches of representations and

warranties or missing documents that required Countrywide to repurchase.  None of these

repurchase demands have been withdrawn, yet Countrywide has failed to repurchase any of the

466 loans.

84.     Despite its contractual duty to enforce Countrywide's repurchase

obligations, U.S. Bank never filed suit against Countrywide based on the 466 breaching loans in

Harborview 2005-8 or took any other action to force Countrywide to honor the repurchase

protocol in the PSA.  This failure is a breach of U.S. Bank's express obligations under the

Harborview 2005-8 PSA.

85.     In addition, as described above, U.S. Bank itself discovered or received

notice that the Mortgage Files for the securitized loans were missing many key documents.

Under section 2.03(a) of the PSAs, upon its discovery or receipt of notice of "any materially

defective document in, or that a document is missing from, a Mortgage File," U.S. Bank must

"promptly notify [Countrywide] of such defect [or] missing document," and if the issue is not

cured it "shall enforce" Countrywide's obligation to repurchase the affected loans.   Moreover,

missing documents from the Mortgage File put Countrywide in breach of the warranty contained

in 7.01(xxxix) providing that the Mortgage Note, the Mortgage, the Assignment, and all other

documents required by Exhibit 5 to the MMLPSA, had been delivered.  Despite knowing that

Countrywide was in breach of this warranty, U.S. Bank did not carry out its obligation to give

Countrywide prompt notice of the breach, demand that Countrywide repurchase, or enforce

Countrywide's obligation to do so.

86.     Further, under section 2.03(b) of the PSAs, if U.S. Bank discovers or

receives notice of any breach by GCFP of GCFP's covenants, representations or warranties

under the MLPA, U.S. Bank must give GCFP prompt written notice and demand that GCFP repurchase the breaching loans.  If GCFP fails to do so, U.S. Bank must enforce GCFP's obligations.  GCFP's failure to deliver required mortgage documents to the Trusts constitutes a breach of GCFP's covenant under the MLPA to deliver to the Trustee all of the documents described in section 2.01 of the PSA, including the mortgages, notes and assignments.  MLPA § 2.02.  U.S. Bank knew of these failures on the part of GCFP, but it failed to satisfy its contractual obligation to enforce GCFP's repurchase obligation.

87.     Finally, U.S. Bank knew—and alleged in a complaint filed in New York Supreme Court relating to Harborview 2005-10—that "it is not commercially plausible that Countrywide, who originated the Loans, and [Countrywide Servicing and BANA], who serviced the Loans, did not discover, or become aware of" pervasive breaches of representations and warranties.  The Harborview Trusts at issue in this action were issued within the same one-year span as Harborview 2005-10, and were backed by loans originated and serviced by Countrywide at the same time.  U.S. Bank therefore knew (or should have known) that Countrywide had independently discovered breaches throughout these five Harborview Trusts.  Such independent discovery of breaches triggered Countrywide's repurchase obligation, and U.S. Bank's obligation to enforce the Trusts' rights against Countrywide.  Notwithstanding this knowledge of Countrywide's obligation to repurchase, and its failure to do so, U.S. Bank took no steps to enforce Countrywide's repurchase obligations with respect to these five Trusts.

88.     U.S. Bank was incentivized not to act to enforce the Trusts' rights against GCFP, Countrywide  and Countrywide Servicing based on U.S. Bank's own conflicts of interest.  On information and belief, U.S. Bank's servicing arm committed many of the same imprudent and unlawful practices as Countrywide Servicing, and it was therefore not in U.S. Bank's interest

30

to draw attention to those practices.  In August 2011, U.S. Bank signed a consent decree with the Office of the Comptroller of the Currency  ("OCC") after the OCC found that U.S. Bank had engaged in unsafe and unsound foreclosure practices.  *See* Consent Order, *In re U.S. Bank National Association, et ano*, No. AA-EC-11-18 (OCC Aug. 2011).  As late as February 2016, U.S. Bank was still paying fines for violating the consent order by failing to institute servicing reforms in a timely fashion.  *See* Consent Order for a Civil Money Penalty, *In re U.S. Bank National Association*, No. AA-EC-2016-10 (OCC Feb. 2016). By August 2012, U.S. Bank was engaged in settlement discussions with the Department of Justice to settle allegations that it engaged in improper foreclosure practices, and had set aside $130 million to pay fines related to its foreclosure practices.  Jon Prior, US Bank sets aside $130 million for potential mortgage servicing settlement, *Housing Wire* (Aug. 9, 2012), *available at* http://www.housingwire.com/ articles/us-bank-sets-aside-130-million-potential-mortgage-servicing-settlement.  Alerting certificateholders and Ambac to deficiencies in Countrywide Servicing's servicing practices would have required U.S. Bank to take a position potentially contrary to its own legal interests in dealings with regulators.

