UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
AMBAC ASSURANCE                        :
CORPORATION,                           :
                                       :
                   Plaintiff,          :          17cv2614
                                       :
         -against-                     :          <u>OPINION & ORDER</u>
                                       :
U.S. BANK NATIONAL ASSOCIATION,        :
                                       :
                   Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, Senior United States District Judge:

   Ambac Assurance Corporation ("Ambac") filed this action to recover damages

arising from U.S. Bank National Association's ("U.S. Bank") alleged failure to satisfy its

contractual and fiduciary duties as trustee for five residential mortgage-backed securities

("RMBS") trusts insured that Ambac insured.  U.S. Bank moves to stay this action under the

<u>Colorado River</u> doctrine based on two sets of pending state court actions.  In the alternative, it

seeks to dismiss Ambac's Streit Act claims, breach of fiduciary duty claims, and any breach of

contract claims that accrued prior to April 11, 2011.  For the reasons that follow, U.S. Bank's

motion to stay is denied, and its motion to dismiss is granted in part and denied in part.

BACKGROUND

   Roughly a decade after the collapse of the U.S. housing market plunged the nation

into economic crisis, litigation arising in its fallout continues to pit various permutations of

parties involved with the mortgage loan securitization process against each other—whether they

be investors, trustees, underwriters, originators, or other entities.  The most recent iteration seeks

to hold RMBS trustees responsible for defaulting on their contractual, statutory, and common-

law obligations to take action against mortgage originators and sponsors for breaches of the governing trust documents.

The mortgage loan securitization process has been described in myriad New York state and federal cases.  E.g., ACE Secs. Corp. v. DB Structured Prods., Inc., 36 N.E.3d 623, 625 (N.Y. 2015).  In broad strokes, the process begins when a lender (the "Originator") originates mortgage loans and sells its interest in those loans to another financial institution (the "Sponsor"), which pools the loans and transfers the loan pools to a special purpose vehicle (the "Depositor").  The Depositor then conveys the loan pools to a trust, which subsequently issues certificates (i.e., RMBS) backed by cashflows from payments made by borrowers of the underlying mortgage loans.  Because investors who purchase the certificates essentially purchase entitlements to these payments, their rate of return ultimately turns on the creditworthiness of the loans and the borrowers' ability to repay them.  The certificates are also divided into tranches, or classes, that correspond to different payment priorities.  To protect investors against the risk of insufficient payments by borrowers, insurers like Ambac issued policies guaranteeing payments on those certificates in exchange for a premium.

While the passage of time has increasingly exposed the arcana of RMBS to the public eye, this Court nonetheless reviews the pertinent allegations of the Amended Complaint ("Complaint"), which are presumed true for purposes of this motion.

I.      Creation and Operation of the RMBS Trusts

U.S. Bank is the trustee of the five RMBS trusts at issue in this action: Harborview Mortgage Loan Trust ("Harborview") 2005-2, Harborview 2005-8, Harborview 2005-12, Harborview 2005-13, and Harborview 2005-16 (the "Trusts").  (Compl., ECF No. 62, ¶ 1.)  The Trusts are backed by loans originated and sold by Countrywide Home Loans Inc.

("Countrywide"). (Compl. ¶¶ 19, 24.) As part of the securitization process, Countrywide sold its interest in the loans for all five Trusts to the sponsor of the securitizations, Greenwich Capital Financial Products, Inc. ("Greenwich"), pursuant to a Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA"). (Compl. ¶ 24.)

In the MMLPSA, Countrywide assumed obligations to Greenwich and made a number of representations and warranties relating to the quality and characteristics of the loans, including that the loans were underwritten in accord with guidelines relating to the borrower's ability to repay and the quality of the loan collateral, that the loans were originated without fraud, that the loans were described accurately in the Mortgage Loan Schedule, and that complete loan files were delivered to the designated custodian. (Compl. ¶¶ 25-31.) If Countrywide breached its representations and warranties, the MMLPSA generally required Countrywide to cure or repurchase the breaching loan. (Compl. ¶ 29.) Finally, under the MMLPSA, Countrywide also retained the right to service the loans, although it subsequently assigned that right to Countrywide Home Loans Servicing ("Countrywide Servicing").[1] (Compl. ¶ 32.)

To complete the mortgage loan securitization process, Greenwich pooled the loans and transferred the loan pools to the depositor pursuant to a Mortgage Loan Purchase Agreement ("MLPA"), which then conveyed the loans to the Trusts pursuant to a Pooling and Servicing Agreement ("PSA"). (Compl. ¶¶ 33-34.) Under these agreements, Greenwich assigned its rights against Countrywide and Countrywide Servicing to U.S. Bank, which obliged U.S. Bank as trustee to enforce the Countrywide entities' obligations and Countrywide's representations and warranties for the benefit of the Trusts and their beneficiaries. (Compl. ¶¶ 25, 34-35.) In Reconstituted Servicing Agreements ("RSAs"), Countrywide and

---

[1]    Countrywide Home Loans Servicing LP was later acquired by Bank of America and renamed before ultimately merging with Bank of America. (See Compl. ¶ 32.)

Countrywide Servicing acknowledged these assignments of rights to U.S. Bank, and

Countrywide also restated the representations and warranties it made in the MMLPSA. (Compl.

¶ 36.) Each transaction closed between April and November of 2005. (Compl. ¶ 38.)

II.     The Instant Action

Ambac is a monoline insurer that issued financial guaranty insurance policies

guaranteeing principal and interest payments to certain classes of certificates in exchange for a

premium. (Compl. ¶¶ 19, 38.) Ambac is an express trust beneficiary under the PSAs, which also

vest Ambac with the right to exercise the rights of insured certificateholders. (Compl. ¶ 39.) In

relevant part, Ambac contends that U.S. Bank, as trustee of the five Trusts, violated an array of

contractual, statutory, and common-law obligations owed to Ambac as trust beneficiary, both

before and after Events of Default ("EOD").[2] (See Compl. ¶¶ 52-90.)

A.     U.S. Bank's Obligations

Prior to an Event of Default, U.S. Bank had an obligation under the PSAs to

acquire and protect trust assets for the benefit of all certificateholders. (Compl. ¶ 42.) Thus,

U.S. Bank was required to certify that it received complete mortgage loan files to ensure that the

Trust legally owned the loan and U.S. Bank had standing to institute a foreclosure action if the

borrower defaulted. (Compl. ¶¶ 28, 34, 43, 56-57.) The PSAs also imposed a duty on U.S. Bank

to enforce Countrywide's obligation to cure or repurchase loans that breached its contractual

representations and warranties, Greenwich's obligation to deliver complete loan files to the

Trusts, and Countrywide Servicing's obligation to service the loans properly. (Compl. ¶ 44.)

Finally, Ambac alleges that U.S. Bank owed a pre-EOD duty to Trust beneficiaries to fulfill its

---

[2]     Ambac also asserts claims for damages and declaratory relief based on U.S. Bank's failure to abide by the
PSAs' terms that govern distribution of recoveries received by the Trusts. (See Compl. ¶¶ 95-101, 130-143.) The
merits of these claims are not the subject of U.S. Bank's motion to dismiss.

contractual obligations with due care.  (Compl. ¶ 46.)

An Event of Default occurs under the Trusts' PSAs when Countrywide or Countrywide Servicing fail to observe or perform their covenants or agreements under the MMLPSA after receiving written notice of such failure.  (Compl. ¶¶ 54, 63.)  After an Event of Default, the PSAs impose a heightened duty on U.S. Bank to "exercise such of the rights and powers vested in it by [the PSAs], and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." (Compl. ¶ 48 (citing language from the PSAs).)  Moreover, as Ambac alleges, U.S. Bank incurred heightened post-EOD duties under New York common law to act prudently and to act with undivided loyalty, along with the post-EOD duty under New York's Streit Act to act prudently.  (Compl. ¶¶ 49-50.)

