**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 17-cv-2614 |
| U.S. BANK NATIONAL ASSOCIATION, | Hon. Paul A. Engelmayer |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF U.S. BANK'S OPPOSITION TO AMBAC ASSURANCE CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

JONES DAY
David F. Adler
Michael T. Marcucci
100 High Street, 21st Floor
Boston, Massachusetts 02110.1781
Telephone: (617) 960-3939
Facsimile: (617) 449-6999
dfadler@jonesday.com
mmarcucci@jonesday.com

Louis A. Chaiten
Shimshon Balanson
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114.1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
lachaiten@jonesday.com
sbalanson@jonesday.com

Albert J. Rota
2727 N. Harwood Street, Suite 500
Dallas, Texas 75201-1515
(214) 220-3939; (214) 969-5100 (fax)
ajrota@jonesday.com

*Attorneys for Defendant*
*U.S. Bank National Association*

### TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    A.    The 2003 Master Mortgage Loan Purchase and Servicing Agreement ................. 3

    B.    Reconstituted Servicing Agreements .................................................................... 4

    C.    The Harborview PSAs and Prospectus Supplements ........................................... 5

    D.    Servicers' Post-Execution Performance ................................................................ 6

    E.    Ambac's Claims and U.S. Bank's Mutual-Mistake Defense ................................. 6

ARGUMENT .......................................................................................................................... 7

I.      AMBAC IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO MUTUAL
       MISTAKE ..................................................................................................................... 7

    A.    Because The Agreements Are Ambiguous And The Extrinsic Evidence
       Does Not Support Ambac, Summary Judgment Is Inappropriate ......................... 8

       1.    The agreements are ambiguous regarding the trigger for EODs ............. 8

           (a)    The Servicing Agreements are ambiguous because they use
               the term Seller in inconsistent and irreconcilable ways .................. 8

           (b)    Ambac's contrary interpretation arguments are
               unconvincing ................................................................................ 11

           (c)    The Prospectus Supplements confirm the ambiguities ................. 14

       2.    The extrinsic evidence does not support Ambac's view ........................... 15

    B.    Questions of Fact Remain On The Affirmative Defense of Mutual Mistake ....... 17

       1.    Questions of fact remain as to timeliness ................................................. 17

       2.    Questions of fact remain as to the merits of a mutual-mistake
           defense .................................................................................................... 17

           (a)    Absurdity is not relevant to a reformation claim ......................... 18

           (b)    Questions of fact remain as to whether the parties reached a
               different agreement ...................................................................... 19

II.    ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON U.S. BANK'S
       ESTOPPEL AND WAIVER DEFENSES ................................................................. 21

    A.    Issues Of Fact Preclude Summary Judgment On Equitable Estoppel ................. 21

    B.    Issues Of Fact Preclude Summary Judgment On Waiver .................................... 24

CONCLUSION ..................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*1414 APF, LLC v. Deer Stags, Inc.*,
   39 A.D.3d 329 (1st Dep't 2007) ...........................................................................18

*Ambac Assur. Corp. v. U.S. Bank Nat'l Ass'n*,
   No. 21-70, 2021 U.S. App. LEXIS 37514 (2d Cir. Dec. 20, 2021)........................14

*Barbour v. Knecht*,
   296 A.D.2d 218 (1st Dep't 2002) ..........................................................................15

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
   448 F.3d 573 (2d Cir. 2006).................................................................................24

*Brewington v. State Farm Mut. Auto. Ins.*,
   45 F. Supp. 3d 1215 (D. Nev. 2014) .......................................................................9

*Cappelletti v. Unigard Ins. Co.*,
   222 A.D.2d 1029 (4th Dep't 1995)...........................................................................7

*Collins v. Harrison-Bode*,
   303 F.3d 429 (2d Cir. 2002)...................................................................8, 14, 18

*CP III Rincon Towers, Inc. v. Cohen*,
   666 F. App'x 46 (2d Cir. 2016) ..............................................................................8

*Fed. Ins. Co. v. Ams. Ins. Co.*,
   258 A.D.2d 39 (1st Dep't 1999) ............................................................................15

*First Am. Int'l Bank v. Cmty. Bank*,
   2012 WL 4341740 (S.D.N.Y. Sept. 21, 2012).........................................................7

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
   720 F.3d 84 (2d Cir. 2013).....................................................................................24

*Gen. Elec. Cap. Corp. v. Armadora, S.A.*,
   37 F.3d 41 (2d. Cir. 1994) ..............................................................................23, 24

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*,
   85 N.Y.2d 232 (1995) ............................................................................................25

*George Backer Mgmt. Corp. v. Acme Quilting Co.*,
   46 N.Y.2d 211 (1978) ................................................................................................20

*Health-Loom Corp. v. Soho Plaza Corp.*,
   272 A.D.2d 179 (1st Dep't 2000) ........................................................................23, 24

*In re Trusteeship Created by Am. Home Mortg. Inv. Tr.*
   *2005-2*, 2014 WL 3858506 (S.D.N.Y. July 24, 2014)..................................14, 20, 21

*Int'l Multifoods Corp. v. Com. Union Ins. Co.*,
   309 F.3d 76 (2d Cir. 2002)...........................................................................................8

*Intelligent Digital Sys., LLC v. Beazley Ins. Co.*,
   906 F. Supp. 2d 80 (E.D.N.Y. 2012) ........................................................................21

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
   639 F.3d 63 (2d Cir. 2011)...........................................................................................7

*Nassau Tr. Co. v. Montrose Concrete Prod. Corp.*,
   56 N.Y.2d 175 (1982) ...........................................................................................21, 24

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
   460 F. Supp. 3d 481 (S.D.N.Y. 2020)........................................................................23

*Powermat Techs., Ltd. v. Belkin Int'l Inc.*,
   2020 WL 2892385 (S.D.N.Y. Apr. 2, 2020).................................................7, 18, 20

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997)....................................................................................................12

*Rsch. Frontiers Inc. v. Prelco Inc.*,
   2020 WL 6746730 (E.D.N.Y. Nov. 17, 2020)...........................................................25

*U.S. Energy Sys., Inc. v. Enviro Partners, L.P.*,
   1999 WL 123806 (S.D.N.Y. Mar. 8, 1999) ...............................................................23

*Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*,
   707 F.2d 680 (2d Cir. 1983)........................................................................................25

*Wallace v. 600 Partners Co.*,
   86 N.Y.2d 543 (1995) .................................................................................................18

*Wells Fargo Bank, N.A. v. ESM Fund I, LP*,
    785 F. Supp. 2d 188 (S.D.N.Y. 2011); *aff'd sub nom. Wells Fargo Bank, N.A.*
    *v. Fin. Sec. Assur. Inc.*, 504 F. App'x 38 (2d Cir. 2012) ........................................................19

*Zumpano v. Quinn*,
    6 N.Y.3d 666 (2006) .............................................................................................................17

## INTRODUCTION

Ambac claims that U.S. Bank breached Pooling and Servicing Agreements ("PSAs") by failing to exercise its rights and powers as a prudent person following alleged Events of Default ("EODs").  But that alleged trustee duty arises only if a contractually defined EOD occurred and U.S. Bank had actual knowledge of it.  Much of Ambac's case, then, turns on proving that an EOD occurred under the PSAs.  As anyone familiar with this industry's customs and practices knows, an EOD is typically triggered by uncured servicer breaches, which is why the potential consequences of an EOD include terminating and replacing the servicer.  Nothing about the PSAs in this case, or the offering documents provided to investors (the Prospectus Supplements), suggested otherwise.  In fact, the Prospectus Supplements—the interpretational relevance of which was confirmed by the Second Circuit just a few days ago in a case involving Ambac—specifically described an EOD as triggered by servicer breaches.