89.     U.S. Bank was also an originator of mortgage loans in the lead-up to the financial crisis and—like Countrywide—the loans it sold to various third parties were the subject of repurchase demands.  By June 2014 ,U.S. Bank agreed to pay the Department of Justice $200 million to resolve allegations that it violated the False Claims Act by knowingly originating and underwriting FHA-insured mortgage loans that did not meet applicable requirements.  Settlement Agreement, *available at* https://www.justice.gov/iso/opa/resources/ 125201463012554782206.pdf.  U.S. Bank admitted that in its own origination process it failed to meet requirements such as verification of rent or mortgage payment history, documentation of

borrower employment and income, and verification of borrower assets—deficiencies strikingly similar to Countrywide's.  *See* Settlement Agreement Statement of Facts, *available at* https://www.justice.gov/iso/opa/resources/834201463012640526448.pdf.  Pursuing claims against Countrywide for breaches of representations and warranties on the Harborview Trusts in 2010 and 2011 could have drawn attention to what the DOJ called U.S. Bank's own "lax underwriting" and failure to give notice of the defective loans it originated.  *See* Dep't of Justice, U.S. Bank to Pay $200 Million to Resolve Alleged FHA Mortgage Lending Violations (June 30, 2014), *available at*  https://www.justice.gov/opa/pr/us-bank-pay-200-million-resolve-alleged-fha-mortgage-lending-violations.  At the same time, U.S. Bank needed to maintain a good relationship with RMBS sponsors and originators so as not to lose out on business for its asset-backed trustee arm.  All of these conflicts contributed to U.S. Bank's failure to abide by its obligations to enforce the obligations of GCFP, Countrywide, and Countrywide Servicing.

## V.    Harm to Ambac

90.    Countrywide's systemic breaches of the representations it made about the quality and creditworthiness of loans included in the Harborview Trusts and Countrywide and GCFP's failure to properly transfer complete mortgage files to the Trusts resulted in loan pools that are vastly riskier than the pools Ambac agreed to insure, and Countrywide's failure to abide by its agreement to prudently service the loans contributed to the Trusts' losses.  U.S. Bank's failure to comply with its contractual, statutory, and common law duties to protect the Trusts' assets and enforce the Trusts' rights against GCFP, Countrywide and its affiliates has caused Ambac to suffer significant harm.  In the course of its statutory rehabilitation proceedings through the end of 2016, the Segregated Account has paid or accrued $333 million of claims under its Policies issued to the Trusts:

9595726

| Trust | Ambac Claims |
|-------|--------------|
| Harborview 2005-2 | $12 million |
| Harborview 2005-8 | $118 million |
| Harborview 2005-12 | $56 million |
| Harborview 2005-13 | $43 million |
| Harborview 2005-16 | $105 million |
| **Total** | **$333 million** |

Due to the high rate of delinquency and expected defaults, future borrower repayment shortfalls affecting the Trusts are likely, and Ambac also faces tens of millions of dollars in future claims.

91.     If Countrywide had complied with its contractual obligations to repurchase breaching loans by remitting the contractual repurchase price to the Trustee, Ambac would be made whole through the Trusts' "waterfall" of payment distributions, either because claims on the Policies would have been avoided or because it would be reimbursed for claim payments under the PSA provision entitling Ambac to be reimbursed for past draws on its Policies if the Trust receives recoveries on the securitized mortgage loans.

92.     Similarly, if U.S. Bank had filed suit on behalf of the Trusts, and Countrywide were ordered by a court to pay damages to the Trustee in an amount equivalent to its repurchase obligations, that sum would be deposited in the Trusts and distributed through the waterfall to Ambac and to certificateholders.  An appropriate settlement of such claims would have likewise been deposited in the Trusts and gone toward making Ambac and certificateholders whole.