B.  U.S. Bank's Alleged Breaches

U.S. Bank's purported dereliction of its duties as RMBS trustee began even before Events of Default occurred.  Like other financial institutions who had a hand in different parts of the RMBS securitization process, U.S. Bank originated, underwrote, and serviced mortgage loans in addition to serving as an RMBS trustee.  (Compl. ¶¶ 89-90.)  But U.S. Bank had also entered into agreements with federal regulators to settle allegations of its improper origination, underwriting, and servicing practices.  According to Ambac, U.S. Bank's misfeasance in its loan origination, underwriting, and servicing practices incentivized inaction as trustee in enforcing the Trusts' rights against Greenwich, Countrywide, and Countrywide Servicing to avoid scrutiny of its own conduct and maintain good relationships with its counterparties.  (Compl. ¶¶ 89-90.)  Thus, U.S. Bank reneged on its contractual duties under the PSAs by failing to enforce Countrywide's and Greenwich's obligations to cure or repurchase

breaching loans, even though Countrywide and U.S. Bank knew or should have known of deficiencies in the loans. Specifically, Countrywide had been notified of breaches in the loans backing the Harborview 2005-8 Trust, U.S. Bank had known that certain loan files were missing documents and that Greenwich failed to deliver complete mortgage loan files to the Trusts, and U.S. Bank knew or should have known about breaches in loans backing the Harborview 2005-10 trust. (Compl. ¶¶ 83-88.)

Additionally, Ambac alleges breaches of its heightened contractual and fiduciary post-EOD obligations premised on U.S. Bank's failure to investigate Countrywide's breaches of representations and warranties, to enforce contractual remedies as to breaching loans, and to timely bring hundreds of millions of dollars of claims against Countrywide, despite knowing or having reason to know that the loans backing the Trusts did not conform to Countrywide's representations and warranties. (See Compl. ¶¶ 74, 81-82.) Specifically, U.S. Bank failed to act despite (1) having actual knowledge since no later than 180 days after the closing date of the transactions of Events of Default based on Countrywide's failure to deliver complete mortgage files as required by the MMLPSA, (Compl. ¶¶ 53-62); (2) having reason to know of Events of Default based on Countrywide Servicing's rampant servicing misconduct in breach of the MMLPSA, (Compl. ¶¶ 63-71); (3) having actual knowledge of Countrywide's failure to repurchase certain breaching loans in the Harborview 2005-8 Trust for which U.S. Bank had already provided notice to Countrywide, (Compl. ¶¶ 72-73); and (4) having reason to know since at least 2011 that the Trusts likely contained breaching loans based on extensive losses experienced by the Trusts as well as lawsuits brought against Countrywide alleging widespread breaches in Countrywide loans originated in the same time period as the loans backing the Trusts. (Compl. ¶¶ 75-80.)

Ultimately, U.S. Bank's abdication of its contractual, statutory, and common-law obligations to protect Trust assets and enforce the Trusts' rights depleted those assets and deprived the Trusts of recoveries, which in turn caused Ambac to pay or accrue over $300 million in claims under the policies it issued to the Trusts.  (Compl. ¶¶ 91, 110, 115, 122.)  If U.S. Bank had fulfilled its duties, then Ambac would have avoided claims under the policies or been reimbursed through recoveries deposited into the Trusts stemming from breaching mortgage loans.  (Compl. ¶¶ 92-94.)

DISCUSSION

I.    <u>Motion to Stay</u>

A.  <u>Colorado River Abstention</u>

The lion's share of the parties' briefing centers on the applicability of the <u>Colorado River</u> abstention doctrine.  As a well-settled precept, abstention is "generally disfavored, and federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction."  <u>Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.</u>, 673 F.3d 84, 100 (2d Cir. 2012) (citation omitted); <u>see also</u> <u>Woodford v. Cmty. Action Agency of Greene Cty., Inc.</u>, 239 F.3d 517, 522 (2d Cir. 2001) (describing abstention as "compris[ing] a few extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction").  Thus, "as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'"  <u>Colo. River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976).

Notwithstanding this general rule, a federal court may in "exceptional circumstances" decline or postpone the exercise of its jurisdiction "when parallel state-court litigation could result in 'comprehensive disposition of litigation' and abstention would conserve

judicial resources." <u>Niagara Mohawk Power Corp.</u>, 673 F.3d at 100 (quoting <u>Colo. River</u>, 424 U.S. at 813, 817-18). The doctrine is to be applied "in a pragmatic, flexible manner with a view to the realities of the case at hand." <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 21 (1983). Further, the "burden of persuasion rest[s] on the party opposing the exercise of federal jurisdiction." <u>Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of N.Y.</u>, 762 F.2d 205, 210 (2d Cir. 1985).

   As a threshold matter, the court must find that the concurrent federal and state proceedings are parallel. <u>Dittmer v. Cty. of Suffolk</u>, 146 F.3d 113, 118 (2d Cir. 1998). Proceedings are parallel when "substantially the same parties are contemporaneously litigating substantially the same issue in another forum." <u>Dittmer</u>, 146 F.3d at 118 (quotation mark and citation omitted); <u>accord</u> <u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Karp</u>, 108 F.3d 17, 22 (2d Cir. 1997) ("Federal and state proceedings are 'concurrent' or 'parallel' for purposes of abstention when the two proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same."). Courts in this Circuit have also recognized that "[p]erfect symmetry of parties and issues is not required." <u>Shields v. Murdoch</u>, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (quoting <u>In re Comverse Tech., Inc.</u>, 2006 WL 3193709, at *2 (E.D.N.Y. Nov. 2, 2006)). Nonetheless, "resolution of the state action must 'dispose <u>all</u> claims presented in the federal case.'" <u>DDR Constr. Servs., Inc. v. Siemens Indus., Inc.</u>, 770 F. Supp. 2d 627, 644 (S.D.N.Y. 2011) (emphasis in original). Finally, "[a]ny doubt regarding the parallel nature of a federal and state action should be resolved in favor of the exercise of federal jurisdiction." <u>Shields</u>, 891 F. Supp. 2d at 577 (citation and quotation mark omitted).

   If the court determines that the federal and state actions are parallel, it then

considers the following factors in determining whether to abstain, with the balance heavily weighted in favor of exercising jurisdiction: (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights. Niagara Mohawk Power Corp., 673 F.3d at 100-01; see also Vill. of Westfield v. Welch's, 170 F.3d 116, 121 (2d Cir. 1999).

   B. Whether the State Court Proceedings Are Parallel

   Here, U.S. Bank moves to stay this action under the Colorado River doctrine based on two sets of actions pending in New York state court: (1) Ambac Assurance Corp., et al. v. Countrywide Home Loans, Inc., et al., No. 653979/2014 (N.Y. Sup. Ct.) (the "2014 Countrywide Action") and Ambac Assurance Corp., et al. v. Countrywide Home Loans, Inc., No. 652321/2015 (N.Y. Sup. Ct.) (the "2015 Countrywide Action," and together with the 2014 Countrywide Action, the "Countrywide Actions");[3] and (2) Blackrock Balanced Capital Portfolio (FI), et al. v. U.S. Bank National Association, No. 652204/2015 (N.Y. Sup. Ct.) (the "Blackrock Action").

   The antecedent question is whether, as U.S. Bank frames it, a court may

---

[3]     Ambac filed the 2014 Countrywide Action, which involves one of the Trusts as well as several other trusts, on December 30, 2014.  That same day, it filed an action including the remaining four Trusts against Countrywide in Wisconsin state court (the "Wisconsin Countrywide Action").  Amid Countrywide's challenges to the Wisconsin court's personal jurisdiction, Ambac filed a substantially similar "placeholder" action including those four Trusts in New York state court (i.e., the 2015 Countrywide Action).  The 2015 Countrywide Action was stayed pending state appellate review of the Wisconsin trial court's dismissal of the Wisconsin Countrywide Action on personal jurisdiction grounds.  (See Declaration of Louis A. Chaiten in Support of U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 39 ("Chaiten Decl."), Ex. C.)  On December 14, 2017, the Wisconsin Court of Appeals affirmed the dismissal.  Regardless of the effect of the dismissal of the Wisconsin Countrywide Action on the 2015 Countrywide Action, however, this Court's conclusion remains the same.