In this lawsuit, however, filed more than a decade after these agreements were signed, Ambac contended for the first time that EODs can be triggered by the conduct of the originator, Countrywide Home Loans ("CHL"), rather than just the servicer.  The PSAs define EODs as defined in a Servicing Agreement, which itself defines an EOD to include certain "failures of the Seller."  According to Ambac, "Seller" unambiguously refers to CHL.  But that is certainly not the only interpretation.  The reality is that the Servicing Agreements' use of Seller in the EOD provisions is a remnant of an earlier master agreement under which CHL as Seller also serviced the loans, so there was no reason to refer to a separate Servicer.  When servicing functions transferred to a different entity, the master agreement was amended to try to account for the now-separate servicer.  But it was amended in a way that created much ambiguity.  Notwithstanding this ambiguity, the parties always intended for EODs to be triggered in the usual way—and in the way referenced in the offering documents—by servicer conduct.

1

Given the parties' interpretational dispute, and Ambac's repeated assertions that the agreements unambiguously compel its reading, one would have expected Ambac to move for summary judgment on its interpretation. But it is unclear whether Ambac is doing so—or at least no clearer than the agreements Ambac would have the Court interpret. Ambac repeatedly *assumes* that the agreements unambiguously support its interpretation, but it does not actually move for summary judgment on the definition of an EOD. Instead, it purports to limit its motion to three of U.S. Bank's affirmative defenses: mutual mistake, waiver, and estoppel. Regardless of the scope of Ambac's motion, however, it should be denied.

*Mutual mistake*. The Court need not reach the defense of mutual mistake if the contracts are ambiguous—which they are. The Servicing Agreements use the defined term Seller in inconsistent and irreconcilable ways. And they use different terms (Seller and Servicer) to refer to a single entity—the party servicing the loans. The extrinsic evidence, including Servicers' course of performance and industry custom and practice, reflect that the parties intended that EODs would arise only from Servicers' conduct, not from CHL's. At the very least, that evidence is not so one-sided in Ambac's favor as to warrant summary judgment.

But if the Court disagrees and concludes the contracts *unambiguously* compel Ambac's interpretation, Ambac is still not entitled to summary judgment on mutual mistake. Issues of fact would remain as to whether the parties agreed that only Servicer conduct triggers EODs—*i.e.*, whether they reached an agreement different than the one Ambac says the contracts reflect.

*Estoppel and waiver*. To the extent Ambac says it knew all along that CHL's breaches could trigger an EOD, it never shared that with U.S. Bank, even though Ambac and U.S. Bank spent years discussing the consequences of CHL's breaches—and Ambac knew U.S. Bank thought differently. Given all this, there is at the very least an issue of fact as to whether Ambac

is estopped from making—or waived—its arguments that CHL's breaches can trigger EODs.

In short, because the agreements do not unambiguously compel Ambac's reading, and because issues of fact remain on mutual mistake, estoppel, and waiver, Ambac's motion fails.

## **BACKGROUND**

### A.    The 2003 Master Mortgage Loan Purchase and Servicing Agreement

In 2003, CHL and Greenwich Capital Financial Products, Inc. ("Greenwich") signed the Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA"). JSF ¶ 16.[1]  True to its name, the MMLPSA served as a master agreement for dozens of securitizations, including the five Harborview trusts here, and for loans that CHL sold to Greenwich outside the securitization context.  The MMLPSA set forth representations and warranties regarding the mortgage loans, the terms for servicing the mortgage loans, and the definitions of an EOD.

Under the MMLPSA, CHL originated mortgage loans and sold them to Greenwich, which then pooled the loans and sold them to RMBS trusts.  JSF ¶¶ 15-16.  CHL sold the loans to Greenwich on a "servicing retained basis," so CHL serviced the loans sold to the trusts.  Ex. 1 at 1.  CHL as Seller was thus both the originator and servicer—the MMLPSA had no separate servicer.  Thus, the MMLPSA used Seller in provisions relating to the originator and in those relating to the servicer.  The Seller represented and warranted that loans were "underwritten generally in accordance with the Seller's underwriting standards," and promised to repurchase any loan that breached them.  *Id.* §§ 7.02, 7.03.  The Seller also "service[d] and administer[ed] the Mortgage Loans," with responsibility for modifying loans, collecting payments, foreclosures,

---

[1] "JSF" refers to the Joint Stipulation of Undisputed Facts, ECF 237.  Exs. A through SS are to the Declaration of Michael T. Marcucci in Support of U.S. Bank's Opposition to Ambac's Motion for Partial Summary Judgment.  "SUF" refers to Ambac's Statement of Undisputed Facts Pursuant to Local Rule 56.1 and U.S. Bank's Additional Paragraphs in Response.  Exs. 1 through 40 are to the Declaration of Peter W. Tomlinson in Support of Ambac's Motion.

and real-estate owned properties—*i.e.*, the traditional servicing functions.  *Id.* § 11 & Ex. 9; *see also id.* at 11 ("Servicing Officer" is "officer of the Seller involved in . . . servicing").

### B.  Reconstituted Servicing Agreements

In 2005, however, CHL's dual role ended.  For the CHL-originated loans that Greenwich sold to the five Harborview trusts here, CHL transferred its servicing functions to Countrywide Home Loans Servicing, LP ("Countrywide Servicing").  And "to account for the transfer of servicing rights," for each trust, CHL, Countrywide Servicing, and Greenwich entered into a Reconstituted Servicing Agreement ("RSA") to "amend[] and restate[] certain provisions of the MMLPSA."  JSF ¶ 32.  Under each RSA, "Countrywide Servicing," defined as the "Servicer," agreed, "with respect to the servicing of the Serviced Loans, to perform and observe the duties, responsibilities and obligations that are to be performed and observed by the Seller (as such term is defined in the [MMLPSA]) under the provisions of the [MMLPSA], except as otherwise provided herein and on Exhibit One hereto."  Ex. 3 at 2.  "Exhibit One" sets out "Modifications" to the MMLPSA.  Some of these modifications are fully drafted replacement provisions (or entirely new provisions).  Ex. 3 at Ex. 1 ¶ 18.  Other modifications describe how the MMLPSA is modified by the RSA (*e.g.*, "Section 16 (Successor to the Seller) is hereby amended . . . by replacing the words "Prior to" with "Upon" at the beginning of the first sentence.").  *Id.* ¶ 19(i).

Like the PSAs, we refer to the MMLPSA as reconstituted by each RSA as a "Servicing Agreement."[2]  But the Servicing Agreements do not exist as standalone documents—the parties never actually "reconstituted" the MMLPSA to create Servicing Agreements.  Perhaps for that reason, the amendments introduced clear mistakes.  Section 13.05, for example, reads:

Seller shall not either assign this Agreement or the servicing hereunder, . . .