93.     By allowing the statute of limitations to lapse on the Trusts' claims against Countrywide, U.S. Bank squandered its opportunity to obtain the compensation to which the Trusts are contractually entitled.  Because of U.S. Bank's failure, Ambac experienced claims on its Policies that would not have occurred, or, alternatively, would have been subsequently

reimbursed from recoveries against Countrywide, had U.S. Bank carried out the duties it owed to Trust beneficiaries.

## VI.     U.S. Bank's Improper Treatment of Trust Recoveries

94.     Ambac has also been harmed and will be further harmed by U.S. Bank's improper treatment of recoveries received by the Trusts.

95.     Under Section 5.01 of the PSAs, U.S. Bank must distribute "Recoveries" (amounts received in respect of defaulted mortgage loans that have already been liquidated) to certificateholders based on the "Class Certificate Principal Balance" of each class of certificates.

96.     However, prior to such distribution, under Section 5.08(a)(i) of the PSAs, U.S. Bank must increase (or "write up") the Class Certificate Principal Balances of each class of senior certificates (which includes the Insured Certificates) by the amount of any Recoveries, *pro rata* based on the Realized Loss previously allocated to each class of those certificates.

97.     The PSAs make clear that this writing up of Class Certificate Principal Balances based on Recoveries pursuant to Section 5.08 must occur prior to the actual distribution of those Recoveries pursuant to Section 5.01.  As noted above, Recoveries are distributed based on Class Certificate Principal Balance, a defined term under the PSAs.  The definition of "Class Certificate Principal Balance" begins with the Original Class Certificate Principal Balance and adds and subtracts certain items to arrive at the Class Certificate Principal Balance for that Distribution Date.  Certain parts of the definition make clear that items are subtracted based on the aggregate of all such amounts for "all prior Distribution Dates."  In contrast, clause (ii) of the proviso of the definition, which deals with the addition of Recoveries, has no such reference to prior Distribution Dates and reads: "pursuant to Section 5.08, the Class Certificate Principal Balance of a Class of Certificates may be increased up to the amount of Realized Losses previously allocated to such Class, in the event that there is a Recovery[.]"  Thus, the omission of

34

"all prior Distribution Dates" in this clause makes clear that the Class Certificate Principal Balance, as of any Distribution Date, that provides the basis for the distribution of Recoveries under Section 5.01 is the balance of each class of certificates after being written up based on those Recoveries under Section 5.08.

98.    U.S. Bank has not been writing up the Insured Certificates and distributing Recoveries according to these terms.  As indicated by remittance reports, U.S. Bank has indeed failed to write up the Class Certificate Principal Balance of the Insured Certificates based on Recoveries until after it had already distributed those Recoveries, in plain violation of the PSAs.

99.    In addition, U.S. Bank accounts for Recoveries incorrectly in two other respects.  First, U.S. Bank has written up the Class Certificate Principal Balance of the Insured Certificates incorrectly based only on the portion of the deferred Ambac policy claims, rather than all Realized Loss allocated to those certificates, as mandated by Section 5.08 of the PSAs. Second, U.S. Bank has offset Recoveries against Realized Loss incurred on other loans, which is not contemplated or permitted anywhere in the PSAs.

100.    U.S. Bank's failure to correctly account for Recoveries has already caused Ambac harm because it has impacted the amount and timing of insurance claims payments Ambac has paid and deferred.   If U.S. Bank's improper treatment of recoveries is not corrected, future Trust recoveries will also not be distributed properly.  Accordingly, Ambac seeks damages for any harm it has suffered as a result of U.S. Bank's prior improper treatment of Recoveries and a declaratory judgment that the PSAs require that Recoveries must be accounted for as set forth herein in order to avoid further harm.

## VII.    The No Action Clause Does Not Apply to This Suit Against U.S. Bank

101.    The no action clause in the PSAs does not apply to this lawsuit because the claims are brought against U.S. Bank as Trustee, not against a third party.  In addition, the

claims are brought directly by Ambac against U.S. Bank, not derivatively on behalf of the Trusts. Under New York law, compliance with a no action clause is excused in a suit brought by trust beneficiaries against a trustee for its own wrongdoing.  Additionally, no action clauses do not apply to claims brought against a trustee for breach of fiduciary duty or other extra-contractual duties.