"measur[e] parallelism by reference to multiple state suits." (See Reply Memorandum of Law in Support of U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 48 ("U.S. Bank's Reply"), at 3.) Certainly, courts have done so. See, e.g., Smulley v. Mutual of Omaha Bank, 634 F. App'x 335, 336 (2d Cir. 2016) (summary order) (recounting that the district court "decided to abstain in light of four pending state actions arising from the same facts"); Telesco v. Telesco Fuel & Masons' Materials, Inc., 765 F.2d 356, 360 (2d Cir. 1985) (reviewing the propriety of dismissal based on two state proceedings). But such a superficial comparison elides an important distinction—in Smulley and Telesco, for example, at least one of the state proceedings included some commonality of plaintiffs and defendants with the federal action. See Smulley, 634 F. App'x at 337; Telesco, 765 F.2d at 358. Here, neither the Countrywide Actions nor the Blackrock Action shares an overlap of both plaintiffs and defendants with this action—instead, U.S. Bank seeks to draw parties from both sets of actions to cobble together a parallel state proceeding. Accordingly, this Court analyzes whether each set of state actions is a concurrent or parallel proceeding in turn.

      1.  The Countrywide Actions

The Countrywide Actions are fraudulent inducement actions brought by Ambac against an originator, Countrywide,[4] which at bottom allege that Countrywide misrepresented the quality of its collateral to induce Ambac into insuring the trusts. U.S. Bank contends that the Countrywide Actions are parallel because taken together, they concern the same trusts, the same misconduct by Countrywide with respect to its breaches of representations and warranties, and the same question of whether Countrywide must reimburse Ambac for the insurance payments it

---

[4]      The 2014 Countrywide Action names Countrywide, Countrywide Securities Corporation, Countrywide Financial Corporation, and Bank of America Corporation as defendants, while the 2015 Countrywide Action names only Countrywide as a defendant. This distinction is immaterial to this Court's analysis.

made.  Ambac counters that there is no commonality of parties because the defendants in the Countrywide Actions do not overlap with the Defendant here, and the Countrywide Actions principally concern Countrywide's misrepresentations to Ambac.

This Court concludes that the Countrywide Actions are not parallel proceedings that would warrant <u>Colorado River</u> abstention.  The core of the Countrywide Actions concerns Countrywide's misrepresentations about the loans it originated and its practices regarding origination, underwriting, and quality control.  Those misrepresentations, which Countrywide made in meetings, public statements, and prospectus supplements, are alleged to have fraudulently induced Ambac into issuing the policies.  (<u>See</u> Declaration of Louis A. Chaiten in Support of U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 39 ("Chaiten Decl."), Ex. A ("Wisconsin Countrywide Action Compl.") ¶¶ 30, 47-73, 171-184; Chaiten Decl. Ex. B ("2014 Countrywide Action Compl.") ¶¶ 15, 42-82, 210-223.)

To be sure, the Countrywide Actions implicate the same representations and warranties by Countrywide that Ambac allegedly considered in deciding whether to insure the Trusts.  (<u>Compare</u> Wisconsin Countrywide Action Compl. ¶¶ 178-179, 187; 2014 Countrywide Action Compl. ¶ 217-218, 226, <u>with</u> Compl. ¶ 25.)  But the focus of this action is whether U.S. Bank failed to perform its obligations as trustee based on U.S. Bank's actual or constructive knowledge of Countrywide's breaches of those representations and warranties.  <u>See</u> <u>Dittmer</u>, 146 F.3d at 118 (commonality in subject matter or overlap of issues is insufficient standing alone for abstention).  Thus, even though "both actions arise out of a similar set of circumstances," this action and the Countrywide Actions are not parallel because "the nature of the claims" in question differs.  <u>See</u> <u>DDR Constr. Servs., Inc.</u>, 770 F. Supp. 2d at 645 (quotation mark omitted). Framed differently, it is not substantially likely that the disposition of the Countrywide Actions

would resolve the claims in this case. Even if, for example, the Countrywide Actions result in a finding that Countrywide breached its representations and warranties, the factfinder in this action must nevertheless determine whether U.S. Bank fulfilled its obligations to provide notice and enforce contractual remedies.

Moreover, there is no identity of defendants between this action and the Countrywide Actions because U.S. Bank is not a party to the Countywide Actions, and Countrywide is not a party to this action. See Smulley, 634 F. App'x at 336-37 (holding that because "the only [remaining] defendant in the federal action . . . is not a party to any state action, there are no concurrent, 'parallel' actions in state court"); accord Sheerbonnet, Ltd. v. Am. Exp. Bank Ltd., 17 F.3d 46, 49-50 (2d Cir. 1994). U.S. Bank points to cases concluding that an inexact identity of parties does not vitiate parallelism "when the interests of the parties in each case are congruent." Phillips v. Citibank, N.A., 252 F. Supp. 3d 289, 298 (S.D.N.Y. 2017). However, those cases are distinguishable because the parties on the side for which no overlap existed shared virtually identical interests.

For example, in Canaday, homeless mothers with dependents sought injunctive relief requiring the City of New York to provide additional emergency shelter for homeless families. Canaday v. Koch, 608 F. Supp. 1460, 1464 (S.D.N.Y. 1985). While the Canaday plaintiffs were "technically not represented" in a state court proceeding brought by different homeless mothers with dependents seeking, inter alia, the same injunctive relief, the court found that such an injunction "would benefit Daisy Canaday no less than" a named plaintiff in the state court proceeding. Canaday, 608 F. Supp. at 1475. Similarly, in Congress Talcott, the court found that the individual defendant in the federal proceeding was "closely related" to a separate individual defendant and two entity defendants in the state proceeding where both individual

defendants were principals of one entity defendant and where the federal defendant was the president, secretary, and sole shareholder of the other entity.[5] Congress Talcott Corp. v. Roslin, 1996 WL 499337, at *3 (S.D.N.Y. Sept. 4, 1996). Here, by contrast, U.S. Bank fails to demonstrate that its interests are similarly aligned with those of Countrywide—a counterparty whose promises U.S. Bank was charged with enforcing—aside from a general interest in a judicial determination that Countrywide did not breach its representations and warranties. Accordingly, the Countrywide Actions are not concurrent proceedings.

    2.  The Blackrock Action

The Blackrock Action is brought by a putative class of investors who purchased certificates issued by 770 RMBS trusts—including the five Trusts at issue in this case—for which U.S. Bank serves as trustee. In sum, the investors seek damages arising from U.S. Bank's alleged failure to satisfy its fiduciary duties as well as its pre-EOD and post-EOD duties under the PSAs for the trusts. U.S. Bank contends that the Blackrock Action is a parallel proceeding because it involves the same defendant, same trusts, and same misconduct by Countrywide and U.S. Bank with respect to Countrywide's alleged breaches of representations and warranties. Ambac retorts that it is not a party to the Blackrock Action, that the scope of the Blackrock Action dwarfs that of this action, and that the Blackrock Action does not concern financial guarantors such as Ambac.