---

[2] The RSAs use "Servicing Agreement" to refer to the MMLPSA.  We use "Servicing Agreement" as the PSAs do—to refer to the MMLPSA as amended and restated by each RSA.

> without the *the* prior written consent of the Trustee, which consent shall not be unreasonably withheld, *which consent will not be unreasonably withheld* . . .

*See* Ex. A § 13.05 (errors in italics).  As another example, the RSA added to Section 11.05 of the Servicing Addendum a "new subclause (ix)" that refers to a "subclause (iii) above."  Ex. 3 at Ex. 1 ¶ 25.  But Section 11.05 had only clauses (xii) through (xix), *see* Ex. 1 § 11.05, so neither new subclause (ix) nor its internal reference to subclause (iii) can be right.

Although the RSA amended the MMLPSA to account for the end of CHL's dual role and the introduction of Countrywide Servicing as Servicer, the RSA did not change the word Seller to the word Servicer in any provisions relating to servicing.  Instead, Servicer appears in the Servicing Agreement only as a result of newly drafted provisions that used the term Servicer and that replaced existing provisions (as for Section 14.01(i)) or added new language (as in Section 16).  The result is an inexplicable mix of Seller and Servicer, often used in the same provisions to refer to the same entity.  For example, Section 11.01 says that "[t]he *Seller* shall . . . have full power and authority, acting alone, to" take action "in connection with such servicing . . . which the *Seller* may deem necessary or desirable and consistent with [this] Agreement; *provided however*, that the *Servicer* shall not knowingly or intentionally take [certain actions]."  Ex. A § 11.01; *see also, e.g.*, *id.* §§ 16, 11.05, 11.26.

**C.      The Harborview PSAs and Prospectus Supplements**

The PSAs and the Prospectus Supplements, by contrast, use only the term Servicer to refer to the party servicing the loans.  Starting with the PSAs, they define the Servicer as Countrywide Servicing and say "[t]he Servicer will service the Mortgage Loans pursuant to the terms of the Servicing Agreement."  Ex. 2 § 3.01.  And under the PSAs, "if an [EOD] described in the Servicing Agreement shall occur and be continuing," "the Trustee may, and at the written direction of the [holders with] Voting Rights aggregating not less than 51%, shall, by notice then

given in writing to the Servicer, terminate all of the rights and obligations of the Servicer as servicer under this Agreement."  *Id.* § 7.02.

The Prospectus Supplements likewise refer to Countrywide Servicing as the Servicer and say that it "will have primary responsibility for servicing the mortgage loans" "in accordance with the servicing provisions" of the servicing agreement.  Ex. B at S-1, S-62.  The Prospectus Supplements also specify that "an event of default with respect to the servicer will consist, among other things, of . . . any failure by the servicer to observe or perform in any material respect any other of its covenants or agreements in the servicing agreement."  JSF ¶ 76.

### D.    Servicers' Post-Execution Performance

Since these five deals closed in 2005, various entities have fulfilled the role of Servicer.  Countrywide Servicing was the first Servicer.  SUF ¶¶ 75-77.  In 2009, Countrywide Servicing changed its name to BAC Home Loans Servicing LP (once Bank of America acquired CHL's and Countrywide Servicing's parent company).  JSF ¶ 33.  Then, on July 1, 2013, Nationstar Mortgage LLC became Servicer.  *Id.* ¶ 34.  These entities, as Servicers, serviced the loans and fulfilled other requirements relating to loan servicing.  For example, they provided Officer's Certificates and the Independent Accountant's Reports under Sections 11.25 and 11.26 of the Servicing Addendum, Exs. 23-38—even though the provisions imposing those obligations speak to the Seller's obligations (in 11.25) and the Seller's servicing (in 11.26).  Ex. A §§ 11.25, 11.26.

### E.    Ambac's Claims and U.S. Bank's Mutual-Mistake Defense

More than a decade after all of these agreements were executed, Ambac filed this suit.  As noted above, Ambac asserts that EODs occurred based on CHL's failure to deliver complete mortgage files.  That theory is based on the fact that the Servicing Agreements (and thus the PSAs) define an EOD to include certain "failure[s] of the Seller," Mot. 9, which Ambac contends unambiguously refers to CHL.  Ambac also contends that EODs occurred based on Countrywide

Servicing's alleged failures to deliver certifications under Sections 11.25 and 11.26, Mot. 9—a theory that depends on reading Seller as Servicer in these provisions.

As discovery progressed, U.S. Bank determined that, beyond arguing that the Servicing Agreements are ambiguous and that extrinsic evidence demonstrates the parties intended that Seller in the EOD provisions say Servicer, U.S. Bank had grounds to assert a mutual-mistake defense as "an alternative legal theory" "in the event [the Court] found that under the literal terms of the contract it was []unambiguous." Ex. C at 2-3. With the Court's permission, U.S. Bank thus amended its answer to add a mutual-mistake defense. *See* ECF 131, 132.

## ARGUMENT

### I.   AMBAC IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO MUTUAL MISTAKE.

Ambac's motion skips past the "threshold question" in any "dispute over the meaning of a contract"—"whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). If it is, summary judgment is generally inappropriate, *see First Am. Int'l Bank v. Cmty. Bank*, 2012 WL 4341740, at *7 (S.D.N.Y. Sept. 21, 2012) (Engelmayer, J.), and the Court need not reach mutual mistake, a defense that assumes the contract is unambiguous, *see, e.g.*, *Cappelletti v. Unigard Ins. Co.*, 222 A.D.2d 1029, 1031 (4th Dep't 1995) ("[I]f the ambiguity is resolved in accordance with [plaintiff's] interpretation, there would be no need to seek reformation of the policy."); *Powermat Techs., Ltd. v. Belkin Int'l Inc.*, 2020 WL 2892385, at *7 (S.D.N.Y. Apr. 2, 2020) (reformation based on mutual mistake is "not a matter of resolving an ambiguity but rather of supplying what the parties clearly intended to include but inadvertently omitted").

That is the case here. The different uses of Seller throughout the Servicing Agreements, and the Prospectus Supplements' description of *servicer* EODs, makes the agreements at least

7

ambiguous.  The Court thus may look to extrinsic evidence to determine intent.  *CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46, 53 (2d Cir. 2016).  That evidence, paired with the contracts themselves, favors U.S. Bank's reading.  But at the very least, the evidence is far from "so one-sided" that no reasonable factfinder could agree with U.S. Bank's reading.  *Id.*

That disposes of Ambac's motion.  If, however, the Court disagrees and concludes the contracts *unambiguously* compel Ambac's interpretation, Ambac is still not entitled to summary judgment on mutual mistake.  Issues of fact would remain as to whether the parties agreed that only Servicer conduct triggers EODs—*i.e.*, whether they reached an agreement different than the one Ambac says the contracts reflect.  Summary judgment on mutual mistake should be denied.

### A. Because The Agreements Are Ambiguous And The Extrinsic Evidence Does Not Support Ambac, Summary Judgment Is Inappropriate.

Ambac cannot demonstrate that the agreements unambiguously compel its reading that CHL's breaches trigger EODs.  The agreements are at the very least ambiguous on that point, and the extrinsic evidence supports *U.S. Bank's* view that only Servicer conduct triggers EODs.