102.    Further, even if demand were required, it would be futile for Ambac to make demand on U.S. Bank as it would be absurd to ask the Trustee to sue itself for its own misconduct.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Post-Event of Default)

103.    Ambac realleges and incorporates by reference paragraphs 1 through 102 of this Complaint.

104.    The PSAs for the Trusts are valid contracts that establish U.S. Bank's contractual duties and obligations, in its capacity as Trustee, to the Trusts, to Ambac, and to certificateholders.

105.    Ambac is an express third-party beneficiary of the PSAs in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce U.S. Bank's performance as Trustee.

106.    Under the PSAs, upon an Event of Default and while an Event of Default continues uncured, U.S. Bank must exercise the rights and powers vested in it under the PSAs, and shall exercise the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

107.    An Event of Default occurred shortly after the closing date of each Harborview Trust when Countrywide failed to cure or repurchase loans for which required

36

documentation in the Mortgage File was missing and for which Countrywide's warranty that it provided a complete Mortgage File was false. By virtue of its contractual obligation under the PSAs to review and certify the completeness of the Mortgage Files deposited in each Trust, U.S. Bank knew or should have known that Countrywide failed to perform its obligations under the MMLPSA, which constituted an Event of Default under the PSAs. The Events of Default on the Trusts have not been cured.

108.     Under the PSAs, U.S. Bank had the power to request loan files and other information from Countrywide, to demand that Countrywide repurchase breaching loans, and to file suit on behalf of the Trusts. Notwithstanding its contractual duty following an Event of Default to exercise all of the powers granted to it under the PSA with the same skill and care as a prudent person would use in managing that person's own affairs, U.S. Bank failed to investigate whether and to what extent Countrywide breached its other representations and warranties to the Trusts, failed to give Countrywide notice of its breaches, and failed to file suit within the limitations period—or obtain a tolling agreement—to enforce the Trusts' rights against Countrywide under the PSAs. These failures constituted breaches of U.S. Bank's contractual duties after an Event of Default.

109.     U.S. Bank's material breaches of the PSAs have caused and will continue to directly and proximately cause damage to the Trusts and to Ambac by depriving the Trusts of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets by failing to timely prosecute the Trusts' claims, depriving Ambac of reimbursement for past draws on the Policies and failing to recover funds that would have prevented future draws on the Policies.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

110.    Ambac realleges and incorporates by reference paragraphs 1 through 102 of this Complaint.

111.    Under New York law, after the occurrence of an Event of Default, U.S. Bank owed a fiduciary duty to the Trusts and to the Trusts' beneficiaries, including Ambac. This extra-contractual fiduciary duty encompasses an obligation to exercise all contractually conferred rights and powers in good faith and for the benefit of Ambac and of certificateholders to preserve the assets of the Trusts, including claims against third parties. It also encompasses a duty of loyalty, requiring U.S. Bank to prioritize the interests of the Trusts ahead of its own interests.

112.    An Event of Default occurred shortly after the closing date of each Harborview Trust when Countrywide failed to cure or repurchase loans for which required documentation in the Mortgage File was missing and for which Countrywide's warranty that it provided a complete Mortgage File was false. By virtue of its contractual obligation under the PSAs to review and certify the completeness of the Mortgage Files deposited in each Trust, U.S. Bank knew or should have known that Countrywide failed to perform its obligations under the MMLPSA, which constituted an Event of Default under the PSAs. The Events of Default on the Trusts have not been cured.

113.    Notwithstanding its fiduciary duty following an Event of Default, U.S. Bank did not act with undivided loyalty to the Trusts and their beneficiaries and failed to act to secure the Trusts' assets. U.S. Bank prioritized its own interests, which favored inaction, over the interests of the Trusts. It failed to investigate whether and to what extent Countrywide breached its other representations and warranties to the Trusts, failed to give Countrywide notice of its breaches, and failed to file suit within the limitations period to enforce the Trusts' rights

38

against Countrywide under the PSAs.  These failures constituted breaches of U.S. Bank's fiduciary duty to preserve the Trusts' assets and to act with undivided loyalty for the Trusts' beneficiaries, including Ambac.