While a closer call than the Countrywide Actions, this Court likewise concludes that the Blackrock Action is not "essentially the same" as this action. Shields, 891 F. Supp. 2d at 577. U.S. Bank contends that the issues common to this action and the Blackrock Action—

---

[5]     As the court explained, Congress Talcott filed two "virtually identical" actions in state and federal court because it could not join the state defendants in the federal action without destroying diversity of citizenship, and because it did not wish to join the federal defendant in the state action "to avoid the burden of enforcing a New York judgment in New Jersey." Congress Talcott Corp., 1996 WL 399337, at *1, 3.

namely, whether U.S. Bank performed its contractual and common-law pre-EOD and post-EOD obligations for the Trusts—are sufficient to satisfy the threshold parallelism requirement. (See Memorandum of Law in Support of U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 38 ("U.S. Bank's Mem."), at 10-11.) But although courts in this Circuit have sometimes stated that parallelism is satisfied "when the main issue in the case is the subject of pending litigation," e.g., GBA Contracting Corp. v. Fid. & Deposit Co. of Md., 2001 WL 11060, at *1 (S.D.N.Y. Jan. 4, 2001); Weiser v. Koch, 632 F. Supp. 1369, 1386 (S.D.N.Y. 1986), the ongoing vitality of such a relaxed standard is questionable in the face of Circuit precedent explaining that actions are parallel or concurrent when substantially the same parties litigate substantially the same issues, see Dittmer, 146 F.3d at 118; Nat'l Union Fire Ins. Co., 108 F.3d at 22; accord Aurelius Capital Master, Inc. v. MBIA Ins. Corp., 695 F. Supp. 2d 68, 73 (S.D.N.Y. 2010) (explaining that "the threshold requirement is that there be a substantial identity of parties between the federal and state actions").

In other words, the Blackrock Action presents the mirror image of the obstacle that U.S. Bank faces with the Countrywide Actions in demonstrating an identity of parties. In particular, the only common party to this action and the Blackrock Action is U.S. Bank, the defendant in both actions. However, no overlap exists on the other side of the ledger—Ambac is not a plaintiff to the Blackrock Action, and none of the investor-plaintiffs in that action is a plaintiff here. Without "a substantial identity of parties between the federal and state actions," Colorado River abstention is unwarranted based on the Blackrock Action. Aurelius Capital Master, Inc., 695 F. Supp. 2d at 73 (declining to abstain based on a lack of overlap in plaintiffs); see also Gudge v. 109 Rest. Corp., 118 F. Supp. 3d 543, 548 (E.D.N.Y. 2015) (concluding that federal and state actions were not parallel in part because "[p]laintiff here is not a plaintiff in the

state case; nor are those plaintiffs in this case"); <u>Alliance of Am. Insurers v. Cuomo</u>, 854 F.2d 591, 603 (2d Cir. 1988) (finding that federal and state actions were not concurrent because the state plaintiff, an association whose members included the federal plaintiffs, was not a party to the federal action and the federal plaintiffs were not parties to the state actions).

While U.S. Bank again points to authority explaining that a "complete identity" or "perfect symmetry" of parties is unnecessary, the cases it cites for that proposition are distinguishable because they include at least some overlap of plaintiffs <u>and</u> defendants. <u>E.g.</u>, <u>Telesco</u>, 765 F.2d at 357-59; <u>Jenkinson v. Baptiste-Bruno</u>, 2016 WL 7377234, at *3 (S.D.N.Y. Dec. 20, 2016); <u>Pabco Constr. Corp. v. Allegheny Millwork PBT</u>, 2013 WL 1499402, at *2 (S.D.N.Y. Apr. 10, 2013); <u>Abercrombie v. Andrew Coll.</u>, 438 F. Supp. 2d 243, 245 (S.D.N.Y. 2006). Also unavailing is U.S. Bank's objection that Ambac cannot rely on its absence from the Blackrock Action because Ambac could have intervened in the Blackrock Action. (<u>See</u> U.S. Bank's Reply, at 3 (citing <u>Caisse Nationale de Credit Agricole v. Bank of Tokyo-Mitsubishi Tr. Co.</u>, 1997 WL 345216 (S.D.N.Y. June 20, 1997)).) In <u>Caisse Nationale</u>, the court observed that because the plaintiff could have intervened in the state court action, it was "reluctant to allow plaintiff's forum-shopping tactics to work in its favor in the abstention inquiry, which is equitable in nature." <u>Caisse Nationale</u>, 1997 WL 345216, at *6.

But <u>Caisse Nationale</u> is inapposite for at least two reasons. First, that discussion occurred in the context of whether <u>Colorado River</u> abstention would serve the interest of avoiding piecemeal litigation—not the threshold parallelism inquiry. <u>See</u> <u>Caisse Nationale</u>, 1997 WL 345216, at *6. Second, the court concluded that the "piecemeal litigation" factor "point[s] toward abstention only because of the peculiar circumstances of [that] case"—<u>i.e.</u>, because plaintiff "apparently sought to avoid the state forum" by commencing the federal action. <u>Caisse</u>

Nationale, 1997 WL 345216, at *6.  The mere filing of any lawsuit—whether in state or federal court—necessarily reflects a choice of forum.  But absent some indication that Ambac sought to avoid the state forum for an improper purpose, this Court is unpersuaded that the mere fact that Ambac could have intervened in the Blackrock Action should bear on the parallelism analysis.

Ultimately, applying Colorado River when the federal and state actions share no overlap in plaintiffs—as opposed to defendants—raises the additional concern of functionally depriving the federal plaintiff of its choice of forum.  Cf. Landis v. N. Am. Co., 299 U.S. 248, 255 (1936) ("Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.").  Because "[a]ny doubt regarding the parallel nature of a federal and state action should be resolved in favor of the exercise of federal jurisdiction," Shields, 891 F. Supp. 2d at 578 (quotation marks omitted), this Court declines to find that the Blackrock Action is parallel.  Since neither the Countrywide Actions nor the Blackrock Action are parallel proceedings, U.S. Bank's motion for a stay is denied.  See Shields, 891 F. Supp. 2d at 578 ("If a court finds that the federal and state cases are not parallel, 'Colorado River abstention does not apply, whether or not issues of state law must be decided by the federal court.'").

II.     Motion to Dismiss

The standard on a motion to dismiss under Rule 12(b)(6) is well settled.  To withstand dismissal, a pleading "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  Thus, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  Although the plausibility standard is "not akin to a 'probability requirement,' . . . it asks for

more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. In deciding a motion to dismiss under Rule 12(b)(6), a court must accept factual allegations as true and construe all reasonable inferences in the plaintiff's favor. ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

U.S. Bank contends that (1) Ambac's post-EOD breach of fiduciary duty claims should be dismissed on the merits and as time-barred; (2) the breach of contract claims that accrued prior to April 11, 2011 should be dismissed as time-barred; and (3) the Streit Act claims should be dismissed on the merits and as time-barred.[6] Each argument is addressed seriatim.

A.  Post-EOD Breach of Fiduciary Duty Claims

U.S. Bank asserts that Ambac's post-EOD breach of fiduciary duty claims must be dismissed because (1) they are duplicative of Ambac's breach of contract claims; (2) they are foreclosed by the economic loss rule; and (3) they are time-barred because they accrued more than three years before the filing of the original complaint.