### 1. The agreements are ambiguous regarding the trigger for EODs.

#### (a) The Servicing Agreements are ambiguous because they use the term Seller in inconsistent and irreconcilable ways.

A contract is ambiguous where its terms "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'"  *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).  Ambiguities can arise "due to internal inconsistencies" in an agreement, including where "uses of [a defined] term are inconsistent and irreconcilable."  *Collins v. Harrison-Bode*, 303 F.3d 429, 433-34 (2d Cir. 2002).

That describes the Servicing Agreements to a T.  Not only do they use the defined term

Seller in "inconsistent and irreconcilable" ways, but they also use different defined terms (Seller and Servicer) to refer to a single entity—the party servicing the loans. All of this creates ambiguity regarding the meaning of Seller throughout the Servicing Agreements, including within the EOD provisions that the PSAs incorporate.

Start with the definition itself. Seller is defined as "[CHL] or any successor to or assignee of the *Seller* under this Agreement as provided herein." Ex. A § 1. The definition thus uses the defined term to define the term. That by itself creates ambiguity. *E.g.*, *Brewington v. State Farm Mut. Auto. Ins.*, 45 F. Supp. 3d 1215, 1219 (D. Nev. 2014). And trying to make sense of this definition—for example, by reading Seller in the definition as CHL—gives Seller different meanings in different places.

But that is just the beginning. Seller has no consistent meaning throughout the Servicing Agreements. In some places, Seller *must* mean CHL, the originator. One of those places is Section 7.02, setting forth the "Seller's representations and warranties concerning the individual mortgage loans," including that the loans "[w]ere underwritten generally in accordance with the Seller's underwriting standards [when] the Mortgage Loan was originated." Ex. A § 7.02(xxiii).

But in other places, Seller *cannot* mean CHL. Consider Section 11 and the Servicing Addendum. Section 11 says "[t]he Seller . . . shall service and administer the Mortgage Loans in accordance with the terms of Exhibit 9," the Servicing Addendum. The Servicing Addendum, too, says that "[t]he Seller shall service and administer the Mortgage Loans." Ex. A § 11 & Ex. 9. Seller in these places cannot be CHL—the same agreement reflects that "CHL [] assigned its servicing rights . . . to Countrywide Servicing," the "Servicer." Ex. 3 at 1, 2. Reading Seller as CHL here also conflicts with the PSAs—they say "[t]he *Servicer*" (Countrywide Servicing) "will service the [loans] pursuant to the . . . Servicing Agreement." Ex. 2 § 3.01.

Nor can Seller be CHL in Section 16.  It refers to "termination of Seller's responsibilities and duties" under "Section 15," but Section 15 does not address CHL's termination—it addresses when "obligations and responsibilities of the *Servicer* shall terminate."  Ex. A §§ 15, 16.  And Section 16 ends by discussing the "successor to the *Servicer*," not CHL's successor.

The EOD provisions also have examples where Seller cannot be CHL.  We discuss three.

*First*, an EOD can occur when "the Seller fails to duly perform . . . its obligations under Sections 11.25 or 11.26 of the Servicing Addendum."  Ex. A § 14.01(ix).  But flipping to Section 11.26, it imposes obligations only on the Servicer.  Within Section 11.26, moreover, lurks another instance in which Seller is not CHL.  It provides that the "Servicer at its expense shall cause a firm of independent public accountants" to "furnish a statement" that "such firm has examined certain documents and records relating to the servicing of mortgage loans by the Seller" and that "such servicing" complied with "this Agreement."  Ex. A § 11.26.  It would make no sense for the *Servicer* to direct an accounting firm to review *CHL's* records.  And because, of course, CHL does not service the loans, there would be no "servicing . . . by [CHL]" to review.  Ambac, moreover, agrees:  it argues that EODs occurred when "*Countrywide Servicing* . . . failed to deliver certain required annual certificates of compliance with servicing criteria, [as] set forth in Sections 11.25 and 11.26."  Mot. 9 (emphasis added); *see* SUF ¶ 39.

*Second*, reading Seller as CHL in Section 14.01(ii), under which the "failure of the Seller" to perform can trigger an EOD, renders the PSA's sole remedy clause meaningless.  Under the PSA, CHL's obligation to repurchase loans is the trustee's "sole remedy" against CHL for missing and defective mortgage file documents.  Ex. 2 § 2.03.  But that would not be true if, as Ambac says, "failure on the part of [CHL]" to deliver mortgage file documents triggers an EOD.  Post-EOD, the trustee would have *additional* remedies:  it could terminate CHL and

pursue "whatever rights the trustee may have at law or equity to damages."  Ex. A § 14.01.

*Third*, if Seller means CHL in Section 14.01(ii) or 14.01(iv), CHL's breaches (under 14.01(ii)) or CHL's bankruptcy (under 14.01(iv)) would trigger the trustee's right—and investors' right to direct the trustee—to terminate the Servicer.  Ex. 2 § 7.02; Ex. 3 at 2, 3.  This is problematic for two reasons:  (1) it would mean that *CHL's* failure to repurchase loans or bankruptcy could justify terminating *Nationstar*, the current Servicer; and (2) it would mean that Nationstar's servicing failures and bankruptcy would *not* trigger its termination.  So reading Seller to mean CHL makes no sense in these provisions either.

**(b)    Ambac's contrary interpretation arguments are unconvincing.**

Ambac's attempts to explain away these conflicts go nowhere.

"Either/Or."  Ambac first invokes the definition of Seller to contend that Seller can mean "*either* CHL *or* one of its successors or assignees."  Mot. 16.  In doing so, however, Ambac assumes the definition says "[CHL] or any successor to or assignee of [CHL]."  *Id.*  It does not— as explained above, the definition uses the defined term Seller to define Seller.  *Supra* at 9.

Even if Ambac were correct that Seller unambiguously includes a successor or assignee of *CHL*, Ambac's application of that definition makes little sense.  Ambac argues that Seller throughout the Servicing Agreements can be replaced with any one of CHL, a CHL successor, or a CHL assignee, which Ambac says includes both Countrywide Servicing and Nationstar.  Thus, Ambac says, EODs can be "triggered by a breach or bankruptcy of *either* CHL *or* one of its successors or assigns, . . . including Countrywide Servicing (CHL's assignee) or the current servicer, Nationstar (CHL's successor)."  Mot. 16.[3]

---

[3] *See* ECF 128 at 2 (EODs "include any of the circumstances listed in Section 14.01 . . . (such as bankruptcy) to the extent they apply *either* to CHL *or* to one of its successors or assigns"); Mot. 21 ("breaches by the Seller" "lead to [EODs] in addition to breaches by the Servicer").

But if Ambac is correct that the term Seller encompasses Countrywide Servicing, then there would have been no reason for the RSAs to introduce the term "Servicer" to refer to Countrywide Servicing—the term Servicer becomes pointless.  In all events, Ambac's argument just confirms the ambiguities in the Servicing Agreements—it confirms that Seller does not have a uniform meaning.  Under Ambac's reading, in each instance in which Seller appears, the parties would have to determine which of CHL or Countrywide Servicing or Nationstar has the duty, made the representation, has the right to consent, can be terminated, and so on.  An agreement requiring choices like this cannot be anything but ambiguous.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 343-44 (1997) (in statutory-interpretation context, when term has different meanings across the statute, "the term standing alone is necessarily ambiguous").