114.    U.S. Bank's breaches of fiduciary duty have caused and will continue to directly and proximately cause damage to the Trusts and to Ambac by depriving the Trusts of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets by failing to timely prosecute the Trusts' claims, depriving Ambac of reimbursement for past draws on the Policies and failing to recover funds that would have prevented future draws on the Policies.

### THIRD CAUSE OF ACTION
#### (Violation of the Streit Act)

115.    Ambac realleges and incorporates by reference paragraphs 1 through 102 of this Complaint.

116.    As insurer of New York Trusts and subrogee of certificateholders in New York Trusts, Ambac is a Trust beneficiary entitled to the protections under the Streit Act, N.Y. Real Prop. Law § 124 *et seq.*  The purpose of the Streit Act is to provide for the regulation and supervision of trusts concerning real property to ensure that trust assets will be properly conserved and administered.

117.    The certificates issued by the five Harborview Trusts are "mortgage investments," the PSAs underlying and establishing the Trusts are each an "indenture," and U.S. Bank is a "trustee" under the Streit Act.  *See* N.Y. Real Prop. Law § 125(1), (3).

118.    Section 126(1) of the Streit Act requires that upon an event of default, the indenture trustee must exercise such of the rights and powers vested in the trustee by such

39

instrument, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

119.    An Event of Default occurred shortly after the closing date of each Harborview Trust when Countrywide failed to cure or repurchase loans for which required documentation in the Mortgage File was missing and for which Countrywide's warranty that it provided a complete Mortgage File was false.  By virtue of its contractual obligation under the PSAs to review and certify the completeness of the Mortgage Files deposited in each Trust, U.S. Bank knew or should have known that Countrywide failed to perform its obligations under the MMLPSA, which constituted an Event of Default under the PSAs.  The Events of Default on the Trusts have not been cured.

120.    U.S. Bank failed to investigate whether and to what extent Countrywide breached its other representations and warranties to the Trusts, failed to give Countrywide notice of its breaches, and failed to file suit within the limitations period to enforce the Trusts' rights against Countrywide under the PSAs.  These failures constituted breaches of U.S. Bank's obligation under the Streit Act to act as a prudent person following an event of default.

121.    U.S. Bank's violation of the Streit Act have caused and will continue to directly and proximately cause damage to the Trusts and to Ambac by depriving the Trusts of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets by failing to timely prosecute the Trusts' claims, depriving Ambac of reimbursement for past draws on the Policies and failing to recover funds that would have prevented future draws on the Policies.

9595726

## FOURTH CAUSE OF ACTION
### (Breach of Contract – Pre-Event of Default)

122.    Ambac realleges and incorporates by reference paragraphs 1 through 102 of this Complaint.

123.    The PSAs for the Trusts are valid contracts that establish U.S. Bank's contractual duties and obligations, in its capacity as Trustee, to the Trusts, to Ambac, and to certificateholders.

124.    Ambac is an express third-party beneficiary of the PSAs in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce U.S. Bank's performance as Trustee.

125.    Under the PSAs, U.S. Bank must give Countrywide prompt notice when U.S. Bank discovers or is notified of a breach of Countrywide's representations and warranties. If Countrywide fails to cure or repurchase breaching loans, U.S. Bank must enforce Countrywide's repurchase obligations.

126.    U.S. Bank failed to give Countrywide notice when U.S. Bank learned of breaches of Countrywide's representations and warranties, including but not limited to through the interim and final certifications U.S. Bank was required to provide setting forth documents missing from the Mortgage Files.

127.    U.S. Bank also failed to take any action, including legal action, to force Countrywide to repurchase loans that breached representations and warranties where Countrywide had received notice of breaches or independently discovered breaches, yet failed to cure or repurchase the breaching loans.

128.    U.S. Bank's material breaches of the PSAs have caused and will continue to directly and proximately cause damage to the Trusts and to Ambac by depriving the Trusts of

valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets by failing to timely prosecute the Trusts' claims, depriving Ambac of reimbursement for past draws on the Policies and failing to recover funds that would have prevented future draws on the Policies.