1. Duplication of Breach of Contract Claims

Ambac alleges that U.S. Bank breached its heightened post-EOD duties to act prudently and in good faith to preserve the assets of the Trusts and to act with undivided loyalty to the Trusts and their beneficiaries. (Compl. ¶¶ 48-49, 112-115.) Specifically, Ambac premises these breaches on U.S. Bank's failure to investigate the extent of Countrywide's breaches of contractual representations and warranties, failure to notify Countrywide of those breaches, and failure to file suit against Countrywide within the limitations period to enforce the trusts' rights

---

[6]    U.S. Bank had also sought to dismiss all of Ambac's claims as time-barred based on its purported assignment of claims to the Segregated Account of Ambac Assurance Corporation (the "Segregated Account"), originally named as a plaintiff in this action. (See Memorandum of Law in Support of U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 38 ("U.S. Bank's Mem."), at 22.) On February 12, 2018, the Segregated Account merged with and into Ambac and ceased to exist. Consequently, the parties stipulated that U.S. Bank's arguments based on Ambac's assignment of claims to the Segregated Account be deemed withdrawn and that all other arguments be deemed to respond to the Complaint. (ECF No. 61.)

under the PSAs.  (Compl. ¶ 114.)  According to the Complaint, U.S. Bank's duty to act in the best interests of the Trusts and their beneficiaries was compromised by U.S. Bank's interest in maintaining good relationships with RMBS counterparties and avoiding scrutiny of its own origination, underwriting, and servicing practices.  (Compl. ¶¶ 89-90.)  U.S. Bank principally contends that the breach of fiduciary duty claims should be dismissed as duplicative of Ambac's breach of contract claims because they both "arise from the same contract-based allegations." (U.S. Bank's Mem., at 21.)

Under New York law, "a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." Phoenix Light SF Ltd. v. Bank of N.Y. Mellon ("Phoenix Light/BNY Mellon"), 2015 WL 5710645, at *6 (S.D.N.Y. Sept. 29, 2015).  Instead, a plaintiff must allege the breach of an independent legal duty that "spring[s] from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."[7] Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 194 (N.Y. 1987).  That the breach of fiduciary duty and breach of contract claims are premised on the same underlying conduct is of no moment.  Rather, "[i]it is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by the contract but which is independent of the contract itself." 37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Servs., LLC, 68 N.Y.S.3d 424, 427 (N.Y. App. Div. 2017).  Thus, a breach of fiduciary duty claim is "not subject to dismissal as duplicative" even if it "concerns some of the same underlying conduct as the breach of contract claim" so long as "the allegations concern a breach of a duty that is independent of the contract." 37 E. 50th St. Corp., 68 N.Y.S.3d at 427.

---

[7]     Of course, a defendant may also be liable for "tortious conduct separate and apart from its failure to fulfill its contractual obligations." N.Y. Univ. v. Cont'l Ins. Co., 662 N.E.2d 763, 767 (N.Y. 1995).

Applying these principles, this Court dismisses Ambac's claims for breach of fiduciary duty as duplicative to the extent that they are premised on U.S. Bank's post-EOD duties to act prudently and in good faith. Indeed, the PSAs impose on U.S. Bank a post-EOD duty to exercise its contractual rights and powers and "use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." (Compl. ¶ 48 (citing PSA § 8.01).) Because U.S. Bank's post-EOD duties to act prudently and in good faith are essentially "subsumed within the language of the PSAs . . . or else implied within their terms," they cannot form the basis for a breach of fiduciary duty claim. See Phoenix Light/BNY Mellon, 2015 WL 5710645, at *6 (citations omitted); accord Fixed Income Shares: £Series M v. Citibank N.A., 130 F. Supp. 3d 842, 857 (S.D.N.Y. 2015) (dismissing breach of fiduciary duty claim premised on substantially similar duty to "exercise its contractually conferred rights and powers in good faith").

On the other hand, U.S. Bank's post-EOD fiduciary duties of undivided loyalty "exist separate and apart from the post-EOD duties memorialized in the PSAs." Commerzbank AG v. U.S. Bank Nat'l Ass'n, 277 F. Supp. 3d 483, 497 (S.D.N.Y. 2017); accord BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011) (noting that after an event of default, "'fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries'" (citation omitted)). Because U.S. Bank's post-EOD duty of loyalty is independent of the PSAs, Ambac's breach of fiduciary duty claim is "not subject to dismissal as duplicative," even if the same underlying conduct undergirds both claims. 37 E. 50th St. Corp., 68 N.Y.S.3d at 427.

To clarify, some courts in this Circuit have observed that "conflict of interest

allegations are properly pled under a negligence cause of action, not a breach of fiduciary [duty] or breach of loyalty cause of action." See Phoenix Light/BNY Mellon, 2015 WL 5710645, at *7 (citations and quotation marks omitted). But a trustee's duty to avoid conflicts of interest is one of two exceptions to the general rule that before an event of default, "an indenture trustee's duty is governed solely by the terms of the indenture." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 191-92 (S.D.N.Y. 2011). This pre-EOD duty is not a fiduciary duty, but an "obligation[] whose breach may subject the trustee to 'tort liability.'" Ellington Credit Fund, Ltd., 837 F. Supp. 2d at 192 (citing AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co., 896 N.E.2d 61, 67 (N.Y. 2008)). Here, Ambac's breach of fiduciary duty claim is distinct because it is premised on the breach of the post-EOD duty of loyalty. See Ellington Credit Fund, Ltd., 837 F. Supp. 2d at 192 (citing Beck v. Mfrs. Hanover Tr. Co., 632 N.Y.S.2d 520, 527 (N.Y. 1995)) (explaining that following an event of default, an indenture trustee's obligations "come more closely to resemble those of an ordinary fiduciary").[8]

### 2. Economic Loss Rule

Under New York law, "'a tort action for economic loss will not lie' where the parties' relationship is governed by an express contract." Commerzbank, 277 F. Supp. 3d at 496 (citing BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013)). Courts in this District have split on the application of this so-called economic loss rule to

---

[8]      In its opposition brief, Ambac suggests that it has stated viable breach of fiduciary duty claims based on U.S. Bank's breach of its duty to carry out its contractual obligations with due care, irrespective of whether an Event of Default has occurred. (See Memorandum of Law in Opposition to U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 44 ("Ambac's Opp."), at 22 (citing Commerzbank AG, 277 F. Supp. 3d at 497-98).) Indeed, under New York law, an indenture trustee has a pre-EOD obligation to perform its non-discretionary ministerial tasks with due care. See Commerzbank AG, 277 F. Supp. 3d at 497. But like the trustee's pre-EOD obligation to avoid conflicts of interest, such an obligation is not construed as a fiduciary duty. Thus, the result in Commerzbank differs because the tort claims arising out of U.S. Bank's pre-EOD duty to perform ministerial tasks with due care were brought in that action as negligence and gross negligence claims—not breach of fiduciary duty claims. Nevertheless, because U.S. Bank does not appear to address this point in its opening or reply briefs, this Court need not proceed further.

breach of fiduciary duty claims against RMBS trustees.  See Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n ("Blackrock Series S"), 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017).  This schism centers on whether a defendant's alleged breach of extra-contractual legal duties is independently sufficient to foreclose application of the economic loss rule, or whether a plaintiff must also allege damages flowing from the tort claims that are independent of the damages flowing from the contract claims.

On one hand, some courts—including this one—have allowed breach of fiduciary duty claims to survive a motion to dismiss based on the economic loss rule solely on the basis that the plaintiff had adequately alleged an extra-contractual duty.  See Commerzbank, 277 F. Supp. 3d at 497; Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co. ("Phoenix Light/Deutsche Bank"), 172 F. Supp. 3d 700, 719 (S.D.N.Y. 2016) (framing the "dispositive issue [as] whether [the trustee] owed duties to the plaintiffs that were separate from the duties set forth in the [agreements]").  On the other hand, courts have dismissed breach of fiduciary duty claims even where the plaintiff had alleged an extra-contractual duty because the damages alleged "in connection with the breach of fiduciary duty claims arise entirely from defendants' obligations under the PSAs."  Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n ("Phoenix Light/U.S. Bank"), 2016 WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016); see also Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon, 2018 WL 1417850, at *7 (S.D.N.Y. Mar. 8, 2018); Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n ("Blackrock/U.S. Bank"), 165 F. Supp. 3d 80, 106 (S.D.N.Y. 2016); Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n ("NCUA/U.S. Bank"), 2016 WL 796850, at *11 (S.D.N.Y. Feb. 25, 2016).