Servicer in some provisions.  Ambac also notes that the RSAs changed Seller to Servicer only in some instances.  Mot. 6.  To the extent that Ambac suggests that this means the parties intended for Seller to mean CHL everywhere else, *see* ECF 213 at 2, that argument fails.

For starters, the RSAs did not change the word Seller to the word Servicer anywhere— the RSAs did not, for example, say that "Seller should be replaced by Servicer" in Section 14.01(i).  The RSAs instead replaced entire provisions that referred to Seller with entire provisions that, as drafted, referred to the Servicer.  *See supra* at 5.  Thus, Servicer appears in the Servicing Agreement only as a result of these newly drafted provisions.  At any rate, there is little (if any) meaning to draw from these changes.  The RSAs did not use Servicer to signal provisions that applied only to servicing.  Not even close.  Section 11.01, for example, still says that "Seller shall service."  Sections 11.25 and 11.26 likewise still refer to the Seller.  That is true even though the RSAs amended these provisions in other ways.  Ex. 3 at Ex. 1 ¶¶ 23, 29-30.

Section 16 is another example.  The RSAs revised that provision as follows:

12

~~Prior to~~ Upon termination of Seller's responsibilities and duties under this Agreement pursuant to ~~Section 15.01(ii) or 15.02~~ <u>Subsection 14.01 or Section 15</u>, the Purchaser shall<u>, in accordance with the Pooling and Servicing Agreement,</u> (i) succeed to and assume all of the Seller's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor having a net worth of not less than $15,000,000 and which shall succeed to . . . the Seller under this Agreement prior to the termination of Seller's responsibilities, duties and liabilities under this Agreement . . . <u>Any successor to the Servicer shall be a FHLMC- or FNMA-approved servicer</u> . . ."

Ex. A § 16.   So although the RSAs added a sentence on Servicer succession and references to Servicer-specific termination provisions (Section 15 and the PSAs), the RSAs did not change Seller to Servicer throughout Section 16.[4]

    <u>Affiliates.</u>  Ambac also insists that, because Seller and Servicer were affiliates when the parties executed the RSA and PSA, "linking Servicer termination to Seller conduct makes sense."  Mot. 16.  Even assuming that is true, that does not compel the conclusion that Seller unambiguously means CHL.  The agreements "do not state that the seller/originator and servicer *must* be the same or affiliated entities for seller or originator conduct to cause an EOD."  Ex. D at Ex. B ¶ 72.  To the contrary, both the PSAs and Servicing Agreements contemplate transfer of servicing away from Countrywide Servicing.  *See* Ex. 2 § 7.02 (Servicer termination); Ex. A § 13.05 (transfer of servicing rights).[5]  And that is ultimately what happened.  *See supra* at 6.

***

    In sum, the agreements are at least ambiguous.  Seller in the Servicing Agreements has no consistent meaning—it sometimes *cannot* mean CHL but sometimes *must* mean CHL.  Equally problematic, the Servicing Agreements use different terms (sometimes Seller, sometimes

---

[4] *See also* Ex. A at Ex. 9 § 11.05 ("The *Seller* may, from time to time, withdraw from the Custodial Account . . . to reimburse itself for unreimbursed Servicing Advances to the extent such amounts are unrecoverable by the *Servicer*." (emphases added)).

[5] Ambac argues that the agreements "restricted the ability of the Seller to transfer servicing to a non-affiliate."  Mot. 16 n.11.  But the Seller could transfer servicing with trustee consent (which could not be unreasonably withheld).  Ex. A § 13.05.

13

Servicer) to refer to what is clearly the same party—the party servicing the loans.  And "[t]he impossibility of sensibly reconciling the usage of [these terms] throughout the contract . . . leads to [the] conclusion that [it] is ambiguous."  *Collins*, 303 F.3d at 434.

### (c)    The Prospectus Supplements confirm the ambiguities.

Everything above is enough to defeat Ambac's motion.  But there is more.  The Prospectus Supplements provide that "an event of default with respect to the servicer will consist, among other things, of . . . any failure by the servicer."  JSF ¶ 76.  They say nothing about CHL or originator EODs.  And this "conflict between the Offering Documents and the [PSAs]" (as Ambac reads them) "creates doubts and ambiguities" as to whether the PSAs "accurately reflect the intent of the contracting parties."  *In re Trusteeship Created by Am. Home Mortg. Inv. Tr. 2005-2*, 2014 WL 3858506, at *21 (S.D.N.Y. July 24, 2014).

Ambac tries to wave away the Prospectus Supplements by saying that they do not "describe all circumstances that can lead to an Event of Default," and so do not preclude CHL-triggered EODs.  Mot. 21.  But it would make little sense for them to leave entirely unmentioned EODs based on CHL's breaches if, as would be true under Ambac's reading, those breaches were the primary triggers for EODs.  In fact, in deals where parties other than the Servicer could trigger EODs, the Prospectus Supplements disclosed that.  Ex. E at S-89 ("so long as the Servicer is a Seller, any failure by any Seller to observe or perform…"); *see* Ex. 12 ¶ 33.  That includes the depositor EOD deals Ambac references.  Mot. 15; Ex. 13 ¶ 35 n.100; Ex. F at S-43 (WAMU 2007-OA2) ("Events of Default" by "depositor" and "servicer").

As for Ambac's argument that the Prospectus Supplements "are not contracts and cannot alter the terms of the PSAs," Mot. 20, Ambac just made and lost this same argument in the Second Circuit.  The court held that the district court had "properly considered" the Prospectus Supplement to "interpret[]" the contract there, *Ambac Assur. Corp. v. U.S. Bank Nat'l Ass'n*, No.

14

21-70, 2021 U.S. App. LEXIS 37514, at *13 (2d Cir. Dec. 20, 2021), despite Ambac's argument that the Prospectus Supplement was "not a contract" and "does not control over the plain terms of the Pooling Agreement."  Ambac Reply Br., 2021 WL 2315457, at *14 (June 3, 2021).

> **2.      The extrinsic evidence does not support Ambac's view.**

Because the agreements are ambiguous, extrinsic evidence is admissible to ascertain the parties' intent.  *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 43 (1st Dep't 1999).  And the only conclusion to draw from this evidence is that the parties intended Seller to say Servicer in provisions relating to servicing, including in the provisions defining EODs.

Start with the parties' course of performance, *Barbour v. Knecht*, 296 A.D.2d 218, 224 (1st Dep't 2002)—most notably, the Servicers' performance under Sections 11.25 and 11.26 of the Servicing Addendum.  To review, as drafted, Section 11.25 says the Seller must provide an annual Officer's Certificate, and Section 11.26 says the Servicer must deliver an Independent Accountant's Report on the Seller's servicing activities.  *Supra* at 6, 10.  Yet the Servicers understood these provisions to apply to the Servicer and the Servicer's activities.  Since 2013, Nationstar as Servicer has provided the Officer's Certificate and Independent Accountant's Report.  Exs. 34-38.  Before that, BAC Home Loans Servicing LP submitted those materials in its role as Servicer.  Exs. 25, 26.  And before that, Countrywide Financial Corporation provided them as to loans "for which the Company provides servicing functions," Ex. 23—*i.e.*, for the loans that Countrywide Servicing serviced.  This course of performance thus weighs *against* reading Seller to mean CHL—or indeed to even include CHL—in the EOD provisions.