### FIFTH CAUSE OF ACTION
### (Declaratory Judgment)

129.     Ambac realleges and incorporates by reference paragraphs 1 through 102 of this Complaint.

130.     Under Section 5.08(a)(i) of the PSAs, on any Distribution Date, the Class Certificate Principal Balance of each class of senior certificates (including the Insured Certificates) must be increased *pro rata* (based on Realized Losses previously allocated to such certificates) by the amount of any Recoveries received with respect to such Distribution Date. Thereafter, under Section 5.01 of the PSAs, on such Distribution Date, U.S. Bank must distribute those Recoveries to certificateholders based on the written-up Class Certificate Principal Balance of each class of certificates.

131.     Under the PSAs, with respect to any Distribution Date, Class Certificate Principal Balance increases pursuant to Section 5.08 must occur prior to the distribution of Recoveries under Section 5.01.  Further, under the PSAs U.S. Bank is not permitted to offset such Recoveries against current period Realized Losses incurred on other mortgage loans.

132.     In addition, under the PSAs, U.S. Bank must write up the Class Certificate Principal Balance of the Insured Certificates based on all Realized Loss allocated to those certificates, not on the portion of the deferred Ambac policy claims.

133.     U.S. Bank has not followed the treatment of Recoveries described above.

134.    A real and justiciable controversy exists over U.S. Bank's treatment of Recoveries under the PSAs.  Accordingly, Ambac seeks a declaration that U.S. Bank must account for and distribute Recoveries under the PSAs as described in this Complaint.

## SIXTH CAUSE OF ACTION
### (Breach of Contract – Distribution of Recoveries)

135.    Ambac realleges and incorporates by reference paragraphs 1 through 102 of this Complaint.

136.    The PSAs are valid contracts that establish U.S. Bank's contractual duties and obligations, in its capacity as Trustee, to the Trusts, to Ambac, and to certificateholders.

137.    Ambac is an express third-party beneficiary of the PSAs in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce U.S. Bank's performance as Trustee.

138.    Under Section 5.08(a)(i) of the PSAs, on any Distribution Date, the Class Certificate Principal Balance of each class of senior certificates (including the Insured Certificates) must be increased *pro rata* (based on Realized Losses previously allocated to such certificates) by the amount of any Recoveries received with respect to such Distribution Date. Thereafter, under Section 5.01 of the PSAs, on such Distribution Date, U.S. Bank must distribute those Recoveries to certificateholders based on the written-up Class Certificate Principal Balance of each class of certificates.

139.    Under the PSAs, with respect to any Distribution Date, Class Certificate Principal Balance increases pursuant to Section 5.08 must occur prior to the distribution of Recoveries under Section 5.01.  Further, under the PSAs U.S. Bank is not permitted to offset such Recoveries against current period Realized Losses incurred on other mortgage loans.

140.    In addition, under the PSAs, U.S. Bank must write up the Class Certificate Principal Balance of the Insured Certificates based on all Realized Loss allocated to those certificates, not on the portion of the deferred Ambac policy claims.

141.    U.S. Bank has not followed the treatment of Recoveries described above.

142.    U.S. Bank's material breaches of the PSAs by failing to correctly account for Recoveries have caused Ambac harm by impacting the amount and timing of insurance claims payments Ambac has paid and deferred.

## JURY DEMAND

143.    Ambac demands a trial by jury pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Ambac respectfully prays for the following relief:

A.    An award of all appropriate damages in favor of Ambac and against U.S. Bank for damages sustained as a result of U.S. Bank's breaches and violations, in an amount to be determined at trial, including any applicable pre- and post-judgment interest;

B.    A declaration that U.S. Bank must treat Recoveries under the PSAs in the manner set forth in this Complaint; and

C.    Any other relief that the Court deems just and proper.

44

Dated:          New York, New York
                April 11, 2017

                                    PATTERSON BELKNAP WEBB & TYLER LLP

                                    /s/ Peter W. Tomlinson_____
                                    Peter W. Tomlinson
                                    Stephanie Teplin
                                    W. Robert Fair
                                    1133 Avenue of the Americas
                                    New York, New York 10036-6710
                                    Telephone:  (212) 336-2000
                                    Fax:  (212) 336-2222
                                    pwtomlinson@pbwt.com
                                    steplin@pbwt.com
                                    rfair@pbwt.com

                                    *Attorneys for Plaintiffs Ambac Assurance
                                    Corporation and the Segregated Account of Ambac
                                    Assurance*

9595726