Perhaps unsurprisingly, Ambac leans on Commerzbank, in which this Court found that the economic loss rule did not bar plaintiff's tort claims—including a similar breach

of fiduciary duty claim—that sufficiently alleged extra-contractual duties.  See Commerzbank AG, 277 F. Supp. 3d at 496.  U.S. Bank counters that even if Ambac adequately alleges the breach of an extra-contractual duty, the economic loss rule bars its breach of fiduciary duty claims because it seeks damages identical to its breach of contract claims.  (U.S. Bank's Mem., at 20; U.S. Bank's Reply, at 7.)  In other words, U.S. Bank urges dismissal because the requirement that a plaintiff must allege separate damages poses a "second, distinct barrier."  See Royal Park Investments SA/NV v. HSBC Bank USA, Nat'l Ass'n, 109 F. Supp. 3d 587, 599 (S.D.N.Y. 2015); Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 220 (S.D.N.Y. 2007).

After a fresh review of the relevant case authority, this Court sees no reason to depart from its prior conclusion in Commerzbank.  By way of background, the debate appears to stem from a sometimes inconsistent patchwork of state and federal decisions applying two related but distinct principles.  Cf. 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 750 N.E.2d 1097, 1101 n.1 (N.Y. 2001).  The first, adopted by the New York Court of Appeals in Schiavone Construction Company v. Mayo Corporation, 436 N.E.2d 1322 (N.Y. 1982), reversing on dissent at 439 N.Y.S.2d 933 (N.Y. App. Div. 1981), is generally referred to as the "economic loss rule."  In sum, the economic loss rule limits the end-purchaser of a product to contract remedies and precludes a recovery in tort for purely economic losses—without personal injury or property damage—against a manufacturer.  Finlandia Ctr., Inc., 750 N.E.2d at 1101 n.1; see also, e.g., Suffolk Laundry Servs., Inc. v. Redux Corp., 656 N.Y.S.2d 372, 374 (N.Y. App. Div. 1997).  The rule reflects the premise that "damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, unless a legal duty independent of the contract itself has been violated."  Suffolk

Laundry Servs., Inc., 656 N.Y.S.2d at 374; accord Kalimantano GmbH v. Motion in Time, Inc., 939 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2013) (same).

On the other hand, courts have also applied a so-called "economic loss doctrine." See, e.g., Cornelia Fifth Ave., LLC v. Canizales, 2017 WL 1034644, at *2 (S.D.N.Y. Mar. 16, 2017); King Cty., Wash. v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012), rev'd in part on other grounds, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012); Travelers Cas. & Sur. Co. v. Dormitory Auth.–State of N.Y., 734 F. Supp. 2d 368, 378 (S.D.N.Y. 2010). Under the economic loss doctrine, a defendant is not liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which "may arise from a special relationship[,] . . . to protect against the risk of harm to plaintiff." Finlandia Ctr., Inc., 750 N.E.2d at 1101, 1103 (dismissing negligence claims based solely on economic loss as "fall[ing] beyond the scope of the duty owed [plaintiffs] by defendants"). Like the economic loss rule, this doctrine rests on the principle that economic losses arising from injury to expectancy interests created by contract ought to be brought as contract claims, but also "reflects a policy interest in protecting defendants from disproportionate, and potentially limitless, liability." See Travelers Cas. & Sur. Co., 734 F. Supp. 2d at 378-79; Cornelia Fifth Ave., LLC, 2017 WL 1034644, at *3.

Here, Ambac's breach of fiduciary duty claim survives U.S. Bank's motion to dismiss regardless of which principle is applied. As discussed, the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff. Ambac has sufficiently alleged that U.S. Bank owes a fiduciary duty of undivided loyalty to the Trusts and their beneficiaries. See Commerzbank AG, 277 F. Supp. 3d at 497; BNP Paribas Mortg. Corp., 778 F. Supp. 2d at 401. As for the economic loss rule, this Court notes as an

initial matter that the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful.[9]  See IKB Deutsche Industriebank AG, 863 F. Supp. 2d at 301 (observing that in Finlandia, "the New York Court of Appeals cautioned that the 'economic loss rule' has no application outside the product-liability context"); Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co., 2017 WL 1383773, at *4 (S.D.N.Y. Apr. 12, 2017).

Similarly, courts in this District that have used an economic loss framework to bar breach of fiduciary duty claims against RMBS trustees have relied on the economic loss approach applied by the New York Court of Appeals in Bellevue South Associates.  See Phoenix Light/U.S. Bank, 2016 WL 1169515, at *9; Blackrock/U.S. Bank, 165 F. Supp. 3d at 106; NCUA/U.S. Bank, 2016 WL 796850, at *11.  That approach considers "[t]he nature of the defect, the injury, the manner in which the injury occurred[,] and the damages sought" in determining whether a plaintiff's remedy "lies in the enforcement of contract obligations."  See Bellevue S. Assocs. v. HRH Constr. Corp., 579 N.E.2d 195, 200 (N.Y. 1991).  But such an approach arose in the products liability context, and it is unlikely that the New York Court of Appeals would apply it here.  Cf. Finlandia Ctr., Inc., 750 N.E.2d 1097, 1101 n.1.

But even assuming that the economic loss rule applies outside product-liability cases, Ambac's allegations that U.S. Bank breached its extra-contractual duty of undivided loyalty suffice to foreclose application of the economic loss rule.  See Holborn Corp. v. Sawgrass Mut. Ins. Co., --- F. Supp. 3d ---, 2018 WL 485975, at *3 (S.D.N.Y. 2018) (recognizing an

---

[9]    Some New York courts have extended the economic loss rule outside the products-liability context to "limit the liability of providers of services as well as providers of products."  Bristol-Myers Squibb, Indus. Div. v. Delta Star, Inc., 620 N.Y.S.2d 196, 198-99 (N.Y. App. Div. 1994) (discussing architects, engineers, and builders for construction projects).  Of course, such an extension is arguably in tension with Second Circuit's recognition in dicta that the economic loss rule ought not to apply to "the limited class of cases involving liability for the violation of a professional duty."  Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 16 (2d Cir. 2000).  Nonetheless, the precise contours of this rule need not be delineated for this motion.

exception to the economic loss rule "where the defendant has a duty independent of contractual obligations" (quotation marks and citation omitted)); <u>Sackin v. TransPerfect Global, Inc.</u>, 278 F. Supp. 3d 739, 749 (S.D.N.Y. 2017) (same); <u>cf.</u> <u>Suffolk Laundry Servs., Inc.</u>, 656 N.Y.S.2d at 374 ("[D]amages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, <u>unless a legal duty independent of the contract itself has been violated</u>." (emphasis added)).

When applying state law, a court must "apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." <u>V.S. v. Muhammad</u>, 595 F.3d 426, 432 (2d Cir. 2010). To the extent that New York courts have applied the economic loss rule or economic loss doctrine outside the product liability context, they have appeared to eschew a rigid damages-based rule in favor of a policy-driven duty-focused analysis. <u>See</u> <u>IKB Deutsche Industriebank AG</u>, 863 F. Supp. 2d at 304 & n.126 (calling into doubt the court's prior holding in <u>Manhattan Motorcars</u> that an extra-contractual duty "does not allow evasion of the economic loss rule, which presents a second, distinct barrier"). Absent a pronouncement by the New York state courts to the contrary, this Court declines to require Ambac to disaggregate the damages arising from its breach of contract and breach of fiduciary duty claims at this stage in the proceedings. Ambac has sufficiently alleged that it was harmed as the result of the breach of a legal duty independent of the breach of a contractual obligation or harm to an expectancy interest created by contract in the first instance. Accordingly, U.S. Bank's motion to dismiss based on the economic loss rule is denied.

3. <u>Statute of Limitations</u>

"Although the statute of limitations is ordinarily an affirmative defense that must

be raised in the answer," such a defense "may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014); accord Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").