So does industry custom and practice.  For virtually all (over 95%) RMBS deals that closed from 2003 to 2005, "only the actions or inactions of servicers" triggered EODs.  Ex. 12 ¶ 31.  For the tiny minority that were different, the contracts "explicitly describe[d] situations in which the EOD provision deviates from an industry standard EOD provision"—*e.g.*, by saying

that Seller failures could trigger EODs for "so long as the Servicer is a Seller." *Id.* ¶ 34.  The agreements here have no such explicit language.

The Prospectus Supplements (even assuming they are only extrinsic evidence) also cut against Ambac's reading.  Again, they are explicit that "[a]n event of default with respect to the servicer will consist, among other things, of . . . any failure by the servicer to observe or perform in any material respect," and make no mention of CHL or originator EODs.  JSF ¶ 76.  They also confirm what the trusts' Servicers understood all along—that the Servicers are the parties subject to Sections 11.25 and 11.26.  The Prospectus Supplements explain that "[t]he servicing agreement provides that each year during which the servicer services any of the mortgage loans, *the servicer* shall cause a firm of independent accounts to furnish a statement . . . that the servicing has been conducted in accordance with . . . the servicing agreement." Ex. B at S-67.

Ambac itself, moreover, did not think that CHL's breaches could trigger EODs—at least not until it filed this suit.[6]  Ambac asserts that CHL's failure to deliver complete mortgage files was "well known by 2010 and 2011."  ECF 62 ¶ 59.  By then, too, Ambac was analyzing its potential rights and remedies as to these trusts, JSF ¶ 177, including reviewing servicing transfer triggers under the agreements, SUF ¶¶ 135-40.  Yet in negotiating with U.S. Bank to address CHL's alleged breaches, Ambac never hinted that they triggered an EOD.  To the contrary, it affirmatively invoked contract provisions that apply only *absent* an EOD.  *See infra* at 22.

Ambac's own witnesses and files confirm that Ambac did not conclude that CHL's breaches could trigger EODs.  Jean Kim, Ambac's lawyer responsible for these deals, testified that any "nonstandard" provisions would have been brought to her attention, but that she did not

---

[6] Ambac asserts (without any support) that its views are not "probative of whether there was a mutual mistake."  Mot. 20.  But Ambac once again skips past ambiguity—and ignores that its views are highly relevant to interpreting ambiguities in the agreements.

recall that happening for any of these trusts, SUF ¶¶ 124-28—even though all agree that EODs based on a seller or originator breach are just that, *see* ECF 213 at 2 ("not the norm").  Ambac's files likewise made no mention of nonstandard EOD provisions for these trusts.  SUF ¶¶ 129-34.

In sum, the agreements are at least ambiguous as to whether CHL's breaches can trigger EODs.  And the extrinsic evidence is far from "so one-sided" in *Ambac's* favor.  Accordingly, Ambac is not entitled to summary judgment that CHL's breaches unambiguously trigger EODs.

**B.**      **Questions of Fact Remain On The Affirmative Defense of Mutual Mistake.**

Even if the Court were to conclude that the agreements unambiguously compel Ambac's reading, Ambac is not entitled to summary judgment on mutual mistake.

Ambac asserts that U.S. Bank's mutual-mistake *defense* is by definition a reformation *claim*.  Mot. 11.  From that premise, Ambac argues that the defense fails because (1) it is untimely; (2) U.S. Bank cannot rely on extrinsic evidence because the agreements are not absurd; and (3) even if extrinsic evidence were available, it does not show that the parties reached an agreement different from that reflected in the contracts.  Mot. 12-17.  Ambac's arguments fail.

**1.**      **Questions of fact remain as to timeliness.**

Ambac says "U.S. Bank's assertion of mutual mistake" is untimely.  Mot. 11-12.  But if this defense is subject to the statute of limitations, then equitable estoppel, which applies "where it would be unjust to allow [a party] to assert a statute of limitations defense," *Zumpano v. Quinn*, 6 N.Y.3d 666, 673 (2006), is also in play.  And for reasons below, questions of fact remain as to equitable estoppel, precluding summary judgment.  *Infra* at 21-24.

**2.**      **Questions of fact remain as to the merits of a mutual-mistake defense.**

Ambac next asserts that U.S. Bank's defense fails because "the contract is [not] absurd or unenforceable as a matter of law," so U.S. Bank cannot invoke extrinsic evidence, and even if extrinsic evidence were available, that evidence does not show "what was *actually* agreed upon

17

between the parties."  Mot. 12, 17.  Once again, Ambac's arguments are unconvincing.

(a)     <b>Absurdity is not relevant to a reformation claim.</b>

To begin, Ambac improperly merges the separate doctrines of reformation and absurdity.

A party seeking reformation does not have to show absurdity (or ambiguity) to rely on extrinsic

evidence.  *E.g.*, *Powermat*, 2020 WL 2892385, at *7 ("parol and extrinsic evidence are generally

admissible in reformation actions").

*Wallace* is not to the contrary.  The court concluded that a reformation claim was time-

barred.  So the court went on to apply general rules of contract interpretation.  Recognizing that

"[t]he rules governing the construction of ambiguous contracts are not triggered unless the court

first finds an ambiguity," the court first asked "whether [the] writing is ambiguous."  *Wallace v.

600 Partners Co.*, 86 N.Y.2d 543, 548 (1995).  The court concluded it was not.  *Id.*  As a result,

and because the contract "is not unenforceable and does not create an absurd result," the court

declined an "excursion beyond the four corners of the document."  *Id.  Wallace*, then, confirms

that when reformation is unavailable (as time-barred or otherwise), general contract

interpretation principles apply.  *See Collins*, 303 F.3d at 435 (addressing breach-of-contract and

reformation claims based on same mutual-mistake theory, and reversing grant of summary

judgment on contract claim because the agreements were ambiguous but affirming grant of

summary judgment on reformation claim); *1414 APF, LLC v. Deer Stags, Inc.*, 39 A.D.3d 329,

330-31 (1st Dep't 2007) (finding reformation claim untimely but reversing grant of summary

judgment on contract claim because "[t]he agreement here contains irreconcilable ambiguities").

But even if absurdity were relevant to reformation (or to the extent that Ambac moves on

the standalone interpretative doctrine of absurdity), Ambac still cannot get summary judgment.

The agreements, if unambiguous, are absurd, for many of the same reasons discussed above.  As

just one illustration, if Seller unambiguously means CHL, the agreements would assign to a party

18

(CHL as Seller) obligations (to "service and administer" the loans) that it could not possibly fulfill (because it "assigned its servicing rights" to Countrywide Servicing under the very same agreement). Surely that is a "disposition that no reasonable person could approve." Mot. 12.[7]

> **(b)     Questions of fact remain as to whether the parties reached a different agreement.**

Ambac asserts the "reformation claim" separately fails because there is no evidence of an agreement "different from what is reflected in the final signed agreement." Mot. 17. But there is more than enough to create an issue of fact as to whether the parties agreed that Servicer would replace Seller in provisions relating to servicing, including in the definition of EODs.