As a preliminary matter, neither party briefs the applicability of New York's borrowing statute, under which a cause of action that accrues outside of New York must be timely under the law of the state of accrual as well as New York law.  See N.Y. C.P.L.R. § 202. For purposes of the borrowing statute, a "cause of action accrues where the injury is sustained rather than where the defendant committed the wrongful acts."  Woori Bank v. Merrill Lynch, 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013) (quotation marks and citation omitted).  Where, as here, "an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."  Global Fin. Corp v. Triarc Corp., 715 N.E.2d 482, 485 (N.Y. 1999).  Ambac is alleged to maintain its principal place of business in New York.  (See Compl. ¶ 11.)  Therefore, it is considered a New York resident for purposes of New York's borrowing statute.  See Woori Bank, 923 F. Supp. 2d at 495 (collecting cases).  And because Ambac's injury occurred in New York, this Court applies New York's statutes of limitations.

This Court concludes—and the parties do not dispute—that a three-year statute of limitations governs Ambac's breach of fiduciary duty claims.  Under New York law, the limitations period for such a claim depends on two variables: (1) the type of relief sought; and (2) whether fraud is alleged.  First, claims seeking relief that is "equitable in nature" are governed by a six-year limitations period, while those seeking "purely monetary" relief are

subject to a three-year limitations period.  <u>See</u> <u>IDT Corp. v. Morgan Stanley Dean Witter & Co.</u>, 907 N.E.2d 268, 272 (N.Y. 2009).  Second, if an allegation of fraud is "essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations."  <u>IDT Corp.</u>, 907 N.E.2d at 272 (citing <u>Kaufman v. Cohen</u>, 760 N.Y.S.2d 157 (N.Y. App. Div. 2003)).  Here, while Ambac seeks declaratory relief relating to U.S. Bank's treatment of recoveries received by the Trusts, such relief is incidental to the money damages that Ambac principally seeks.  <u>See</u> <u>IDT Corp.</u>, 907 N.E.2d at 272 (admonishing courts to "look[] to the reality, rather than the form, of [the] action" in determining the nature of the relief sought).  Moreover, the gravamen of the Complaint is that Ambac suffered harm resulting from U.S. Bank's nonfeasance—not that U.S. Bank engaged in any fraudulent conduct.

U.S. Bank's argument rests on the following syllogism: (1) any breach of fiduciary duty occurred at the very latest based on U.S. Bank's alleged failure to bring timely put-back actions against Countrywide for breaches of its contractual representations and warranties; (2) because U.S. Bank purportedly knew of Countrywide's alleged breaches at the latest by mid-2006, the latest it could have brought a put-back action based on those breaches was mid-2012; and (3) therefore, any claim for breach of fiduciary duty lapsed three years later, in mid-2015.  At the outset, Ambac implicitly concedes that its claims for breach of fiduciary duty are untimely if they are solely premised on U.S. Bank's failure to timely file suit in the face of Countrywide's alleged breaches of its contractual representations and warranties.  Indeed, under the bright-line rule established by the New York Court of Appeals, the six-year limitations period for U.S. Bank's put-back claims against Countrywide accrues on the date that Countrywide's allegedly false contractual representations and warranties were made, <u>i.e.</u>, the closing dates of the Trusts in 2005.  <u>See</u> <u>ACE Sec. Corp. v. DB Structured Prods., Inc.</u>, 36

N.E.3d 623, 628-29 (N.Y. 2015). At the very latest, then, Ambac's claim for breach of fiduciary

duty accrued once the window for U.S. Bank to bring timely put-back actions based on

Countrywide's purported breaches of representations and warranties lapsed—namely, sometime

in 2011.[10]

Instead, Ambac retorts that its breach of fiduciary duty claims are timely based on

U.S. Bank failure to enforce the Trusts' rights against Greenwich, Countrywide, and

Countrywide Servicing for their failure to notify U.S. Bank of their breaches, as well as U.S.

Bank's failure to notify Ambac of the existence of an Event of Default. As to the first, Ambac

correctly notes that the New York intermediate courts have recognized that an RMBS seller's

"failure to provide the trustee with notice of material breaches it discovers in the underlying

loans states an independently breached contractual obligation, allowing a plaintiff to pursue

separate damages." See Fed. Hous. Fin. Agency for Fed. Home Loan Mortg. Corp. v. Morgan

Stanley ABS Capital I Inc. ("FHFA/Morgan Stanley"), 73 N.Y.S.3d 374, 384-85 (N.Y. Sup. Ct.

2018) (discussing Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit &

Capital, Inc., 19 N.Y.S.3d 1 (N.Y. App. Div. 2015); Morgan Stanley Mortg. Loan Tr. 2006-

13ARX v. Morgan Stanley Mortg. Capital Holdings, 36 N.Y.S.3d 458 (N.Y. App. Div. 2016);

and Bank of N.Y. Mellon v. WMC Mortg., LLC, 56 N.Y.S.3d 1 (N.Y. App. Div. 2017)). But

---

[10] To the extent that Phoenix Light/Deutsche Bank suggests that a breach of fiduciary duty claim based on a trustee's failure to take action against sponsors, servicers, or originators accrues when a certificateholder (or certificate insurer) has notice of the trustee's inaction, this Court declines to adopt its reasoning. See Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 710. Such a formulation is at odds with the rule in New York "that if a breach of fiduciary duty claim is not based upon fraud, the statute of limitation begins to run upon the breach, and not when the plaintiff discovers the breach." See Ciccone v. Hersh, 530 F. Supp. 2d 574, 579 (S.D.N.Y. 2008) (quotation mark omitted) (quoting Bastys v. Rothschild, 2000 WL 1810107, at *34 (S.D.N.Y. Nov. 21, 2000)). Similarly, the authorities on which Phoenix Light/Deutsche Bank relies are unpersuasive because they either concern RMBS fraud claims or apply the accrual rules under German law, which turn on when the plaintiff obtains notice. See Landesbank Baden-Württemberg v. RBS Holdings USA Inc., 14 F. Supp. 3d 488, 503-04 (S.D.N.Y. 2014); accord Commerzbank AG, 277 F. Supp. 3d at 490 (explaining that "German's statute of limitations begins to run when the plaintiff has knowledge of the facts giving rise to the claim, but that is inherently a factual inquiry that cannot be determined on a motion to dismiss").

aside from a stray reference that U.S. Bank's inaction was driven in part by its interest in shrouding its failure to give notice of the defective loans it originated, (see Compl. ¶ 90), Ambac does not theorize that Countrywide, Countrywide Servicing, or Greenwich shirked their duties to notify U.S. Bank of breaches of their contractual representations and warranties.  And this Court declines to read such allegations into the Complaint.  Cf. Soules v. Conn., Dep't of Emergency Servs. & Public Prot., 882 F.2d 52, 56 (2d Cir. 2018) (reiterating the general rule that "parties may not amend the pleadings through motion papers").

On the other hand, Ambac's breach of fiduciary duty claims may be timely insofar as they are based on U.S. Bank's failure to notify it of the existence of Events of Default. For instance, Ambac alleges that despite pervasive servicing misconduct by Countrywide Servicing, U.S. Bank failed to act.  (See Compl. ¶¶ 63-64.)  In particular, the PSAs require U.S. Bank to provide Ambac and certificateholders with notice within 60 days of any event which constitutes or which, with notice or a passage of time, would constitute an Event of Default— such as Countrywide Servicing's violations of its servicing obligations under the MMLPSA. (Compl. ¶ 71 (citing PSA § 7.04(b)).)  But according to the Complaint, "[a]lerting certificateholders and Ambac to deficiencies in Countrywide Servicing's servicing practices would have required U.S. Bank to take a position potentially contrary to" legal positions taken with regulators by U.S. Bank's own servicing arm.  (See Compl. ¶ 89.)  Thus, if the time for U.S. Bank to notify Ambac of Events of Default lapsed within three years of the filing of this action— i.e., after April 2014, then Ambac's breach of fiduciary duty claims may be timely.