Start with the RSAs. They say that "Countrywide Servicing agrees . . . to perform and observe the duties, responsibilities and obligations that are to be performed and observed by the Seller (as such term is defined in the [MMLPSA]) under the provisions of the [MMLPSA]." Ex. 3 at 2. The parties agreed, then, that Countrywide Servicing would replace the Seller with respect to loan servicing. The RSAs also say "[t]he Trustee shall be entitled to terminate the rights and obligations of *Countrywide Servicing* under this Agreement, *as provided in Section 14* (Default)." *Id.* at 3 (emphases added). Given that Section 14 deals with termination of only the *Seller*, the parties must have agreed that Seller would be replaced with Servicer in Section 14. The PSAs confirm this—the trustee can terminate the Servicer, not CHL. Ex. 2 § 7.02.

The Prospectus Supplements are further "persuasive evidence" of an agreement that only Servicers' conduct would trigger EODs. *See Wells Fargo Bank, N.A. v. ESM Fund I, LP*, 785 F. Supp. 2d 188, 196 (S.D.N.Y. 2011); *aff'd sub nom. Wells Fargo Bank, N.A. v. Fin. Sec. Assur.*

---

[7] Ambac's arguments against absurdity are unconvincing. Ambac says that "neither novelty nor unconventionality" creates absurdity. Mot. 15. But we do not argue that reading Seller as CHL is absurd because that creates a "novel" EOD—the absurdity arises from applying that reading throughout the agreements. And in arguing that "the EOD definition" is not absurd, Mot. 16, Ambac forgets the EOD definitions do not stand alone, but are part of the Servicing Agreements.

*Inc.*, 504 F. App'x 38 (2d Cir. 2012) (rejecting argument district court "erred in considering, in interpreting the PSA, the Prospectus Supplement and other transaction documents related to the PSA"). They expressly describe EODs based on *servicer* conduct, and say nothing about EODs based on CHL conduct. This "conflict" between the Prospectus Supplements and PSAs (at least as Ambac reads them) "raises the specter that the [PSA] does not accurately reflect the intent of the contracting parties, and contains a mistake." *In re Trusteeship*, 2014 WL 3858506, at *23.

Ambac at various points emphasizes that the contacts were "drafted by sophisticated parties." Mot. 2. True enough. But it is not difficult to see how even these sophisticated parties "would have signed a contract that so clearly sets forth a different bargain than the one they intended to make." *Powermat*, 2020 WL 2892385, at *9. The deal documents were cobbled together from contracts governing different deals and were signed only weeks after drafting, SUF ¶¶ 109-23—drafting was hardly "meticulous and unhurried." *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 220 (1978). It is undisputed that this "rushed" process resulted in at least some mistakes, *Powermat*, 2020 WL 2892385, at *9, JSF ¶¶ 93-94, including in the no-investigation clause—in removing references to the Securities Administrator, the parties failed to conform related language, resulting in a missing "not." SUF ¶¶ 109-14. And there is significant evidence that the parties also made a mistake in failing to change Seller to Servicer in multiple provisions throughout the Servicing Agreements, for all the reasons above.

Ambac also contends U.S. Bank has no "contemporaneous evidence" that the parties to the PSAs or RSAs reached a different agreement than what Ambac says is reflected in the signed agreements. Mot. 17. But both the RSAs and the Prospectus Supplements *are* contemporaneous evidence that the parties agreed Seller would say Servicer in provisions about servicing, including the EOD provisions—*i.e.*, of an agreement different from what Ambac says the

contracts reflect.  To the extent Ambac says that U.S. Bank must rely on "drafting history" or witness recollection, *see* Mot. 18-19, that is wrong.  *See In re Trusteeship*, 2014 WL 3858506, at *23 ("witness who directly recalls the mistake" unnecessary "when the drafting history and structure of the Deal Documents already show that there was a mistake").

One last point.  Ambac spends pages emphasizing that U.S. Bank cannot identify any witnesses who remember the drafting history or whether there was a different agreement.  Mot. 17-19.  But it was Ambac that waited over a decade after these agreements were drafted to even file this case, a delay that made this type of evidence less likely to be available.  Ambac's delay, of course, also means its claims are time-barred, as explained in U.S. Bank's separate motion.

In all events, Ambac is not entitled to summary judgment on mutual mistake:  the agreements are ambiguous, and there is at least a question of fact as to whether the parties agreed to replace Seller with Servicer in the EOD provisions.

## II.   ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON U.S. BANK'S ESTOPPEL AND WAIVER DEFENSES.

Ambac argues that the agreements are "clear" and "plain" that CHL breaches can trigger EODs.  As established above, they are not.  But to the extent Ambac suggests that it thought all along that CHL's breaches could trigger EODs, it runs into the doctrines of equitable estoppel and waiver.  At the very least, issues of fact preclude summary judgment on these defenses.

### A.   Issues Of Fact Preclude Summary Judgment On Equitable Estoppel.

Equitable estoppel is a matter of fairness—it "prevent[s] the enforcement of rights [that] would work fraud or injustice []on [a] person" who, "in justifiable reliance []on the opposing party's words or conduct, has been misled into acting []on the belief that such enforcement would not be sought."  *Nassau Tr. Co. v. Montrose Concrete Prod. Corp.*, 56 N.Y.2d 175, 184 (1982).  "Estoppel is usually a question of fact inappropriate for summary judgment."  *Intelligent*

*Digital Sys., LLC v. Beazley Ins. Co.*, 906 F. Supp. 2d 80, 95 (E.D.N.Y. 2012).

This is the "usual[]" case—summary judgment is inappropriate. Ambac asserts CHL's failure to deliver complete mortgage files and to repurchase loans with R&W breaches triggered EODs. ECF 244-11 at 21-26. According to Ambac, CHL's failure to deliver complete mortgage files was "well known by 2010 and 2011." ECF 62 ¶ 59; *see also id.* ¶ 66. And U.S. Bank provided notice of CHL's failure to repurchase loans in Harborview 2005-8 by March 5, 2012. ECF 244-17; *see also* SUF ¶¶ 141-44 (reports to investors reflected no repurchases).

Yet in conversations with U.S. Bank spanning from 2011 to 2014—all centered around CHL's breaches—Ambac never once suggested that those breaches could trigger or had already triggered EODs. JSF ¶¶ 174-246; SUF ¶¶ 141-55. Not only that, both parties asserted their understanding that EODs had *not*, in fact, occurred. Specifically, each invoked a clause—the one that reads (mistakenly) "the trustee shall be bound to conduct any investigation"—that applies *only absent an EOD*. *See* JSF ¶¶ 188-89, 196-97, 200-03, 221; SUF ¶¶ 145-55. And even when U.S. Bank (twice) asked Ambac to identify a provision that would render this pre-EOD clause inapplicable, Ambac never said that the clause did not apply because an EOD had occurred—Ambac instead invoked the clause for its benefit. *See* JSF ¶¶ 188-225; SUF ¶¶ 145-55; *see also*, *e.g.*, Ex. G (2013 Ambac letter asking U.S. Bank to investigate, pursuant to the investigation clause, "prior to the occurrence of an Event of Default."). Because Ambac led U.S. Bank to believe that Ambac agreed that CHL's breaches could not trigger EODs, U.S. Bank never had the opportunity to address the purported EODs or to otherwise bring a timely reformation claim. This, at the very least, raises a question of fact as to estoppel.