U.S. Bank's objections are unavailing.  First, it argues that such claims must be time-barred because the only Events of Default alleged in the Complaint occurred years before April 2014, and as such, a breach of fiduciary duty claim based on U.S. Bank's failure to notify

Ambac of Events of Default must have accrued long before 2014.  But while the Complaint

alleges that U.S. Bank had reason to know of Countrywide Servicing's breaches of its servicing

obligations in 2010 and 2011, these allegations do not foreclose the possibility that Events of

Default occurred even after 2014.  (See Compl. ¶¶ 65-70.)  Stated differently, the Complaint

merely alleges that Countrywide Servicing had failed to comply with its servicing obligations

without exhaustively listing every purported violation.  Because it is not evident from the face of

the Complaint that such a breach of fiduciary duty claim would be untimely, dismissal at this

stage of the proceedings is unwarranted.

> Second, U.S. Bank contends that an ongoing duty to notify that extends past the

six-year limitations period for put-back actions for breaches of representations and warranties

would be pointless because it would "yield no relief for the aggrieved parties."  Fed. Hous. Fin.

Agency v. WMC Mortg. ("FHFA/WMC"), 2015 WL 9450833, at *4 (S.D.N.Y. July 10, 2015).

FHFA/WMC is inapplicable, however, because it addresses a sponsor or originator's duty to

notify the trustee of its breaches of representations and warranties, which is distinct from a

trustee's duty to notify trust beneficiaries of any Events of Default.  Moreover, the FHFA/WMC

court reasoned that a sponsor or originator's duty to notify is an obligation dependent on and

derivative of its contractual representations and warranties.  FHFA/WMC, 2015 WL 9450833, at

*3.  Based on this premise, that court concluded that the expiration of the "duty to cure or

repurchase, which is the sole remedy available for a breach of the representations and

warranties," logically extinguished the duty to notify of such breaches.  FHFA/WMC, 2015 WL

9450833, at *4.  But this reasoning by the FHFA/WMC court and other courts was subsequently

repudiated by the Appellate Division's trilogy of cases addressing failure-to-notify claims.

Those cases recognized that "the contractual obligation to notify was independent of the

warranty obligations and that claims for failure to notify were not claims 'respecting a warranty breach' subject to the 'sole remedy' clause"—i.e., the breach of a sponsor or originator's duty to notify could give rise to an independent cause of action for damages.  See Bank of N.Y. Mellon, 56 N.Y.S.3d at 7-8; see also FHFA/Morgan Stanley, 73 N.Y.S.3d at 384-85.

B.  Breach of Contract Claims

While Ambac's breach of contract claims are premised on a wide array of inaction, U.S. Bank only seeks to dismiss those claims as time-barred to the extent that they are premised on U.S. Bank's purported breaches of (1) its pre-EOD and post-EOD duties under the PSAs to certify that mortgage files were properly delivered to the Trusts within 180 days of the closing of the transactions in 2005; and (2) its post-EOD duties under the PSAs to act prudently by failing to act despite having reasons to know of Countrywide's breaches of its representations and warranties as early as 2008 and Countrywide Servicing's servicing misconduct in 2010.

Neither party disputes that in New York, a breach of contract claim "must be commenced within six years from the accrual of the cause of action."  Town of Oyster Bay v. Lizza Indus., Inc., 4 N.E.3d 944, 948 (N.Y. 2013); see N.Y. C.P.L.R. § 213(2).  Nor does Ambac contend that any breach of contract claim based on U.S. Bank's duties to certify that mortgage documents were properly delivered to the Trusts are timely.  Rather, it concedes that its breach of contract claims are not predicated on U.S. Bank's document certification obligations, and that the fact that U.S. Bank actually did prepare the certifications simply establishes U.S. Bank's knowledge of Countrywide and Greenwich's breaches of their document delivery obligations.

To the extent that Ambac's breach of contract claims are based on U.S. Bank's failure to discharge its contractual obligations to respond to Countrywide's breaches of its representations and warranties, this Court cannot conclude that they are untimely as a matter of

law.  For instance, Ambac alleges that U.S. Bank had notified Countrywide of 466 loans in the

Harborview 2005-8 Trust that breached Countrywide's representations and warranties and

demanded repurchase no later than the fourth quarter of 2011.  (Compl. ¶¶ 72, 84.)  Nonetheless,

Countrywide never repurchased any of those loans.  Thus, according to Ambac, U.S. Bank

breached its contractual obligation by failing to provide additional notice at the end of the 90-day

cure period, filing suit, or taking other action to enforce Countrywide's repurchase obligation.

(Compl. ¶ 73, 85.)  Accepting these allegations as true, claims based on these contractual

breaches would be timely.  At this stage in the proceedings, this Court need not "give the claims

in the case a 'haircut' by trimming off [each] time-barred allegation[]."  See Phoenix

Light/Deutsche Bank, 172 F. Supp. 3d at 709 n.3.  Because the untimeliness of Ambac's breach

of contract claims does not appear from the face of the Complaint, U.S. Bank's motion to

dismiss them as untimely is denied to the extent that they are not based on U.S. Bank's duty to

certify that mortgage documents were properly delivered to the Trusts.

C.  Streit Act Claims

The Streit Act "regulates all mortgage investments where the properties are

located in the state, the trustee does business with respect to the investments in New York, or the

trustee is authorized to do business in New York."  Phoenix Light/Deutsche Bank, 172 F. Supp.

3d at 722 (citing N.Y. Real Prop. Law § 124).  As has become somewhat customary in cases

against RMBS trustees, Ambac claims that U.S. Bank violated the Streit Act by defaulting on its

statutory obligation to act prudently following an Event of Default—here, by failing to

investigate further breaches, notify Countrywide, or take other action following Countrywide's

failure to cure or repurchase loans in breach of its representations and warranties.  (Compl.

¶¶ 120-121.)

In support of its contention, Ambac points to a provision of the Streit Act providing as follows:

> No trustee shall hereafter accept a trust under any trust indenture or mortgage within the contemplation of this article . . . unless the instrument creating the trust shall contain the following provisions, among others, which confer the following powers and impose the following duties upon the trustees . . . 1. In the case of an event of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

N.Y. Real Prop. Law § 126(1).

Here, the parties have agreed to be bound by this Court's decision on similar claims under the Streit Act in Commerzbank AG v. U.S. Bank National Association. (See U.S. Bank's Mem., at 19-20.) In Commerzbank, this Court joined the consensus of courts in this District holding that the plain language of § 126 "requires only that trust instruments include certain provisions" without imposing any affirmative obligations on trustees. See Commerzbank, 277 F. Supp. 3d at 499 (citation omitted). Given this conclusion, this Court need not address whether Ambac's Streit Act claims are timely. Accordingly, and as Ambac acknowledges in its opposition brief, its claims brought pursuant to the Streit Act are dismissed. (See Memorandum of Law in Opposition to U.S. Bank's Motion to Stay or Dismiss the Complaint, ECF No. 44 ("Ambac's Opp."), at 25.)

## CONCLUSION

For the foregoing reasons, U.S. Bank's motion for a stay is denied. Its motion to dismiss Ambac's breach of fiduciary duty claims, breach of contract claims that accrued before April 11, 2011, and Streit Act claims is granted in part and denied in part. The breach of fiduciary duty claims are dismissed to the extent that they are premised on U.S. Bank's duty to act prudently and in good faith. The breach of contract claims are dismissed to the extent that

33

they are premised on U.S. Bank's obligation to certify that mortgage documents were properly delivered to the Trusts. Finally, the Streit Act claims are dismissed. The Clerk of Court is directed to terminate the motion pending at ECF No. 37.

Dated: June 29, 2018
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III<br>U.S.D.J.