Ambac's contrary arguments fail to persuade. Ambac says that its "silence cannot support a claim of equitable estoppel." Mot. 22. That is wrong factually and legally. Factually,

Ambac was not merely silent.  As just explained, it made *affirmative* statements suggesting that EODs had not occurred based on CHL's breaches.  In any event, legally, "[s]ilence may act as a 'representation' for purposes of estoppel when one has a duty to speak *or* one knows that the other party was acting under a mistaken belief."  *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 498 (S.D.N.Y. 2020) (emphasis added) (alteration omitted). For example, a party's "silence in the face of [the other party's] assertion of its interpretation of" a contract can amount to "falsely misrepresent[ing] its intent to challenge" that interpretation. *Gen. Elec. Cap. Corp. v. Armadora, S.A.*, 37 F.3d 41, 46 (2d. Cir. 1994) (applying estoppel). That tracks the facts here—Ambac knew that U.S. Bank did not believe CHL's breaches had triggered EODs, yet Ambac never even suggested that U.S. Bank's interpretation was mistaken.

Ambac next asserts that it "did not know the facts demonstrating an EOD" and so "could not have concealed that which it did not know."  Mot. 22.  But Ambac itself alleged that CHL's breaches were "well known by 2010 and 2011," and U.S. Bank gave notice of CHL's failure to repurchase in 2012.  *See supra* at 22.  So fact issues remain on Ambac's "actual or constructive knowledge."  Mot. 22; *see Health-Loom Corp. v. Soho Plaza Corp.*, 272 A.D.2d 179, 181 (1st Dep't 2000) (estopped party must have "knowledge, actual or constructive, of the true facts").

Similarly unconvincing is Ambac's argument that U.S. Bank cannot show reasonable reliance because it "had to look no further than to the plain language of the [a]greement to know that an [EOD] had occurred."  Mot. 23.  As already explained, the contract is anything but "plain."  *See supra* at 7-17.  And U.S. Bank's understanding of what triggers an EOD is reasonable given the ambiguities and extrinsic evidence discussed above.  *Id.*; *see also U.S. Energy Sys., Inc. v. Enviro Partners, L.P.*, 1999 WL 123806, at *6 (S.D.N.Y. Mar. 8, 1999) (question of fact as to estoppel where the agreement was "ambiguous").  That distinguishes this

23

case from *Gaia House Mezz LLC v. State Street Bank & Trust Co.* (Mot. 22-23), where the party claiming estoppel did not dispute that an event of default occurred under the "plain language" of the agreement, and the parties' course of dealing contradicted a claim of estoppel.  720 F.3d 84, 91-92 (2d Cir. 2013).  Here, given the parties' interactions, U.S. Bank had no way of knowing that Ambac would ultimately contest U.S. Bank's understanding.  *See Armadora*, 37 F.3d at 45 ("[w]hatever the ultimate merits of [a party's] interpretation of [the contract] as a matter of contract law" a party can assert estoppel where it "made its view [of the contract] clear" to the other party and the other party "failed to state its view of the proper interpretation").

Finally, Ambac suggests that any reliance was not to U.S. Bank's detriment.  Mot. 23. But that is not so.  If Ambac hadn't misrepresented its interpretation of the agreement, U.S. Bank could have taken action to address any purported EODs or filed a timely reformation claim.  *See Health-Loom Corp.*, 272 A.D.2d at 182 (detrimental reliance when party "refrained from taking [certain] steps" under an agreement).  Thus, at the very least, there is a question of fact as to U.S. Bank's detrimental reliance.  Summary judgment on estoppel is therefore inappropriate.

### B.      Issues Of Fact Preclude Summary Judgment On Waiver.

"A breach of contract may be waived by the non-breaching party."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 584-85 (2d Cir. 2006).  Waiver "requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable"—it does not require "detriment to the [other] party." *Nassau*, 56 N.Y.2d at 184.  Waiver is "a question of fact."  *Beth Israel*, 448 F.3d at 584. And here, the parties' interactions, especially Ambac's express statements to U.S. Bank, raise a trial issue as to whether Ambac waived post-EOD claims based on CHL breaches.  *Supra* at 22.

Ambac's contrary points mostly just rehash its flawed estoppel arguments.  Ambac first argues that silence is not enough.  Mot. 24-25.  But "[w]aiver may be established by affirmative

conduct *or by failure to act* so as to evince an intent not to claim a purported advantage." *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236 (1995) (emphasis added). Indeed, waiver "[m]ore commonly" is "proved [with] declarations, acts and *nonfeasance* which permit different inferences to be drawn," in which case it is "properly left to the trier of fact." *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983) (emphasis added). Ambac also says that it did not have the MMLPSA "until years after closing." Mot. 25. That is doubtful, given that it has been publicly available since 2006. SUF ¶ 134. At any rate, that does not help Ambac. If Ambac *had* the agreements by 2011—what one might say is "years after closing"—Ambac *would* have known that CHL breaches trigger EODs (under Ambac's reading) when it negotiated with U.S. Bank. That is what matters. What Ambac knew at "closing" does not.[8]

Ambac also invokes PSA § 7.03—which says that the "Majority Certificateholders" can "direct the Trustee to waive" EODs, Ex. 2 § 7.03—to argue that *Ambac* cannot waive EODs. But § 7.03 concerns a waiver of *the trust's* contract rights against *the Servicer*, under which an EOD "shall cease to exist." The issue here, by contrast, is *Ambac's* waiver of its contract rights against *the trustee*. Nothing prevents that waiver. At any rate, "a non-waiver clause in a contract does not by itself preclude the waiver" of contract rights. *Rsch. Frontiers Inc. v. Prelco Inc.*, 2020 WL 6746730, at *5 (E.D.N.Y. Nov. 17, 2020). Ambac's waiver arguments thus fail.

## CONCLUSION

Ambac's motion for partial summary judgment should be denied.

---

[8] Ambac cites JSF ¶ 45, but that addresses only whether Ambac has a notice duty. And if Ambac meant to cite JSF ¶ 72, that asserts only that Ambac did not have the MMLPSA "at or around the time of negotiation or closing for" the trusts. But again, closing is not the relevant time here.

Dated: December 22, 2021
      Boston, Massachusetts

Respectfully submitted,


/s/ David F. Adler
JONES DAY

David F. Adler
Michael T. Marcucci
100 High Street, 21st Floor
Boston, Massachusetts  02110-1781
(617) 449-3939; (617) 449-6999 (fax)
dfadler@jonesday.com
mmarcucci@jonesday.com

Louis A. Chaiten
Shimshon Balanson
North Point
901 Lakeside Avenue East
Cleveland, Ohio  44114-1190
(216) 586-3939; (216) 579-0212 (fax)
lachaiten@jonesday.com
sbalanson@jonesday.com

Albert J. Rota
2727 N. Harwood Street, Suite 500
Dallas, Texas  75201-1515
(214) 220-3939; (214) 969-5100 (fax)
ajrota@jonesday.com

*Attorneys for Defendant U.S. Bank National Association*