UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION,<br><br>                              Plaintiff,<br><br>              -v-<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>                              Defendant. | 17 Civ. 2614 (PAE) (KHP)<br><br><u>OPINION &</u><br><u>ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

"This is another of the seemingly-endless stream of derivative actions brought by plaintiffs who lost money that had been invested in residential mortgage-back securities ('RMBS') when the housing market collapsed." *Bakal v. U.S. Bank Nat'l Ass'n*, 747 F. App'x 32, 34 (2d Cir. 2019) (summary order) (internal quotation marks omitted). This particular case turns on the contractual and fiduciary duties defendant U.S. Bank National Association ("U.S. Bank") allegedly owed as trustee to five trusts that closed in mid-to-late 2005. Each trust comprised thousands of residential mortgage-backed securities backed by home loans originated by Countrywide Home Loans, Inc. ("CHL"), whose shoddy practices during that era infamously contributed to the collapse of the housing market and the nation's 2008 economic crisis. Plaintiff Ambac Assurance Corporation ("Ambac") insured certain classes of securities within the trusts. When many borrowers on the loans underlying those securities failed to meet their payment obligations, Ambac became saddled with hundreds of millions of dollars in claims by certificate holders. Ambac alleges here that those claims could have been avoided, had U.S. Bank fulfilled its contractual and fiduciary obligations to act against CHL so as to protect the trusts' interests. Ambac seeks more than $340 million dollars from U.S. Bank for its alleged breaches.

More than four years ago, the Hon. William H. Pauley III, to whom this case originally was assigned, issued a decision granting in part and denying in part U.S. Bank's motion to dismiss. *See Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141 (S.D.N.Y. 2018) ("*Ambac I*"). The case has since been in extensive discovery, and was transferred to this Court upon Judge Pauley's untimely death. U.S. Bank and Ambac have filed cross-motions for partial summary judgment. U.S. Bank's motion principally argues that Ambac's claims are time-barred. Ambac's motion principally argues that a number of U.S. Bank's affirmative defenses are precluded by contract text.

For the reasons below, the Court grants in part and denies in part U.S. Bank's motion for partial summary judgment; and grants in full Ambac's motion for partial summary judgment. The case will now proceed to the completion of expert discovery and thereafter to trial.

## I.    Factual Background[1]

The Court assumes familiarity with Judge Pauley's decision in *Ambac I*, which set out the factual background of this case in detail. *See id.* The Court here recounts the facts pertinent to the cross-motions for partial summary judgment.

---

[1] This account draws upon *Ambac I*, 328 F. Supp. 3d 141, and the parties' submissions in support of and opposition to the pending motions. Those include, in addition to the sources identified *infra* in Section II.A: the parties' joint statement of facts, Dkt. 237 ("JSF"); Ambac's Local Rule 56.1 statement, Dkt. 242 ("Ambac 56.1"); U.S. Bank's Local Rule 56.1 statement, Dkt. 245 ("U.S. Bank 56.1"); U.S. Bank's counterstatement to the Ambac 56.1, Dkt. 248 ("U.S. Bank Counter 56.1"); Ambac's counterstatement to the U.S. Bank 56.1, Dkt. 252; U.S. Bank's "responses to plaintiff's additional facts," Dkt. 261; Ambac's reply to U.S. Bank's counterstatement to the Ambac 56.1, Dkt. 264; Peter Tomlinson's declaration in support of Ambac's motion for partial summary judgment and exhibits attached thereto, Dkt. 246; declarations in support of U.S. Bank's motion for partial summary judgment and exhibits attached thereto, submitted by Eve Kaplan, Dkt. 240, and Michael Marcucci, Dkts. 244 (initial declaration), 260 (supplemental declaration); Marcucci's declaration in support of U.S. Bank's opposition to Ambac's motion for partial summary judgment and exhibits attached thereto, Dkt.

### A.     The Parties and Securitization Process

U.S. Bank is a national bank that has continuously served as trustee for five trusts (the "trusts"[2]) since they closed in mid-to-late 2005.[3]  JSF ¶¶ 13–14, 23–27.

Ambac is a monoline insurer that issued financial guaranty insurance on several lines of financial products, including structured finance such as the RMBS making up the trusts, described below.  *Id.* ¶ 66.

Each trust comprises thousands of home loans originated by non-party CHL that have been "securitized" into residential mortgage-backed securities.  *Id.* ¶ 15.

Judge Pauley described the basics of the mortgage loan securitization process this way:

> In broad strokes, the process begins when a lender (the "Originator") originates mortgage loans and sells its interest in those loans to another financial institution (the "Sponsor"), which pools the loans and transfers the loan pools to a special purpose vehicle (the "Depositor").  The Depositor then conveys the loan pools to a trust, which subsequently issues certificates (*i.e.*, RMBS) backed by cashflows from payments made by borrowers of the underlying mortgage loans.  Because investors who purchase the certificates essentially purchase entitlements to these

---

249; and Henry Ricardo's declaration in support of Ambac's opposition to U.S. Bank's motion for partial summary judgment and exhibits attached thereto, Dkt. 253.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] The five trusts are entitled Harborview Mortgage Loan Trust ("Harborview") 2005-2, Harborview 2005-8, Harborview 2005-12, Harborview 2005-13, and Harborview 2005-16.  JSF ¶ 13.

[3] The trusts closed on April 12, 2005 (Harborview 2005-2), July 29, 2005 (Harborview 2005-8), September 30, 2005 (Harborview 2005-12 and Harborview 2005-13), and November 30, 2005 (Harborview 2005-16).  JSF ¶¶ 23–27.

        payments, their rate of return ultimately turns on the creditworthiness of the loans
        and the borrowers' ability to repay them.

*Ambac I*, 328 F. Supp. 3d at 147 (citing *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d

581 (2015)).

      The certificates, as Judge Pauley further explained, are "divided into tranches, or classes,

that correspond to different payment priorities. To protect investors against the risk of

insufficient payments by borrowers, insurers like Ambac issued policies guaranteeing payments

on those certificates in exchange for a premium." *Id.* Specifically, Ambac issued Certificate

Guaranty Insurance Policies to each trust. JSF ¶ 29. Those policies guaranteed payments to

investors of certain classes of certificates within a trust, in the event that the trust proved to lack

sufficient funds from its cashflows to pay those certificate holders. *Id.* ¶¶ 28–29.

      **B.**    **The Contracts**

      On April 1, 2003, CHL sold its interest in the relevant underlying loans it had originated

to the trusts' sponsor, Greenwich Financial Products, Inc. ("Greenwich"). *Id.* ¶ 16. The Master

Mortgage Loan Purchase and Servicing Agreement governed that transaction. *Id.*; *see* Dkt. 244

("Marcucci Decl."), Ex. 10 ("MMLPSA"). Greenwich acquired from CHL all relevant loans

here under the MMLPSA, which applies to each trust. JSF ¶ 16. Despite CHL's having sold its

interest in the underlying loans to Greenwich, under the MMLPSA, CHL continued to exercise

valuable servicing rights (including coordinating the process and handling of borrowers' monthly

mortgage payments, for consideration). *See id.* ¶ 18.

      The MMLPSA required CHL to make certain representations and warranties about the

quality of the loans, and to deliver complete "Mortgage Files" to the trusts' custodian. *Id.* ¶¶ 19–

20; *see* MMLPSA §§ 6.03, 7.02. Mortgage Files comprise numerous documents, including, but

not limited to, the original mortgage note, the original mortgage, and the original or certified

copy of the lender's title insurance policy. JSF ¶ 96. Bank of New York Mellon ("BNYM")

acted as custodian—U.S. Bank's "designated agent" for purposes of receiving and reviewing

Mortgage Files for completion and compliance with a Custody Agreement entered into between

U.S. Bank and BNYM. *Id.* ¶¶ 18, 38, 95, 97–98. Part of BNYM's responsibilities as custodian

was to transmit to U.S. Bank an "exception report" that identified missing documents in

Mortgage Files. *Id.* ¶ 99. Aside from those Mortgage Files identified in the schedule of

exceptions listed in an exception report, BNYM was to confirm that complete Mortgage Files

were delivered by CHL and in the proper form. *Id.* ¶ 100.

In 2003, Greenwich securitized the loans it had acquired from CHL by pooling them

together and transferring them to a depositor, which then conveyed the loans to the trusts. A

Pooling and Servicing Agreement governed each such transaction for a trust. *See, e.g.*, Marcucci

Decl., Ex. 5 ("PSA"); JSF ¶¶ 13, 21–22. Each trust's PSA, for all relevant purposes here, is

identical. JSF ¶ 22[4]; Dkt. 243 (memorandum of law in support of Ambac's motion for partial

summary judgment, or "Ambac Mot.") at 4 n.5. They are the vehicles through which Greenwich

assigned its rights against CHL to U.S. Bank, the trustee. *Id.* ¶¶ 21–22. The PSA governs the

administration of the trusts and sets forth U.S. Bank's obligations as trustee. *See id.* ¶ 32. Under

the PSA, Ambac is an express third-party beneficiary. *Id.* ¶ 30.

Between April and November 2005, CHL transferred its servicing functions to

Countrywide Home Loans Servicing LP ("CHL Servicing").[5] JSF ¶ 31; *Ambac I*, 328 F. Supp.

---

[4] For simplicity, the Court will refer to a singular "PSA" and cite to the Harborview 2005-2 PSA.

[5] CHL Servicing later changed its name to "BAC Home Loans Servicing LP" after Bank of
America acquired its parent company. JSF ¶ 33. On July 1, 2013, Nationstar Mortgage LLC
("Nationstar") succeeded BAC Home Loans Servicing LP as servicer. *Id.* ¶ 34.

3d at 148.  For each trust, Greenwich, CHL, and CHL Servicing entered into agreements recognizing that transfer called Reconstituted Servicing Agreements.  *See* JSF ¶ 31; Dkt. 246, Ex. 3 ("RSA").  Each trust's RSA, for all relevant purposes here, is identical.  JSF ¶ 31[6]; Ambac Mot. at 5 n.6.  The RSA effectively amends and restates certain provisions of the MMLPSA to account for the transfer of servicing rights from CHL to CHL Servicing.  JSF ¶ 32; *see also* Dkt. 249, Ex. A (redlined version of MMLPSA demonstrating changes the Harborview 2005-2 RSA made to the MMLPSA).

### C.   Ambac's Allegations

U.S. Bank's relevant obligations as Trustee are provided by the PSA and common law.[7] *See infra* Section III.  Principally here, U.S. Bank must take certain actions both before and after contractually defined "Events of Default" (or "EODs") occur.  The PSA incorporates by reference the MMLPSA's definition of an EOD, as amended by the RSA.  JSF ¶¶ 47–48; *see* PSA § 1.01; MMLPSA § 14.01 (EOD provision); RSA § 16 (detailing changes RSA makes to MMLPSA's EOD provision).  Relevant here, an EOD occurs shortly after a contractually defined "seller"[8] of loans fails to fulfill one of *its* obligations under the MMLPSA—for instance,

---

[6] For simplicity, the Court will refer to a singular "RSA" and cite to the Harborview 2005-2 RSA.

[7] While Ambac also alleged state statutory duties under New York's Streit Act, *see* N.Y. Real Prop. Law §§ 124 *et seq.*, *Ambac I* dismissed those claims.  *See* 328 F. Supp. 3d at 164–65.

[8] The parties dispute whether "seller" means CHL.  *See infra* Section IV.A.  For purposes of U.S. Bank's motion for partial summary judgment, however, the parties—and the Court—assume *arguendo* that it does.  *See, e.g.*, Dkt. 239 (memorandum of law in support of U.S. Bank's motion for partial summary judgment, or "USB Mot.") at 10 (making statute of limitations argument "[e]ven accepting [Ambac's] theory—that document defects triggered EODs").

30 days after CHL fails to deliver complete Mortgage Files.[9]  *See, e.g.*, MMLPSA §§ 6.03

(committing seller to deliver complete Mortgage Files), 14.01(ii) (EOD occurs when "Seller

[fails] duly to observe or perform in any material respect any other of the covenants or

agreements on the part of the Seller set forth in this Agreement which continues unremedied for

a period of thirty days").

U.S. Bank's general pre-EOD obligations—that is, obligations it owes regardless of

whether an EOD occurs—include certifying that Mortgage Files are complete, PSA § 2.02;

notifying and enforcing CHL's obligation to cure or repurchase certain defective loans, *id.*

§ 2.03(a); and enforcing the loans' servicers' obligations to properly service the loans, *id.* § 3.01.

U.S. Bank's general post-EOD obligation—that is, an additional duty U.S. Bank owes after an

EOD has occurred—is to act as a prudent person would.  *Id.* § 8.01 ("If an Event of Default has

occurred . . . , the Trustee shall exercise such of the rights and powers vested in it by this

Agreement, and use the same degree of care and skill in their exercise, as a prudent man would

exercise or use under the circumstances in the conduct of his own affairs.").  The nomenclature

of "pre-" and "post-" EOD captures only the point in time that a duty arises.  U.S. Bank's pre-

EOD obligations bind U.S. Bank whether or not an EOD actually occurs.  And those pre-EOD

obligations do not cease if and when an EOD does occur.  Rather, after an EOD occurs, U.S.

Bank is bound by both its pre- and post-EOD obligations.

---

[9] EODs occur at the trust level, meaning, for example, that a single instance of the seller failing to deliver a Mortgage File as to one loan would not trigger an EOD.  Although not at issue on the instant cross-motions, the parties have indicated competing views on whether the breaches in a given trust were material.  *See* MMLPSA § 14.01(ii) (EOD occurs when seller fails "to observe or perform in any *material respect*") (emphasis added); Dkt. 274 (transcript of February 17, 2022 conference, or "Feb. 17 Tr.") at 8–9, 15, 17–18, 35, 37, 53, 57–58 (discussing materiality).

Ambac here alleges that certain of U.S. Bank's pre-EOD obligations (such as, in certain circumstances, the duty to enforce CHL's obligations and "cause CHL to repurchase" defective loans, *see* PSA § 2.03(a)) were triggered by (1) CHL's failure to repurchase breaching loans in the Harborview 2005-8 Trust despite a demand being made, Dkt. 62 (Amended Complaint, or "AC") ¶¶ 84–85; (2) CHL's failure to deliver complete Mortgage Files, *id.* ¶¶ 86–87; and (3) U.S. Bank's notice of a lawsuit regarding a trust not at issue here (but from the same shelf of "Harborview" trusts), which comprised contemporaneous loans originated by CHL and which should have alerted U.S. Bank of likely breaches throughout the instant trusts, *id.* ¶ 88. Ambac alleges that post-EOD obligations (namely, its duty to exercise the care of a prudent person) were triggered by (1) CHL's failure to deliver complete Mortgage Files, *id.* ¶¶ 53–62; (2) CHL Servicing's widespread servicing misconduct, *id.* ¶¶ 63–71; (3) CHL's failure to repurchase breaching loans in the Harborview 2005-8 trust despite a demand having been made, *id.* ¶¶ 72–73; and (4) the combination of extensive losses in the trusts and lawsuits filed against CHL that alleged widespread breaches in contemporaneously originated CHL loans, *id.* ¶¶ 75–80.

Ambac alleges that U.S. Bank had a conflict of interest that discouraged it from acting against CHL to protect the trusts as it should have. Like CHL and CHL Servicing, Ambac alleges, U.S. Bank both originated and serviced mortgage loans during the period preceding the financial crisis, and in so doing followed unlawful practices, with respect to which it has since entered into settlement agreements with federal regulators. *Id.* ¶¶ 89–90. Ambac alleges that U.S. Bank's legal interest in those cases disincentivized it from drawing attention to others' suspect origination and servicing practices, and led it not to act against CHL, notwithstanding U.S. Bank's duty to so act to protect the trusts. *Id.* Ambac alleges that U.S. Bank's inaction allowed claims against CHL worth hundreds of millions of dollars to expire, in violation of its

obligations to the trusts. *See id.* ¶ 82. As a result, it alleges, it has paid or accrued $343 million of claims under policies issued to the trusts. *Id.* ¶¶ 91–94.

## II.    Relevant Procedural History

### A.    General Case Management and Motions Practice

On April 11, 2017, Ambac filed the complaint. Dkt. 1. U.S. Bank moved for a stay and to dismiss, briefing for which completed on October 27, 2017. *See* Dkts. 37, 44, 48. On March 12, 2018, after argument on the motion and on the parties' stipulation, Ambac filed an Amended Complaint. Dkt. 62. On June 29, 2018, the Court, per Judge Pauley, issued an opinion and order granting in part and denying in part the motion. It (1) denied U.S. Bank's motion for a stay; (2) dismissed Ambac's fiduciary-duty claim to the extent it was premised on U.S. Bank's duty to act prudently and in good faith[10]; (3) dismissed Ambac's breach-of-contract claims to the extent they were premised on U.S. Bank's obligation to certify that complete Mortgage Files had been delivered to the Trusts[11]; (4) dismissed Ambac's Streit Act claim; and (5) otherwise denied the motion. *See generally Ambac I*, 328 F. Supp. 3d 141.

On August 24, 2018, U.S. Bank answered the complaint. Dkt. 79. On January 7, 2020, after a hearing before Judge Pauley in late 2019, U.S. Bank amended its answer, adding an

---

[10] The opinion and order parsed the timeliness of different theories of fiduciary-duty breach. It dismissed as time-barred fiduciary-duty claims insofar as they were based on Greenwich, CHL, and CHL Servicing's failure to notify U.S. Bank of their breaches. But it did not hold untimely fiduciary-duty claims insofar as they were based on U.S. Bank's failure to notify Ambac of the existence of EODs. *See Ambac I*, 328 F. Supp. 3d at 160–63.

[11] Ambac had conceded that U.S. Bank prepared certifications. On that basis, it asserts that U.S. Bank was on notice of CHL's and Greenwich's breaches of their document delivery obligations. *Id.* at 164. Ambac's principal pre-EOD claim is that U.S. Bank should have enforced CHL's obligations to cure or repurchase loans for which there were missing documents.

affirmative defense of mutual mistake and expanding upon its estoppel defense.  Dkt. 132 ("Am. Answer"); *see* Dkt. 131.[12]

On July 28, 2021, following Judge Pauley's July 6, 2021 death, the case was reassigned to this Court.  On September 15, 2021, the Court held a pre-motion conference to discuss the parties' anticipated cross-motions for summary judgment.  Dkt. 230.  On November 9, 2021, U.S. Bank filed its motion for partial summary judgment, Dkt. 238, and memorandum of law in support, Dkt. 239.  Also on November 9, 2021, Ambac filed its motion for partial summary judgment, Dkt. 241, and a memorandum of law in support.  On December 22, 2021, the parties filed oppositions to each other's motions.  Dkts. 247 ("USB Opp'n"), 250 ("Ambac Opp'n").  On January 31, 2022, the parties filed their respective replies.  Dkts. 259 ("USB Reply"), 263.  On March 16, 2022, U.S. Bank submitted a letter highlighting additional authority for certain of its arguments.  Dkt. 272.  On March 24, 2022, Ambac responded.  Dkt. 273.  On April 8, 2022, U.S. Bank submitted a reply.  Dkt. 276.

On June 28, 2022, the parties stipulated to dismiss certain claims Ambac had brought regarding U.S. Bank's alleged failure adequately to distribute recoveries received by the Trusts, following a Second Circuit summary order clarifying the provisions in question and resolving liability as to them.  Dkt. 285; *see* AC ¶¶ 95–101, 130–43.

In early August 2022—in the run-up to oral argument—the parties each submitted two letters regarding supplemental case authority.  *See* Dkts. 288, 292 (letters from U.S. Bank); 290–91 (letters from Ambac).  On August 17, 2022, the Court heard argument on the cross-motions.  *See* Dkt. 300 (transcript, or "Aug. 17 Tr.").  On August 18, 2022, the Court issued an order

---

[12] Non-dispositive motion practice has included motions for contempt and numerous motions to compel, which the Hon. Katharine H. Parker, United States Magistrate Judge, has ably resolved. *See* Dkts. 71, 88, 141, 191.

directing the parties to submit supplemental letter briefing on a discrete issue concerning a contractual provision that arose at argument but which had not been briefed. Dkt. 293. On August 25, 2022, Ambac filed its supplemental letter. Dkt. 297. On August 30, 2022, U.S. Bank submitted its response letter. Dkt. 298. On September 2, 2022, Ambac filed its reply. Dkt. 299.

### B.      Status of Discovery

On March 16, 2021, fact discovery closed. Expert discovery has proceeded in two phases. Phase 1 consists of expert discovery on issues other than loan-level re-underwriting[13] and damages. Phase 1 expert discovery had initially completed on August 20, 2021. But on June 6, 2022, the parties filed a joint letter informing the Court that U.S. Bank would need to replace its corporate trust industry-custom-and-practice expert due to the expert's health issues. The parties submitted a revised schedule reopening Phase 1 expert discovery to allow for the exchange of new expert reports and depositions. Dkt. 278. On June 10, 2022, the Court granted the request; Phase 1 expert discovery is now scheduled to complete by October 28, 2022.

Phase 2 expert discovery consists of expert testimony as to loan-level re-underwriting and damages. On January 26 and 28, 2022, the parties submitted letters regarding Ambac's proposed use of statistical sampling in connection with Phase 2 discovery. Dkts. 257, 258. The issue on which the parties differed concerned the proper way to value the claims that, Ambac claims, U.S. Bank should have brought against CHL pursuant to its post-EOD prudent-person obligations. On February 17, 2022, the Court held a conference on that issue. On February 24, 2022, so guided by the Court, the parties stipulated (1) to stay Phase 2 expert discovery *sine die*; and, after the instant cross-motions for summary judgment are resolved, (2) to brief certain sampling issues

---

[13] Re-underwriting is the process of reviewing a loan file to determine whether it breaches representations and warranties made in the Trusts' governing contracts, and whether such a breach had a material and adverse effect.

germane to Phase 2 expert discovery; and (3) to propose a new schedule for Phase 2 expert discovery. *See* Dkts. 269, 271.

### III.    Applicable Legal Standards

#### A.    Governing Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

B.       Governing Contractual Interpretation

Under New York law, a cause of action for breach of contract requires "(1) the existence

of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the

contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar.*

*Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quotation omitted); *see also Palmetto*

*Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S.2d 260 (N.Y. App. Div. 2011)

(same).  The plaintiff must allege the specific provisions of the contract upon which liability is

predicated.  *Sud v. Sud*, 621 N.Y.S.2d 37 (N.Y. App. Div. 1995).  Agreements are interpreted in

accordance with the parties' intent, and the best evidence of the parties' intent is what they

expressed in their written contract.  *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430 (2013).

Judgment as a matter of law "is generally proper in a contract dispute only if the language

of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union*

*Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000); *see*

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 138 (2d Cir. 2006). A

contract is unambiguous if on its face it is "reasonably susceptible of only one meaning[.]"

*Selective Ins. Co. of Am. v. Cnty. of Rensselaer*, 26 N.Y.3d 649 (2016) (quotation omitted).  A

written contract that is unambiguous on its face is enforced according to the plain meaning of its

terms.  Conversely, a contract is ambiguous if it is "capable of more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business." *Olin Corp. v. Am. Home Assur. Co.*,

704 F.3d 89, 99 (2d Cir. 2012) (citation omitted).  Whether a contract is ambiguous "is an issue

of law for the courts to decide." *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008)

(quotation omitted).  That the parties interpret a contract provision differently does not make it

ambiguous. *CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*, 9 N.Y.S.3d 220 (N.Y. App. Div. 2015).

## IV.   U.S. Bank's Motion for Partial Summary Judgment

In its motion for partial summary judgment, U.S. Bank makes discrete arguments as to why Ambac's pre-, and post-, EOD claims were filed outside the limitations period.  The Court's discussion first analyzes the timeliness of Ambac's claims of breach of contract.  (Ambac's pre-EOD claims exclusively assert contractual breaches; its post-EOD claims assert breaches of both contractual and fiduciary duties.)  The Court then addresses the timeliness of Ambac's claims of (post-EOD) fiduciary duty breaches.  The Court then addresses two issues on which U.S. Bank moves for summary judgment, but which have proven not in dispute.

### A.   Timeliness of Ambac's Contract Claims

#### 1.   Pre-EOD Contract Claims

##### a.   *What is the relevant duty?*

Ambac's pre-EOD claims are based on U.S. Bank's contractual duty to "enforce" CHL's obligations with respect to loans with document exceptions—that is, loans as to which CHL failed to deliver a complete Mortgage File.[14]  PSA Section 2.03(a) imposes that duty.  It provides, in relevant part:

> Upon its discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originator of any representation, warranty or covenant under the Purchase

---

[14] Ambac does not base its *pre*-EOD contract claims on any alleged breach by CHL of its representations and warranties regarding the loans.  It does base its *post*-EOD contract claims on such breaches.  *See* Ambac Opp'n at 6 ("Ambac's post-EOD claims are that a prudent person in U.S. Bank's shoes would have taken whatever action was necessary to preserve the Trusts' R&W-based repurchase claims before they lapsed."); AC ¶¶ 2, 109; Aug. 17 Tr. at 55–56 ("The pre-EOD claim is a claim to enforce the repurchase of loans with document exceptions. That's it. . . . The thrust of our post-EOD claim is that U.S. Bank should have sued Countrywide for breach of representations and warranties.").

Agreement in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Originator of such defect, missing document or breach and request that the Originator deliver such missing document or cure such defect or breach within 90 days from the date that the Seller was notified of such missing document, defect or breach, and if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the Originator's obligation under the Purchase Agreement and cause the Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price (as defined in the Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period.

PSA § 2.03(a).

The parties disagree on what U.S. Bank's duty was—and therefore when it (as alleged) breached and when Ambac's claims accrued. U.S. Bank argues that its relevant duty was to "'promptly' notify" CHL of the document exceptions. *See* USB Mot. at 8 ("Bank's first failure to act—and thus when U.S. Bank breached and Ambac's claims accrued—was when it allegedly failed to 'promptly' notify CHL under Section 2.03(a)."). U.S. Bank notes that it was on notice of the missing documents in each trust's Mortgage Files (of which there were many thousand) when it received exception reports from BNYM. *See* JSF ¶¶ 95, 107–09, 112–14, 117–19, 122–24, 127–29, 132–34, 137–39, 142–44. It received an exception report for each trust shortly after it closed, no later than December 29, 2005 for the latest-closing trust. *See* Marcucci Decl., Ex. 1 (chart listing dates U.S. Bank received exception reports for each trust, based on stipulations identified at JSF ¶¶ 109–44).

U.S. Bank argues that, after receiving an exception report, it had, at most, 90 days to notify CHL of the missing documents, as CHL itself was required to cure by then.[15] USB Mot.

---

[15] U.S. Bank's argument on this point does not clearly follow from the contract language. The PSA provides that "the Trustee shall promptly notify the Originator of such defect, missing document or breach and request that the Originator deliver such missing document or *cure such defect or breach within 90 days from the date that the Seller was notified* of such missing

at 9–10. U.S. Bank failed to promptly (or ever) notify CHL of any of those exception reports. *See* JSF ¶ 147. Thus, U.S. Bank argues that, if it breached, it breached no later than 90 days after receiving exception reports—on March 29, 2006 for the latest closing Trust. *See* Marcucci Decl., Ex. 1. On this theory, Ambac's contract claims against U.S. Bank accrued on that same day, because contract claims accrue on breach. *See Deutsche Bank Nat'l Tr. Co. for Harborview Mortg. Loan Tr. v. Flagstar Cap. Mkts. Corp.*, 32 N.Y.3d 139, 145 (2018). Insofar as Ambac's claims against U.S. Bank undisputedly are governed by a six-year statute of limitations, U.S. Bank argues that the last of Ambac's claims became untimely on March 29, 2011—long before it initiated this action on April 11, 2017.

U.S. Bank's theory that Ambac's claim accrued at the end of the "notice" period fails because it conflates its contractual duty to notify with its follow-on contractual duty to "enforce." This error, indeed, infects a central precedent on which U.S. Bank relied but which, last month, was overturned: *IKB Intern., S.A. v. LaSalle Bank N.A.*, No. 654436/2015, 2021 WL 358318 (N.Y. Sup. Ct. Jan. 27, 2021), *rev'd sub nom. IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 2022 WL 3720417 (N.Y. App. Div. Aug. 30, 2022). There, a New York state trial court dismissed as untimely claims similar to those here, finding that the "alleged breaches occurred on the dates on which the Trustees were first required, in connection with the closing of the Trusts, to perform the mortgage loan file obligations, including not only the review and certification of the mortgage loan files but also any obligation to seek repurchase based on loan file defects." 2022

---

document, defect or breach." PSA § 2.03(a) (emphasis added). The most natural reading of this language is that, once the seller is notified of document defects and the like, the seller has 90 days to cure. Although the parties dispute whether "seller" meant CHL, *see infra* Section IV.A.1, neither party suggests that *U.S. Bank* was the relevant "seller" whose notice of document defects triggered a 90-day period to notify CHL of the defects. U.S. Bank was required instead to "promptly" notify CHL of the defects, *after* which *CHL* had 90 days to cure.

WL 3720417, at *6. But on the recent appeal, the First Department reversed. It explained that the accrual of plaintiff's claims "cannot be decided on pleadings," because "[t]he governing agreements did not specify how soon *after the sellers' failure to cure* that defendants were required to bring a putback action [(the alleged breach)], and what would be a reasonable time, in lieu of a specified time, cannot be determined at this stage." *Id.* (emphasis added).[16]

This Court is persuaded that U.S. Bank's framing here is similarly in error, and that, as Ambac argues, the timeliness of its claims turns not on U.S. Bank's duty to *notify*, but on its follow-on duty to *enforce*. *See* PSA § 2.03(a) ("[T]he Trustee shall enforce [CHL's] obligation under the Purchase Agreement and cause [CHL] to repurchase that Mortgage Loan."). Ambac's contention is that U.S. Bank not only failed to notify CHL of document exceptions, but also thereafter failed to "enforce" CHL's obligation to repurchase loans which lacked complete Mortgage Files. It could have done so, Ambac posits, by bringing "putback actions" against CHL—lawsuits demanding that CHL repurchase the affected loans. U.S. Bank had six years to do so. *See ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 596 (2015) ("If the cure or repurchase obligation did not exist, the Trust's only recourse would have been to bring an action against [the seller] for breach of the representations and warranties. That action could only have been brought within six years of the date of contract execution."). It did not bring any such actions, however. According to Ambac,

---

[16] *IKB*'s recent reversal also undermines U.S. Bank's reliance on *MLRN LLC v. U.S. Bank Nat'l Ass'n*, No. 652712/2018, 2022 WL 2679090 (N.Y. Sup. Ct. July 12, 2022), a decision to which U.S. Bank alerted the Court in an August 1, 2022 letter, *see* Dkt. 288. The *MLRN* Court, on summary judgment, held that that the relevant breach of many pre-EOD duties "occurred when U.S. Bank first breached its obligation under the PSA," which it identified as "the day following the Seller's cure period." 2022 WL 2679090, at *5. But as case authority in support of that holding, the *MLRN* Court cited—exclusively, in a lengthy block quote—the exact portion of the trial court's decision in *IKB* that the First Department recently repudiated. *See id.*

U.S. Bank breached upon the expiration of the statute of limitations on its potential putback claims against CHL.

Thus, as to Ambac's suit against U.S. Bank, Ambac's theory of timeliness effectively "stacks" two limitations periods: first, the six years which U.S. Bank had in which to sue CHL, and second, the six years which Ambac thereafter had to sue U.S. Bank for failing to do so. *Cf. In re Smith*, 400 B.R. 370, 379 (Bankr. E.D.N.Y. 2009), *aff'd*, 426 B.R. 435 (E.D.N.Y. 2010), *aff'd*, 645 F.3d 186 (2d Cir. 2011) (debtor's claim that a trustee breached fiduciary duty by failing to prosecute estate's claims accrued on "the date that the underlying causes of action expired"); *Shumsky v. Eisenstein*, 96 N.Y.2d 164, 166 (2001) (holding that the "legal malpractice cause of action against defendant accrued . . . when the Statute of Limitations expired on the underlying breach of contract action"). Ambac filed this lawsuit on April 11, 2017, exactly 12 years after April 11, 2005—the day U.S. Bank received the exception report for the earliest closing Trust. Ambac's April 11, 2017 filing is within 12 years as measured from the day CHL assertedly failed to cure—the trigger for U.S. Bank's enforcement duty.

The Court holds, with Ambac, that the duty to enforce is controlling for the purposes of measuring the timeliness of Ambac's suit against U.S. Bank. To be sure, as U.S. Bank notes, its duty to enforce is entwined with its antecedent duty of notice. Both arise from PSA Section 2.03(a). And compliance with the former (notice) is prerequisite to compliance with the latter (enforcement), in that, before "enforcing," U.S. Bank needed to have notified CHL of the document exceptions and given CHL an opportunity to cure. Only 90 days after giving such notification—which U.S. Bank never did—was U.S. Bank required to "enforce" the duty (had CHL not cured). Ambac's theory of breach thus posits a pair of lapses by U.S. Bank: *Had* U.S. Bank "promptly notif[ied]" CHL of the document exceptions, and *had* CHL failed to cure, *then*

U.S. Bank would have had six years to "enforce" the obligation by bringing putback actions against CHL, which it failed to do. But that Ambac's theory posits sequential breaches does not support holding the earlier of the two as setting the trigger for legal action by Ambac. Such would conflate the two alleged breaches. And it would unfairly prejudice Ambac, by allowing U.S. Bank to leverage its earlier breach to set an earlier claim-accrual date than would otherwise apply to its breach of its duty to enforce.

Courts in similar circumstances have declined to allow defendants claiming untimeliness to shield themselves from liability on the ground that before one obligation (*e.g.*, enforcement) they had breached a prerequisite one (*e.g.*, notification). *See, e.g.*, *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, 249 (S.D.N.Y. 2020) ("Generally, the prevention doctrine provides that a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party itself. Under many of the PSAs, an EOD only occurs once U.S. Bank delivers written notice to the Servicer of a material breach. This creates an anomaly where U.S. Bank's failure to provide notice to the Servicers would shield U.S. Bank from liability.") (internal quotation omitted); *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 70 (S.D.N.Y. 2013) ("[T]he trustee cannot rely on its own failure to give notice to escape its own liability."), *abrogated on other grounds by Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 4394 (AJN), 2016 WL 439020, at *5 (S.D.N.Y. Feb. 3, 2016) ("Defendant cannot avoid liability by insisting upon written notice from the Depositor when Defendant prevented such notice from being sent.") (alterations omitted). The logic of these decisions is persuasive. Thus, to the extent U.S. Bank argues that Ambac's claims accrued the moment U.S. Bank failed to "promptly notify" CHL of

the document exceptions, the Court is unpersuaded.[17]  Ambac's claims instead accrued, the Court

holds, once U.S. Bank failed to "enforce."

The Court accordingly turns to two arguments U.S. Bank makes as to the duty to enforce.

The first involves whether that duty can fairly be read, as Ambac claims, to include bringing

putback actions against CHL.  The second involves the timeframe within which U.S. Bank was

required to bring such an action.

<em>b.     Can "enforce" mean "sue"?</em>

The parties dispute whether, as a matter of contract construction, U.S. Bank's duty to

"enforce [CHL]'s obligation under the Purchase Agreement and cause [CHL] to repurchase that

Mortgage Loan" could encompass bringing putback actions against CHL.  PSA § 2.03(a).

Because U.S. Bank is the movant as to this summary judgment argument, it must show, as a

matter of law, that its enforcement duty could *not* have included bringing such an action.  *See*

*Compagnie Financiere*, 232 F.3d at 157 (summary judgment "is generally proper in a contract

dispute only if the language of the contract is wholly unambiguous").  On U.S. Bank's motion, it

is not Ambac's duty to establish that the enforcement duty necessarily included bringing such an

action.  *See Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990)

("Summary judgment normally is inappropriate when a contractual term is ambiguous because 'a

---

[17] U.S. Bank's briefing largely focuses on the meaning of "prompt notice" as elucidated by the case law.  *See* USB Mot. at 9; *Const. Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F. Supp. 124, 130 (S.D.N.Y. 1997), *aff'd*, 182 F.3d 899 (2d Cir. 1999) (interpreting term "prompt"); *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Morgan Stanley Mortg. Cap., Inc.*, No. 11 Civ. 0505 (CM) (GWG), 2013 WL 3146824, at \*20, \*23 (S.D.N.Y. June 19, 2013) (discussing duties to "promptly and diligently" investigate and give notice of a breach).  Insofar as the Court holds that the duty to enforce is separate from the duty of prompt notice and decisive here, these lines of authority are inapposite.

triable issue of fact' exists as to its interpretation.") (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989)).

U.S. Bank cannot meet this burden, as Ambac's construction is persuasive that U.S. Bank's "enforcement" duty extended to bringing putback actions against CHL or taking efforts to preserve the ability to bring such actions (*e.g.*, via entering tolling agreements). As commonly defined, to "enforce" means "to compel obedience." Black's Law Dictionary (11th ed. 2019); *cf. United States v. Meyer*, 808 F.2d 912, 915 (1st Cir. 1987) ("The use of the word 'enforcement' in [a federal statute] is not without significance; the noun by definition ('compulsion . . . forcible urging . . . the compelling of the fulfillment') presupposes the existence of an actual penalty to be enforced.") (quoting Webster's Third New International Dictionary 751 (1981)).  A means to compel obedience with a legal obligation is to bring a lawsuit.  And provisions in the PSA support that the contract uses the term "enforce" in this familiar sense.  For instance, under PSA Section 8.05, U.S. Bank is entitled to compensation for expenses made in connection with "*any claim or legal action* . . . incurred or made by the Trustee in the performance of its duties or the administration of the trusts hereunder (including, but not limited to, *the performance of its duties under Section 2.03* hereof)." (emphasis added).

U.S. Bank's counterargument is weak.  It notes that under the PSA, it has only those "duties and obligations . . . specifically set forth." *See* PSA § 8.01(i).  It then notes that "[n]o provision expressly and specifically requires the trustee to pursue litigation." USB Mot. at 20. Problematic for this argument, however, the duty to "enforce" *is* specifically set forth in the contract. *See W. & S. Life Ins. Co. v. U.S. Bank Nat'l Ass'n,* 69 Misc. 3d 1213(A), 2020 WL 6534496, at *5 (N.Y. Sup. Ct. Nov. 2020) ("While the PSA forbids 'implied covenants or obligations' to be 'read into [the PSA] against the Trustee,' Section 2.06 evinces an express

obligation on US Bank's part to exercise certain rights.") (internal citations omitted), *rev'd on other grounds*, No. 14893, 2022 WL 3204910 (N.Y. App. Div. Aug. 9, 2022). The question is how to construe that obligation.[18]

The various other PSA provisions to which U.S. Bank points as ostensibly showing that its duty to "enforce" did not entail a duty to "sue" do not so show. Subsection 8.02(iii) states that U.S. Bank is not required to "institute, conduct or defend any litigation . . . at the request, order or direction of any of the Certificateholders" unless adequately indemnified. But that provision merely sets a condition precedent for litigation commenced *at the direction of a certificate-holder*. But U.S. Bank's duty here—under subsection 2.03(a) to enforce CHL's contractual obligations—applies *regardless* of certificate-holder input. Similarly, Subsection 8.02(v) absolves U.S. Bank of the duty to investigate, which U.S. Bank argues is a prerequisite to filing litigation (unless directed by a certificate-holder). But U.S. Bank does not explain why investigation would be needed upon its receipt of an exception report identifying the loans on which U.S. Bank was obliged, under subsection 2.03(a), to take enforcement action.

Tellingly, at argument, counsel for U.S. Bank conceded that to "enforce" can mean to "sue,"[19] positing instead that bringing suit was not automatically required, but was "a subset of its duty to enforce"—a "next step" if early enforcement steps did not bear fruit. Aug. 17 Tr. at 21–22. U.S. Bank thus appeared to take the position that its enforcement duty required it to do something *before* bringing a lawsuit. But the PSA's text does not choreograph any such

---

[18] For this reason, U.S. Bank's argument under Section 8.01(i) that contractual ambiguity should be resolved against finding that the trustee had such a duty fails. USB Mot. at 20. U.S. Bank's enforcement duty *is* expressly identified. The interpretive question is what that duty entails.

[19] *See* Aug. 17 Tr. at 21–22 ("The Court: OK. No dispute that a duty to enforce can embrace a lawsuit. That can be a mode of enforcement. [U.S. Bank Counsel]: It can be. We don't think it's required.").

sequence of enforcement measures, or otherwise free the trustee from having to bring putback actions against CHL until lesser measures have failed. And, factually, the evidence adduced would give Ambac a viable argument before the jury that only legal action had the realistic potential to bring about such a repurchase. *See, e.g.*, Dkt. 297-1 ¶ 17 (excerpt of U.S. Bank expert witness report stating that, in practice, CHL virtually never repurchased loans with missing documents).

The Court accordingly holds that U.S. Bank is not entitled to summary judgment on the ground that the PSA Section 2.03(a) term "enforce" *cannot* mean bringing a putback action. That term is broad enough to embrace such a lawsuit as a means of enforcement. And U.S. Bank has not shown that, on the evidence adduced, a reasonable jury could not find the enforcement duty to oblige the trustee to sue CHL to "enforce [CHL]'s obligation under the Purchase Agreement and cause [CHL] to repurchase" defective loans. PSA § 2.03(a).

<em>c.      When did U.S. Bank fail to "enforce"?</em>

The next question is when U.S. Bank may be held to have breached its enforcement duty, such that Ambac's claim against U.S. Bank for failing to do so accrued. *Deutsche Bank*, 32 N.Y.3d at 145 ("In New York, the default accrual rule for breach of contract causes of action is that the cause of action accrues when the contract is breached."). Ambac argues that U.S. Bank breached only upon expiration of the limitations period governing U.S. Bank's potential claims against CHL, insofar as until that point, U.S. Bank could still have sued, whereas U.S. Bank contends that, if any breach were found, it occurred well earlier. The Court begins with U.S. Bank's threshold argument that the PSA sets an enforcement deadline earlier than the expiration of the limits period. Rejecting that argument and finding the PSA silent as to this particular, the Court then finds that—and explains why—Ambac's view that U.S. Bank did not breach until its ability to file a timely action had passed is persuasive.

23

*Determination Date inquiry*:  In a contention raised for the first time at oral argument, U.S. Bank argues that the "Determination Date" set by PSA Subsection 2.03(a) sets the deadline by which it was to carry out its enforcement duty.  It reads: "[T]he Trustee shall enforce the Originator's obligation under the Purchase Agreement and cause the Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price (as defined in the Purchase Agreement) *on or prior to the Determination Date following the expiration of such 90 day period*."  PSA § 2.03(a) (emphasis added).  After argument, the Court commissioned letter briefs on the point.  *See* Dkt. 293.  Upon review of these, *see* Dkts. 296–98, the Court holds that the "Determination Date" does *not* set the date by which U.S. Bank was obliged to enforce.

In particular, Ambac provides a persuasive reading of this provision which the Court adopts.  Applying the "rule of the last antecedent" canon, it urges that the term "Determination Date" modifies the Section 2.03(a) phrase, "Repurchase Price (as defined in the Purchase Agreement)," and not, as U.S. Bank urges, the more textually distant phrase, "enforce the Originator's obligation."  *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("A limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.") (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also Chachkes v. David*, No. 20 Civ. 2879 (LJL), 2021 WL 101130, at *6–7 (S.D.N.Y. Jan. 12, 2021) (applying canon in context of contested phrase in trust agreement).  For the reasons below, Ambac is correct to urge adherence to that canon here, and it avoids absurd outcomes potentially yielded by U.S. Bank's reading.

Starting with the text, the PSA defines "Determination Date" as the "date each month, as set forth in the [MMLPSA], on which the Servicer determines the amount of all funds required to be remitted to the Trustee on the Servicer Remittance Date with respect to the Mortgage Loans."

PSA § 1.01. The MMLPSA, in turn, defines "Determination Date" as "[t]he 15th day of the month," for relevant purposes. MMLPSA § 1. As Ambac explains—and U.S. Bank does not dispute—"[i]n effect, the Determination Date is the day each month when the Servicer calculates the amount of funds that will be remitted to the Trustee for distribution to Trust certificate holders." Dkt. 297 at 2.

On Ambac's read of Section 2.03(a), it is the "Repurchase Price" that must be calculated "on or prior to the Determination Date." Subsection 2.03(a) instructs that "Repurchase Price" is defined as set forth in the "Purchase Agreement"—which undisputedly refers back to the MMLPSA. The MMLPSA defines "Repurchase Price" as:

> [A] price equal to (i) the Stated Principal Balance of the Mortgage Loan plus (ii) interest on such Stated Principal Balance at the Mortgage Loan Remittance Rate from the last day through which interest has been paid and distributed to the Purchaser to the date of repurchase, less amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in the Custodial Account for distribution in the month of repurchase.

MMLPSA § 1. Thus, importantly, the "Repurchase Price" does not set itself. It requires calculating interest on a particular date, only after which the "Repurchase Price" is known.

U.S. Bank counters that the definition of "Repurchase Price" provides a date on which to calculate the amount—"the date of repurchase." *Id.* But that would not make superfluous the Determination Date's contribution to the definition of the "Repurchase Price." The provisions are easily harmonized by reading the Determination Date to set the outer bound of the date on which interest on the Repurchase Price is to be calculated: Should the loan be repurchased, the "date of repurchase" would supply the relevant date, consistent with the Section 2.03(a) command that a price be determined "on or before" the "Determination Date." But should the

loan not be repurchased before the next "Determination Date," that date sets a terminal point on the date on which the interest should be calculated.[20]

This reading not only accords with the "last antecedent" canon and gives meaning to each provision—it also avoids the absurdities risked by U.S. Bank's construction. As the Court has explained, the "enforcement" duty can require U.S. Bank to sue CHL. That duty would arise no later than "90 days from the date that [CHL] was notified" of the defective loans (assuming no cure). PSA § 2.03(a). The "Determination Date" can occur anywhere from one to 31 days after "the expiration of the 90 day period." *Id.* On U.S. Bank's reading that the "Determination Date" set the deadline by which U.S. Bank was obliged to sue CHL pursuant to its enforcement duty, where that 90-day period expired on the 14th day of a month, the trustee (U.S. Bank) would have one day in which to do so. That is an obviously unworkable timeline. By contrast, Ambac's alternative reading does not yield any such absurd outcome. *See IKB Int'l*, 2022 WL 3720417, at *2 ("[A]n agreement [should not] be read to produce a result that is 'absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'") (quoting *In re Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003) (internal citations omitted)).

---

[20] Ambac makes another point: that its reading, which sets a deadline on which to calculate CHL's repurchase price, benefits a trust, in that it sets an earlier starting point for the period during which prejudgment interest (typically paid at a higher rate than the interest CHL would have been obliged to pay under the "Repurchase Price" definition) accrues. *See* Dkt. 297 at 3 (citing *Mastr Adjustable Rate Mortg. Tr. 2006-OA2 et al. v. UBS Real. Est. Sec. Inc. v. UBS*, No. 12 Civ. 7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015)), Dkt. No. 439 at 40–41 (U.S. Bank's brief, stating that the trustee is entitled to prejudgment interest on the repurchase price at interest rate set by state law, that is, 9%, running from the applicable repurchase dates under PSAs). Because the Court finds the text to unambiguously compel Ambac's reading, it has no occasion to consider that argument.

U.S. Bank counters by citing the recent decision in *Phx. Light SF Ltd. v. Wells Fargo Bank, N.A*, Nos. 14 Civ. 10102, 15 Civ. 10033 (KPF) (SN), 2022 WL 2702616 (S.D.N.Y. July 12, 2022) ("*Phoenix Light/Wells Fargo*"). It casts that decision as holding that an agreement "with virtually identical language" to that here set a deadline within which the trustee was obliged to enforce, thereby triggering an earlier accrual date than set by use of the statutory limitations period. Dkt. 298 at 2. U.S. Bank mischaracterizes that decision. In *Phoenix Light/Wells Fargo*, Judge Failla found that a provision in a PSA obligating a trustee to "'enforce' the seller's obligation to repurchase a loan" did not "identify a deadline for Defendant to discharge that obligation." *Phoenix Light/Wells Fargo*, 2022 WL 2702616, at *24. She contrasted the PSA at issue with PSAs that *did* expressly set a deadline for a trustee's enforcement action. *See id.* at *24 n.31 (reviewing language in other PSAs, including, for example, "if the responsible party does not deliver the missing document or cure the material defect within 120 days, the Trustee 'shall enforce' the responsible party's obligation to repurchase the loan before the 15th day of the following month," and, "the Trustee 'shall enforce' the responsible party's repurchase obligation within 90 days after the responsible party was notified"). She held that, in cases such as that before her—in which the PSA was silent as to a deadline for the trustee to discharge its enforcement duty—under New York law, a jury must determine what a reasonable time was within which the trustee had to discharge that duty, but that in cases where the PSA set a deadline, that deadline governed. *Id.* at *24–25. Here, as in *Phoenix Light/Wells Fargo*, the "Determination Date" does not limit the trustee's time in which to enforce, nor does any other portion of the PSA. Instead, as in *Phoenix Light/Wells Fargo*, the

PSA is silent. U.S. Bank's summary judgment motion, to the extent presupposing a necessarily earlier deadline than the expiration of the limitations to sue CHL, cannot be granted.[21]

*Reasonable time inquiry*: In light of the PSA's silence as to the deadline for U.S. Bank to comply with its enforcement duty, the Court—as in *Phoenix Light/Wells Fargo*—looks to principles of New York law governing what the deadline is for contractual performance when the contract is silent on that point. This body of law provides that, in such circumstances, a party has a "reasonable time" to comply with its contractual duties. *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) ("Where a contract does not specify a date or time for performance, New York law implies a reasonable time period."); *Starbucks Corp. v. New WTC Retail Owner LLC*, No. 21 Civ. 400 (VM), 2021 WL 4868585, at *6 (S.D.N.Y. Oct. 18, 2021). The question of what constitutes "reasonable time" is typically reserved for the jury. *BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81, 81 (2d Cir. 2013) (summary order) ("The question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury, unless the facts are undisputed, in which case the question becomes one appropriate for summary judgment.") (internal quotation marks and citation omitted); *Phoenix Light/Wells Fargo*, 2022 WL 2702616, at *24; *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, Nos. 14 Civ. 10103, 15 Civ. 10031 (JGK), 2022 WL 384748, at *26 (S.D.N.Y. Feb. 8, 2022) ("*Phoenix Light/Deutsche Bank*"); *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF) (RWL) ("*Pacific Life/BNYM*"), Dkt. 292 ("*Pacific Life* R&R") at 59.

---

[21] In its supplemental letter, U.S. Bank expanded its 11th-hour argument based on the Section 2.03(a) Determination Date, to suggest that this date also limits Ambac's post-EOD claims. *See* Dkt. 298 at 2, 299 at 1–2 (Ambac's supplemental reply letter, responding). The Court does not have occasion to consider this untimely argument.

Applied here, given that Ambac filed suit near the last possible date as set by the stacked limitations periods reviewed above, for Ambac's claims to be timely, a reasonable jury would have to be able to find the statute of limitations to supply the reasonable timeframe within which U.S. Bank had to enforce. U.S. Bank's summary judgment motion on this point argues that no reasonable jury could so find.

The Court is unpersuaded by U.S. Bank's extreme position. It is at odds with the holdings of numerous courts faced with similar motions in recent RMBS cases presenting the question of the timeframe within which a trustee can comply with a pre-EOD "enforcement" duty. Consistently, these courts have held that that question—including whether enforcement action taken at the limitations period deadline could be timely—is for the jury and cannot be resolved on summary judgment. *Phoenix Light/Wells Fargo*, on which U.S. Bank otherwise relies, exemplifies these holdings. The plaintiff there had alleged that a trustee had failed to enforce sellers' repurchase obligations as to loans with document exceptions. Finding the governing agreement silent as to the trustee's deadline to enforce, the Court looked to what constituted a reasonable time period to do so, and found a genuine dispute of fact on the question, precluding summary judgment. *See Phoenix Light/Wells Fargo*, 2022 WL 2702616, at *24. The parties marshalled competing expert and lay evidence, including as to the point at which it was statistically unlikely that a seller would cure defective documents. *Id.* "Given the parties' disagreement as to what constituted a reasonable time for Defendant to discharge its enforcement duties" and the evidence supporting each side's position, Judge Failla held, she could not find as a matter of law that a reasonable time period for the trustee's performance had expired "more than six years" before plaintiffs filed the action. *Id.* at *25.

Judge Koeltl's decision in *Phoenix Light/Deutsche Bank* is in accord.  That case also involved claims that an RMBS trustee had violated its contractual enforcement duties, and a defense argument for summary judgment that such claims were untimely.  Judge Koeltl held that the defendant failed to "point to any evidence in the record that supports its argument that waiting a year or more to enforce repurchase obligations is unreasonable as a matter of law in view of the relevant facts and circumstances." *Phoenix Light/Deutsche Bank*, 2022 WL 384748, at *26.  On that basis, he denied the defense motion for summary judgment on pre-EOD putback claims. *Id.*[22]

Analogous reasoning can be found in decisions by courts resolving motions to dismiss brought on similar grounds.  As summarized by Judge Koeltl, in these, "[c]ourts have rejected arguments similar to those advanced by [defendant] from RMBS trustees at the motion to dismiss phase," finding that "a reasonable time period for performance depends on the facts and circumstances of the particular case." *See id.* (internal quotation marks omitted); *see also W. & S. Life,* 2020 WL 6534496, at *7 (holding that "whether Plaintiffs' claims accrued when US Bank first allegedly discovered a breach in 2008 (as US Bank contends) or when US Bank allegedly permitted its repurchase rights under the PSA to 'lapse' six years after the breach (as Plaintiffs contend), or sometime in between," was not one that could be decided on the pleadings), *rev'd on other grounds*, 2022 WL 3204910; *Gillespie v. St. Regis Residence Club,*

---

[22] U.S. Bank notes that the court in *Phoenix Light/Deutsche Bank* acknowledged that it had dismissed "claims based on [the trustee's] alleged failure to enforce repurchase obligations for loans identified in the exception reports." Dkt. 292 (quoting *Phoenix Light/ Deutsche Bank*, 2022 WL 384748, at *32).  But the relevant part of the order dismissing certain claims in that case involved "claims arising from facts prior to December 23, 2008, the longest statute of limitations applicable to any of the claims." *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 709 (S.D.N.Y. 2016).  The Court has not been apprised of analogous claims here.  As presented, Ambac's claims are all timely if the trustee's reasonable time within which to take enforcement action against CHL is measured by the six-year limitations period.

*N.Y. Inc.*, 343 F. Supp. 3d 332, 348 (S.D.N.Y. 2018); *see also Pacific Life/BNYM*, 2018 WL 1382105, at *7 (S.D.N.Y. Mar. 16, 2018).

Notwithstanding this developing body of adverse precedent, in theory at least, U.S. Bank might have marshalled evidence requiring a different outcome on summary judgment. It has not done so. It does not anchor its arguments as to the reasonable time for the trustee to act in record evidence. It instead argues, at a high level, that a responsible trustee in U.S. Bank's position, if destined to sue CHL at all, would not have waited so long to do so, and that waiting until the brink of the statutory expiration period would have been unreasonable. *See, e.g.*, Dkt. 272 at 1–2 (quoting *Pacific Life* R&R at 60 n.42 ("One wonders exactly what PacLife would have Mellon do on the 'eve' of expiration of the statute of limitations. If the limitations period were about to expire, then Mellon could not merely begin the process of making demands and trying to negotiate. Rather, Mellon would have to file a lawsuit or obtain a tolling agreement from Countrywide.")).

Ambac, in contrast, anchors its opposition to summary judgment on this point both in supportive case law and in evidence it has adduced. This evidence supports that trustees in the RMBS context have often waited until the eve of a limitations period to bring suit against loan originators.[23] *See* Ambac Opp'n at 7; Dkt. 253 ("Ricardo Decl."), Exs. 27–28 (charting numerous cases in which trustees, including U.S. Bank, sued RMBS sponsors or originators

---

[23] Ambac's arguments and evidence on this point are largely presented in response to U.S. Bank's challenge to Ambac's post-EOD contract claim, under which the operative question as to timeliness is whether U.S. Bank acted as a "prudent person." Such arguments and evidence are equally relevant to Ambac's pre-EOD argument as to the timeframe within which a reasonable trustee could act to enforce CHL's repurchase obligations. *See LNC Invs., Inc. v. First Fid. Bank*, No. 92 Civ. 7584 (MBM), 1997 WL 528283, at *16 (S.D.N.Y. Aug. 27, 1997) ("[D]eterminations of reasonableness and prudence are fact-intensive, and in this case there are issues of fact as to whether the trustees acted or failed to act as reasonably prudent people.").

roughly six years after the trusts closed). This evidence also includes testimony by an expert setting out the steps that a trustee in the shoes of U.S. Bank would have taken to secure the trusts' interests, and why deferring suit against CHL would have been reasonable. *See* Ricardo Decl., Ex. 13 ("Owens Rep."); *see also Phoenix Light/Wells Fargo*, 2022 WL 2702616, at *25 (competing expert witness testimony sufficient to defeat summary judgment argument based on reasonable timeliness of complying with enforcement obligation). Ambac's expert in fact notes that there is evidence that U.S. Bank itself waited until the eve of the expiration of a statutory limitations period to sue CHL on behalf of a different Harborview trust—filing suit on August 29, 2011, two days before the limitations period expired. *See* Owens Rep. at 10 (citing *U.S. Bank N.A. v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. 2011)); Ricardo Decl., Ex. 36 ¶ 22 (August 29, 2011 complaint, alleging underlying trust closed on August 31, 2005).

      In further opposition to U.S. Bank's summary judgment motion based on untimeliness, Ambac also makes a practical point. Had Ambac brought claims against U.S. Bank for failing to sue CHL before U.S. Bank's statute of limitations against CHL ran out, U.S. Bank would have had a likely meritorious defense that Ambac's claims were premature, as it could still bring suit. Much this scenario played out in *Bakal v. U.S. Bank Nat'l Ass'n*, 747 F. App'x 32 (2d Cir. 2019) (summary order). There, U.S. Bank faced a claim brought by RMBS certificate-holders that it had "breached the PSA by failing to act *expeditiously* upon learning that [the loan originator] had breached its representations and warranties governing the Trust"; the certificate-holders faulted U.S. Bank for not suing until "long after [it] was or should have been aware of servicing and underwriting deficiencies." *Id.* at 36 (emphasis in original) (internal quotation marks omitted). The Second Circuit affirmed the dismissal of the claim, on the ground that the certificate-holders

had failed adequately to allege that the "complained-of activity (U.S. Bank's alleged delay in acting) caused them *damages*." *Id.* (emphasis in original). *Bakal* underscores that claims against RMBS trustees for failing to expeditiously sue are liable to successful defenses if it is established that they were brought prematurely, that is, brought before essential elements have been established, be it damages (as in *Bakal*) or "breach" (as, potentially, here).

In this respect, the context of legal malpractice claims presents a fair analogy, in that a client's claim against a lawyer for failing to file a lawsuit first accrues when such a lawsuit has become time-barred—and if filed beforehand may be dismissed as premature. *See, e.g.,* *Shumsky*, 96 N.Y.2d at 166 (legal malpractice claim accrued "when the Statute of Limitations had expired on the underlying breach of contract actions plaintiffs retained defendant to commence"); *Glamm v. Allen*, 57 N.Y.2d 87, 93 (1982) (same, in context of attorney failing to file a notice of claim by statutory deadline). U.S. Bank writes off the analogy on the ground that malpractice claims arise in tort (where accrual occurs at injury) whereas contract claims like Ambac's accrue at breach. *See McCoy v. Feinman*, 99 N.Y.2d 295, 301 (2002) (malpractice claims accrue when "an actionable injury occurs"). But that observation does not engage with Ambac's theory of liability. Ambac does not claim that U.S. Bank committed a breach that only six years later effected an injury on the trust. It claims that there was not, in fact, a determinable breach by U.S. Bank until the point that it could no longer sue CHL.

U.S. Bank does not persuasively respond to these arguments. It notes, generally, that there may be good reason for a trustee to sue earlier—to "get in line" to recover from a financial institution whose ability to pay claims may prove limited. Aug. 17 Tr. at 42–43. Whatever force that observation may have in the abstract, it is untethered to any evidence in this case. It cannot support entry of summary judgment to U.S. Bank on its claim of untimeliness. *See BLD Prods.*,

509 F. App'x at 81; *Phoenix Light/Wells Fargo*, 2022 WL 2702616, at *25; *Phoenix Light/Deutsche Bank*, 2022 WL 384748, at *26; *Sands v. Bernstein*, No. 07 Civ. 9824 (RWS), 2009 WL 151729, at *4 (S.D.N.Y. Jan. 21, 2009) ("The question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury, *unless the facts are undisputed*.") (emphasis added).[24]

U.S. Bank also analogizes to several cases in which a trustee's actions imposed on it an earlier deadline to bring suit, such that its contractual enforcement obligation accrued before the deadline set by a statutory limitations period. *See* Dkt. 272; *see also* Dkt. 273 (Ambac response); Dkt. 276 (U.S. Bank reply). In particular, U.S. Bank cites *Pacific Life/BNYM*, in which Magistrate Judge Lehrburger recently issued a Report and Recommendation rejecting a plaintiff's argument that a trustee charged with enforcing an originator's obligations had until the expiration of the statute of limitations to do so. But the basis for Judge Lehrburger's assessment was that, as claimed, the trustee had breached its enforcement duty when it entered into a settlement agreement with the originator, Countrywide, releasing the trustee's claims against it. That agreement, entered into well before the expiration of the limitations period, prohibited the trustee from commencing any litigation based upon the released claims. *See Pacific Life* R&R at

---

[24] The evidence adduced suggests that U.S. Bank did not, at any time, come close to bringing lawsuits against CHL on behalf of the trust. Indeed, at argument, U.S. Bank conceded that it "never did anything substantially in the direction of building a lawsuit." Aug. 17 Tr. at 35, 47. Its explanation for its inaction on behalf of the trusts was that no certificate-holder directed it to sue CHL. *Id.* U.S. Bank's seemingly lax approach to its enforcement responsibilities as trustee is not dispositive of how a reasonable trustee would have analyzed whether and when to bring suit. But, given its idleness, U.S. Bank's conceptual arguments about how a trustee would have analyzed these questions are reasonably viewed with skepticism.

54–56[25]; *see also Phoenix Light/Wells Fargo*, 2022 WL 2702616, at *25–26 (holding that investors' claims for failure to discharge duties under certain trusts accrued when trustee had issued notices to investors that it would not take action to address EODs); *Phoenix Light/Deutsche Bank*, 2022 WL 384748, at *24 (same, where certificate-holders had been affirmatively notified that there had been an EOD and that the trustee would not act absent direction from the certificate-holders). The common thread in these cases is that the trustee's actions had eliminated any opportunity on the part of the trusts to recover via lawsuits against originators, triggering an earlier accrual of claims against the trustee based on these actions. Here, in contrast, there is no argument or evidence that, before the statutory limitations period ran out, U.S. Bank took any act precluding it from bringing suit. These precedents are, thus, inapposite.[26]

    In sum, the assembled evidence, viewed in light of the apposite precedents, supply a sufficient basis for Ambac's claim that U.S. Bank had until the date on which the statutory limitations period expired to carry out its enforcement responsibility against CHL, including by means of bringing a putback lawsuit. Although a reasonable juror could find otherwise, such a

---

[25] The R&R in *Pacific Life/BNYM* is presently under review by the District Court. *See* No. 17 Civ. 1388 (KPF) (RWL), Dkts. 297–98 (objections), 299–300 (oppositions), 302, 305 (replies).

[26] *First Am. Title Ins. Co. of N.Y. v. Fiserv Fulfillment Servs., Inc.*, No. 06 Civ. 7132 (NRB), 2008 WL 3833831 (S.D.N.Y. Aug. 14, 2008), on which U.S. Bank also relies, is similarly distinct. The issue there involved the accrual of a claim against a defendant that had failed to timely record a mortgage. Critically, there, "the parties' course of performance" demonstrated—as was undisputed—that the defendant had been obliged to record mortgage[s] "in the first few days after they were issued." *Id.* at *2. On this basis, the district court rejected the argument that the claim had not accrued until the defendant's *legal* deadline to record the mortgage had expired. *Id.* Notably, earlier in the litigation, the district court had "held that summary judgment was inappropriate because [it] thought it was possible for plaintiff to prove a set of circumstances" in which defendant's duty was ongoing. *Id.*

juror could certainly find that a lawsuit filed by U.S. Bank on that date was filed within a reasonable time, such that Ambac's claims against U.S. Bank based on a breach of its enforcement responsibility to the trusts are timely. The Court therefore denies U.S. Bank's motion for partial summary judgment on the ground that Ambac's claims to this effect were untimely brought.[27]

### 2. Post-EOD Contract Claims

U.S. Bank's motion for summary judgment as directed to Ambac's post-EOD claims sounding in breach of contract also asserts that these were untimely brought. For reasons largely tracking the analysis above, that motion lacks merit.

Ambac presents two distinct theories as to how EODs occurred: when (1) CHL failed to deliver complete Mortgage Files to the Trusts' custodian; and (2) Countrywide *Servicing* (a distinct corporate entity) failed to provide annual servicing certifications. *See* Ambac Mot. at 9. The occurrence of an EOD triggers a contractual duty for U.S. Bank to "exercise such of the rights and powers vested in it by [the PSA], and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." PSA § 8.01. Ambac contends that a prudent trustee would have sued CHL to repurchase loans for which there were representation and warranty defects, and—echoing its pre-EOD claims—that U.S. Bank breached its post-EOD prudent-person obligations by allowing the statute of limitations on those claims to expire without bringing suit. U.S. Bank again contends that such claims are untimely brought.

---

[27] In light of this ruling, the Court does not have occasion to consider Ambac's alternative theory as to why its claims are timely, based on a theory of a "continuing wrong." For that reason, a case on which U.S. Bank relies in opposition to that theory is inapposite. *See Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552 (S.D.N.Y. 2018).

The Court's analysis of U.S. Bank's claim of untimeliness ultimately largely tracks the analysis above.  At the threshold, however, U.S. Bank casts Ambac's theory of post-EOD breaches as turning on lapses before the point at which it would have brought suit against CHL. It frames Ambac as alleging that U.S. Bank breached its prudent-person duties by immediately failing, after receiving exception reports shortly after the trusts closed, to investigate the scope of CHL's representation and warranty breaches.  And because, U.S. Bank argues, a prudent person would have investigated shortly after receiving these reports (which, uncured, ripened into EODs 30 days later), *see* MMLPSA § 14.01(ii), any breach of its post-EOD prudent-person duties occurred soon after receiving the reports.  *See* Marcucci Decl., Ex. 1.  Thus, U.S. Bank argues, Ambac's post-EOD claims, to the extent based on CHL's failure to deliver complete mortgage files, are time-barred.[28]

U.S. Bank's characterization of Ambac's theory as keyed to alleged investigative lapses is, however, off the mark.  Ambac's claim is a broader one: that a prudent person in U.S. Bank's station would have done *something* to preserve the Trusts' assets, culminating, if necessary, in taking legal action against CHL.  *See Royal Park*, 109 F. Supp. 3d at 609; *Beck*, 218 A.D.2d at 13.  And, Ambac argues, because U.S. Bank could have so acted against CHL until its claims against CHL became untimely, U.S. Bank did not breach until that date passed.  *See* AC ¶¶ 74–82.  The Court therefore rejects U.S. Bank's summary judgment motion claiming untimeliness, to the extent it is based on the theory that U.S. Bank's breach occurred around the time Ambac first received exception reports.  *See Commerzbank AG*, 457 F. Supp. 3d at 248–49 (denying

---

[28] U.S. Bank does not move for summary judgment as to the timeliness of Ambac's post-EOD claims based on its second theory—the failure by Countrywide Servicing to provide annual servicing certifications.  *See* USB Mot. at 13 n.7.

summary judgment where "U.S. Bank at best only describe[d] EODs in some of the trusts. U.S. Bank failed to demonstrate that these EODs ripened into post-EOD breaches by U.S. Bank").

As to the timeframe within which U.S. Bank had to comply with its contractual prudent-person obligation, the PSA is silent. Like the question of the "reasonable timeframe" to comply with pre-EODs obligation to sue CHL, the question of when a "prudent person" would sue CHL is a fact-intensive question. *See LNC Invs.*, 1997 WL 528283, at *16 ("[T]o prevail, the trustees must prove that they acted as reasonably prudent people, while plaintiffs must prove that the trustees failed to act as reasonably prudent people. Both motions [for summary judgment] fail because determinations of reasonableness and prudence are fact-intensive, and in this case there are issues of fact as to whether the trustees acted or failed to act as reasonably prudent people."); *Phx. Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VC), 2017 WL 3973951, at *15 (S.D.N.Y. Sept. 7, 2017) (whether RMBS trustee's efforts were "sufficient to discharge its prudent-person duty is a question of fact that is inappropriate for resolution at this stage"); *FMS Bonds, Inc. v. Bank of N.Y. Mellon*, No. 15 Civ. 9375 (ER), 2016 WL 4059155, at *12 (S.D.N.Y. July 28, 2016) (citing cases).

For the same reasons reviewed in connection with U.S. Bank's duty to bring a suit pursuant to its pre-EOD enforcement duty within a reasonable time, whether U.S. Bank would have complied with its prudent-person obligations had it waited until the end of the statutory limitations period to sue CHL cannot be resolved as a matter of law. U.S. Bank does not adduce additional evidence in connection with this issue. And the same evidence, and precedents, that Ambac has mustered in connection with the pre-EOD duty equally apply here. And a reasonable juror could similarly find that the duties of a prudent person included bringing a putback action against CHL, as opposed to taking only lesser measures. *See FMS Bonds*, 2016 WL 4059155, at

*8–9, *12 (post-EOD contract claim against trustee for imprudently failing to timely file a claim to protect bondholders' interests in bankruptcy proceeding accrued when the trust's underlying claim became time-barred); *Nat'l Credit Union Admin. Bd. v. HSBC Bank USA, Nat. Ass'n*, 117 F. Supp. 3d 392, 403–04 (S.D.N.Y. 2015) (date on which underlying right to sue or make repurchase demand expired marked accrual of tort claim against RMBS trustee); *cf. Beck v. Mfrs. Hanover Tr. Co.*, 218 A.D.2d 1, 13 (N.Y. App. Div. 1995) ("[P]rudence dictates[] exercising those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation."); *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 609 (S.D.N.Y. 2015) (a post-EOD prudent trustee must "exercise its powers in order to secure the trust").

Accordingly, U.S. Bank's motion for partial summary judgment based on the asserted untimeliness of Ambac's post-EOD claims fails.

### B. Post-EOD Fiduciary Duties Claims[29]

#### 1. Timeliness of Repurchase-Related Fiduciary-Duty Claims

U.S. Bank next challenges the timeliness of Ambac's "repurchase-related fiduciary-duty" claims. USB Mot. at 14. These arise under common law. *See* AC ¶ 112 ("[U]nder New York [common] law, after the occurrence of an Event of Default, U.S. Bank owed a fiduciary duty to the Trusts and to the Trusts' beneficiaries, including Ambac."). U.S. Bank challenges them to the extent they allege that U.S. Bank had a fiduciary duty to bring putback actions against CHL. USB Reply at 9. The claims are subject to a three-year statute of limitations. *Ambac I*, 328 F. Supp. 3d at 161. U.S. Bank argues that, even on Ambac's theory that U.S. Bank breached only when it let its claims against CHL expire six years after the Trusts closed in 2012, more than

---

[29] No pre-EOD fiduciary-duty claims are at issue.

three years elapsed between that date and when Ambac brought fiduciary-duty claims in April 2017.

Although this argument has superficial appeal, it misstates Ambac's theory of harm. It assumes that Ambac's fiduciary-duty claim is "based on the same alleged failures underlying the post-EOD contract claims," and therefore accrued at the same time. USB Mot. at 14. In fact, Ambac's post-EOD fiduciary-duty claim is not that U.S. Bank failed to bring putback actions against CHL, but that it failed to timely notify Ambac that an EOD had occurred. *See* Ambac Opp'n at 25. In *Ambac I*, Judge Pauley made this explicit. He held that Ambac's fiduciary-duty claims could be timely, to the extent that these were based on the duty of undivided loyalty and on a claim that these were violated by U.S. Bank's failure to notify Ambac of EODs.[30] At that stage, it was unclear whether—but theoretically possible that—the evidence would show that U.S. Bank, after April 2014, had failed to timely notify Ambac of an EOD. If so, Judge Pauley reasoned, then Ambac's post-EOD fiduciary-duty claims brought in April 2017 would be timely. *See Ambac I*, 328 F. Supp. 3d at 155–63.

Discovery has revealed evidence on which a jury could find that such occurred: servicer Nationwide failed to comply with an obligation on March 20, 2014, *see* Ambac 56.1 ¶ 62, triggering U.S. Bank's contractual duty to notify Ambac of as much within 60 days, *see* PSA § 7.04(b). The undisputed evidence is that it failed to do. *See* U.S. Bank Counter 56.1 ¶ 63 ("Undisputed that no notice was sent."). On this discrete basis, Ambac may claim that U.S. Bank breached its notice-of-EOD obligation in May 2014, less than three years before Ambac sued U.S. Bank. Ambac's claim is therefore timely.

---

[30] Judge Pauley dismissed Ambac's fiduciary-duty claim to the extent that it was based on the obligation to act prudently and in good faith, on the ground that it duplicated U.S. Bank's post-EOD contractual requirement to act as a prudent person. *Ambac I*, 328 F. Supp. 3d at 156.

## 2.    Waiver

U.S. Bank alternatively argues that Ambac "abandoned claims based on U.S. Bank's failure to notify it of EODs." USB Mot. at 14 n.8. U.S. Bank's argument is based on an interrogatory response from Ambac. It stated that Ambac "does not seek to impose liability on Defendant based upon any breach of a duty to notify holders and Ambac." *See* Marcucci Decl., Ex. 11 ("ROG") at 16 n.4. Ambac responds that the language of that response is taken out of context, as it was made in response to an interrogatory regarding document exceptions, not servicing obligations. In other words, Ambac forewent claims based on U.S. Bank's failure to notify Ambac of document exceptions (a lapse of the originator) but not of failures to notify Ambac of a servicer's failed obligations. *See* Ambac Opp'n at 25 n.21.

The distinction Ambac draws is viable. The interrogatory in question asked Ambac to identify what it contended U.S. Bank was supposed to do "for each alleged document defect . . . following its discovery or receipt of written notice of the alleged breach that the document was required but was not present or was materially defective." *See* ROG at 14 (Interrogatory No. 6). To be sure, other correspondence can be read differently. *See, e.g.*, Dkt. 260-6, at 1 (letter from Ambac's counsel to U.S. Bank's counsel stating, "Ambac is not asserting a failure-to-notify claim against U.S. Bank"). But, in the end, the assembled record does not establish a clear wavier by Ambac of such a claim. *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("[T]he intent to waive is usually a question of fact.") (quoting *Jefpaul Garage Corp. v. Presbyterian Hosp.*, 61 N.Y.2d 442, 448 (1984) (alteration in original)); *see also id.* ("So much depends upon the intention of the parties that, where such intent is disputed, it necessarily becomes a question for the determination of a jury.") (quoting *Champion Spark Plug Co. v. Auto. Sundries Co.*, 273 F. 74, 80 (2d Cir. 1921)); *McDarren v. Marvel Ent. Grp., Inc.*, No. 94 Civ. 0910 (LMM), 1995 WL 214482, at *5

(S.D.N.Y. Apr. 11, 1995) ("[W]here a waiver is not express, but found in the acts of a party, summary judgment is not appropriate."). The Court accordingly declines to grant summary judgment on this claim on the basis of Ambac's interrogatory response.

### 3.      Economic-Loss Doctrine

U.S. Bank next reprises an argument Judge Pauley rejected at the motion to dismiss phase: that the economic-loss doctrine bars Ambac's fiduciary-duty claims as duplicative of the contract claims. U.S. Bank describes the claims as resting on identical conduct and resulting in identical harm. In *Ambac I*, Judge Pauley held that, to survive U.S. Bank's economic-loss challenge, Ambac's fiduciary-duty claims needed only to be based on a distinct, extra-contractual *duty*. The breach of contract and fiduciary-duty claims could coexist, he held, even if they sought identical *damages*. *Ambac I*, 328 F. Supp. 3d at 158. U.S. Bank now argues that New York courts have since clarified that fiduciary and contract claims cannot proceed in tandem under the economic-loss doctrine if the damages are the same, even if the source of the duty is distinct. *See* USB Mot. at 25 (citing *Bd. of Managers of St. Tropez Condo. v. JMA Consultants, Inc.*, 191 A.D.3d 402, 402–03, (N.Y. App. Div. 2021); *Blackrock Balanced Cap. Portfolio (FI) v. U.S. Bank Nat'l Ass'n*, 165 A.D.3d 526, 528 (N.Y. App. Div. 2018)).

This argument is unpersuasive. At the outset, barring a change in governing law, *Ambac I*'s rejection of this exact argument is law of the case. "[U]pon reassignment, 'the new judge is well advised to pay particular heed to the doctrine of "law of the case," and not to attempt a *de novo* review of . . . decisions made over a lengthy period by diligent and experienced judicial officers who have handled the case previously.'" *Waverly Props., LLC v. KMG Waverly*, No. 09 Civ. 3940 (PAE), 2011 WL 13322667, at *1 (S.D.N.Y. Dec. 19, 2011) (quoting *Peyser v. Searle Blatt & Co.*, No. 99 Civ. 10785 (GEL), 2004 WL 307300, at *1 (S.D.N.Y. Feb. 17, 2004)).

In *Ambac I*, Judge Pauley recognized that courts have applied the economic-loss doctrine differently, with some allowing fiduciary and contract theories to proceed in tandem where premised on distinct sources of duty, *see e.g.*, *Commerzbank,* 277 F. Supp. 3d at 497, and others requiring distinct sources of both duties *and* damages, *see, e.g.*, *Phx. Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14 Civ. 10116 (KBF), 2016 WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016). After a thoughtful review of the precedents, Judge Pauley held that the former, less-restrictive approach was applicable here. *See Ambac I*, 328 F. Supp. 3d at 158–60. He explained that it was dubious that the more restrictive approach applied outside the context of products-liability cases. Outside that context, the case law had not attached importance to the fact that tort and contract claims, based on breaches of different duties, stood to yield the same damages. *Id.* at 159; *see King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012), *rev'd in part on other grounds*, No. 09 Civ. 8387 (SAS), 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012) ("The approach taken in *Finlandia* is instructive—rather than apply a 'rule' barring plaintiffs from recovering for purely economic losses, the Court of Appeals conducted a duty analysis and determined that 'plaintiffs' negligence claims based on economic loss alone fall beyond the scope of the duty owed them by defendants.' *It is this focused duty analysis*—this policy-driven scrutiny of whether a defendant had a duty to protect a plaintiff against purely economic losses—that can best be termed 'the economic loss doctrine.'") (emphasis added) (quoting *Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001)). To be sure, Judge Pauley recognized that New York courts *might* reach a different outcome here. But, he held, "[a]bsent a pronouncement by the New York state courts to the contrary," he would decline to require Ambac effectively to elect among contract and

43

fiduciary-duty claims that, while based on different theories of breach, pursued the same

damages. *Ambac I*, 328 F. Supp. 3d at 160.

U.S. Bank's assertion that New York courts have since made the decisive pronouncement

that Judge Pauley stated would cause him to reassess is wrong. *See* USB Mot. at 25 (citing *JMA*

*Consultants*, 191 A.D.3d at 402–03; *Blackrock*, 165 A.D.3d at 528). A more accurate statement

is that recent decisions in this area, like their predecessors, have not been resolved along fully

consistent lines, but that the broad distinction drawn by Judge Pauley retains force. The specific

cases that U.S. Bank cites are not doctrinally game-changing. In *Blackrock*, plaintiffs had failed

to "sufficiently allege[] the breach of any professional duty that could support a malpractice

claim, as opposed to the breach of a contractual duty." 165 A.D.3d at 528. Thus, unlike in this

case, the tort and contract claims there did not derive from distinct duties. And *JMA Consultants*

contains virtually no reasoning. It is a two-paragraph opinion, not involving RMBS, that states,

in a single sentence, that the economic-loss doctrine barred the contract and negligence claims

there because they allege the same facts and seek the same damages. *See* 191 A.D.3d at 402–03.

The Court thus rejects U.S. Bank's motion based on a renewed economic-loss argument.

### C.    Merits of Pre-EOD Representation & Warranty Claims

U.S. Bank next moves to dismiss Ambac's pre-EOD claims to the extent they are based

on CHL's breach of the representations and warranties. In response, however, Ambac clarifies

that it does not bring such claims. Its pre-EOD claims, it states, are based on CHL's failure to

deliver complete Mortgage Files (*i.e.*, they are document-defect claims, not representation and

warranty claims). And U.S. Bank does not move for summary judgment as to the merits (as

opposed to the timeliness) of those claims. USB Reply at 10. Accordingly, the Court denies

U.S. Bank's motion, while recognizing that the parties have stipulated that the pre-EOD claim does not pursue on a theory of representation and warranty defects.

### D.    Mutual Mistake Regarding No-Investigation Clause

U.S. Bank, finally, moves for summary judgment that the PSA inadvertently omitted the word "not" from a clause regarding U.S. Bank's duty (not) to investigate.  Helpfully, the parties have since stipulated to this effect.  *See* JSF ¶¶ 93–94.  The Court will construe that feature of the PSA consistent with the parties' stipulation.

## V.    Ambac's Motion for Partial Summary Judgment

Ambac's motion for partial summary judgment implicates the question of what precisely triggers an EOD—and therefore U.S. Bank's contractual obligation as trustee to act as a prudent person.  *See* PSA § 8.01.  It is undisputed that, under the MMLPSA, breach by a non-party of its contractual commitments can trigger an EOD.  The question Ambac presents is whether *CHL* is such a party.  That in turn hinges on the meaning of the term "Seller" within Section 14 of the MMLPSA.  It enumerates the events that can trigger an EOD, including, as relevant here:

> [A] failure on the part of the *Seller* duly to observe or perform in any material respect any other of the covenants or agreements on the part of the *Seller* set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the *Seller* by the Purchaser or by the Custodian.

JSF ¶ 48; MMLPSA § 14.01(ii) (emphases added).  Section 1 defines the term "seller" as "Countrywide Home Loans, Inc., or any successor to or assignee of the Seller under this Agreement as provided herein."  JSF ¶ 17; MMLPSA § 1.

Ambac's motion arises because U.S. Bank disputes that the term "Seller" in Section 14.01(ii) refers to CHL.  It argues that only a "servicer's" breach can trigger an EOD, and that the use of the term "seller" in Subsection 14.01(ii) bespoke a mutual mistake.  U.S. Bank argues

that, when the parties entered into the RSA—which modified some (but not all) provisions in the

MMLPSA—they inadvertently failed to change the word "seller" in Section 14.01(ii) to

"servicer."  And under the RSA, CHL is defined as a "seller," but only Countrywide *Servicing*—

a distinct corporate entity—is a "servicer."  JSF ¶¶ 32, 35.  On U.S. Bank's read, then, CHL's

breaches do not trigger an EOD.

This contention is the basis for an affirmative defense of mutual mistake pled by U.S.

Bank.  Ambac's motion for partial summary judgment argues that this defense is untimely.

Ambac also challenges, on the merits, U.S. Bank's related affirmative defenses that Ambac is

estopped from arguing that CHL's breaches can trigger an EOD, and that Ambac has waived any

such argument.

For the reasons below, the Court grants Ambac's motion in full, while recognizing—as

the parties do—that whether the relevant EOD provision is ambiguous remains an open question.

### A.      Mutual Mistake

Ambac's argument that U.S. Bank's mutual mistake defense is untimely is as follows:

(1) the remedy for a mutual mistake is contract reformation, *see Chimart Assocs. v. Paul*, 66

N.Y.2d 570, 573 (1986); (2) reformation claims have a six-year statute of limitations, beginning

at the time of the mistake, *see* C.P.L.R. § 213(6); *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543,

546–47 (1995); and (3) U.S. Bank's mutual mistake defense was first brought some 14 years

after the alleged mistake was made.

U.S. Bank does not meaningfully counter this argument.  And at argument, counsel for

U.S. Bank virtually—and rightly—conceded the point.  *See* Aug. 17 Tr. at 96 ("In candor, we

don't have a great defense on the limitations issue, other than to say it's an affirmative defense

and it should be treated differently in that circumstance.").  Counsel did note that, although the

six-year statute of limitations governs affirmative *claims* for reformation, its mutual mistake argument takes the form of an affirmative *defense*. *See* USB Opp'n at 17. But U.S. Bank has not identified any case law supporting that this formal distinction matters. And its argument is blocked by *Wallace*, in which the New York Court of Appeals rejected "[a]t the outset" a "claim for reformation as time-barred," where the scrivener's error in question had been asserted (as here) in an answer—as opposed to a counterclaim. *Wallace*, 86 N.Y.2d at 546–47. Pressed on this point, U.S. Bank's counsel acknowledged that "in the *Wallace* case it was an affirmative defense and found to be untimely." Aug. 17 Tr. at 96. Finally, U.S. Bank does not argue that anything inhibited it from acting earlier to rectify the alleged mutual mistake.

The Court thus holds U.S. Bank's affirmative defense of mutual mistake time-barred.

### B.       Estoppel and Waiver

Ambac also moves against U.S. Bank's affirmative defenses that Ambac is estopped from arguing—and has waived the argument—that CHL's breaches triggered an EOD.[31] The defenses are predicated on the same arguments. For the reasons below, the Court grants Ambac's motion and strikes these defenses.

"[E]quitable estoppel is an extraordinary remedy" that "should be invoked sparingly and only under exceptional circumstances." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 507 (S.D.N.Y. 2020) (internal quotation marks omitted). It requires showing (1) an act constituting the concealment of facts or misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; and (4) reliance upon the misrepresentations which causes the innocent

---

[31] Relatedly, U.S. Bank also submits that the doctrine of equitable estoppel can revive its mutual mistake defense. *See* USB Opp'n at 17.

party to change its position to its substantial detriment. *See Gaia House Mezz LLC v. States St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013).

No reasonable juror could find these elements. In its Amended Answer, U.S. Bank recounts that Ambac had (1) earlier requested loan files from U.S. Bank, to enable it to "conduct pre-Event of Default investigations of whether the loans had originator breaches of representations and warranties or other defects"; (2) concluded that CHL had "breached its representations and warranties concerning certain loans"; (3) provided breach notices to U.S. Bank, including loan-specific information, and identifying which portions of the MMLPSA were allegedly breached; and (4) requested that U.S. Bank notify CHL of the breaches. *See* Am. Answer at 23. However, U.S. Bank notes, during this process, Ambac allegedly did not assert that an EOD—or a default that could give rise to an EOD—had occurred. *Id.*

U.S. Bank also relies on conversations it had with Ambac between 2011 and 2014—"all centered around CHL's breaches"—in which, it represents, Ambac did not suggest that those breaches could trigger or had triggered EODs. USB Opp'n at 22. And, U.S. Bank states, during those conversations, Ambac asked U.S. Bank to investigate CHL's potential breaches based on a clause that applies "prior to the occurrence of an Event of Default." *See id.* (citing Dkt. 249, Ex. G (2013 letter from Ambac to U.S. Bank)). U.S. Bank casts that action as an "affirmative statement[] suggesting that EODs had not occurred based on CHL's breaches." *Id.* at 22–23. Further, U.S. Bank states, when it asked Ambac to identify a provision that would make the pre-EOD clause inapplicable, Ambac did *not* respond that the clause did *not* apply because an EOD had occurred.

On the basis of these submissions, a reasonable juror might be able to conclude, at most, that Ambac had not yet, at the time, determined that CHL's document-defect breaches had triggered an EOD. But the elements of estoppel demand more.[32]

The first element, for instance, requires the concealment or misrepresentation of facts. *See Gaia House*, 720 F.3d at 90. U.S. Bank does not identify anything of the sort. That an EOD occurred based on missing documents in Mortgage Files is not something Ambac even *could* have concealed from U.S. Bank. As the entity that received the exception reports, Ambac cannot coherently be said to have concealed from U.S. Bank evidence of an EOD.

As to the second element, the facts recited by U.S. Bank do not support that Ambac intentionally concealed facts to induce U.S. Bank not to act. U.S. Bank thus cannot meet the second element of estoppel—an intention to induce reliance. *See id.* And U.S. Bank's actual knowledge of the allegedly triggering events independently defeats its ability to claim estoppel. *See Babitt v. Vebeliunas*, 332 F.3d 85, 94 (2d Cir. 2003) ("The part[y] asserting estoppel must show with respect to [it]sel[f] . . . lack of knowledge and of the means of knowledge of the true facts . . . .").

Finally, it is undisputed that, before this lawsuit, Ambac was unaware of the exception reports that allegedly brought about the EODs. *See, e.g.*, JSF ¶ 176 ("Before filing this lawsuit, Ambac did not have any trust receipts or exception reports for the Covered Trusts, or any other

---

[32] So does waiver. No reasonable juror could find, on the basis of U.S. Bank's account, that Ambac made "express statements" that CHL's breaches did not trigger EODs sufficient to support that Ambac waived its argument to the contrary. *But see* USB Opp'n at 24. Waiver "requires a clear manifestation of an intent by [a party] to relinquish [its] known right." *Beth Israel*, 448 F.3d at 585 (internal quotation marks omitted). It "may not be inferred from mere silence or inaction," nor can it "be created by negligence, oversight, or thoughtlessness." *J & J Sports Prods., Inc. v. Patin*, 358 F. Supp. 3d 318, 323 (S.D.N.Y. 2019) (internal quotation marks omitted).

documents or information concerning any missing or defective documents from Mortgage Files for the Covered Trusts."). This precludes U.S. Bank from making out the third element of estoppel—actual or true knowledge of the concealed facts by a wrongdoer. And U.S. Bank has not suggested that Ambac was required to flag for U.S. Bank that an EOD had occurred, even if it had somehow known earlier that one had occurred. *See Gaia House*, 720 F.3d at 90 ("[A] party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak."); *Vebeliunas*, 332 F.3d at 94 (defendant's silence not a basis for equitable estoppel where defendant had no duty to speak).

As to the fourth element, reliance by the innocent party, it too does not apply. U.S. Bank was apprised of all it needed to recognize that an EOD had occurred (*i.e.*, access to the contracts spelling out an EOD's triggering events, and knowledge of the facts showing that such events had allegedly occurred). U.S. Bank does not coherently develop how it purportedly reasonably relied to its detriment on any action, statement, or omission by Ambac. *See Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."). Instead, U.S. Bank's Amended Answer only conclusorily states that U.S. Bank has been "prejudiced by Ambac's conduct." *See* Am. Answer at 24. At most, U.S. Bank's briefing explains that, had Ambac earlier affirmatively stated its view that CHL's breaches had led to an EOD, it could have acted earlier to address the alleged EODs or perhaps to bring a timely reformation claim. But even if that alleged harm were cognizable—and it tellingly does not appear in U.S. Bank's Amended Answer—the time it took for Ambac to formulate and articulate its ultimate legal conclusions would not be a basis on which U.S. Bank could claim reasonable

reliance. U.S. Bank would still have its own duty to recognize EODs and take corrective action. *See Grumman*, 748 F.2d at 737; *Gaia House*, 720 F.3d at 92 ("Even if Gaia had been able to demonstrate reasonable reliance on a misrepresentation or omission by State Street, its claim still fails because it did not demonstrate that the alleged misrepresentations caused it to change its position to its substantial detriment.").

The Court therefore grants Ambac's motion for partial summary judgment and strikes U.S. Bank's affirmative defenses of equitable estoppel and waiver. *See Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 540–41 (S.D.N.Y. 2015) (rejecting, at summary judgment phase, waiver and estoppel defenses).

## CONCLUSION

For the reasons above, the Court grants in part and denies in part U.S. Bank's motion for partial summary judgment; and grants in full Ambac's motion for partial summary judgment.

As addressed during both the February 17 conference and the August 17 oral argument, an outstanding question in this case—which, among other implications, has the potential to greatly affect the forthcoming Phase 2 expert discovery—regards whether Subsection 14.01(ii) of the MMLPSA is ambiguous as to which entity the term "seller" references. The parties have not moved for summary judgment on that question. And its answer does not ineluctably follow from the Court's resolution of the motions addressed in this opinion. The parties are instructed to file a joint letter, no later than October 14, 2022, setting out their view as to the most efficient means by which that issue may be litigated.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 238, 241, and 295.

SO ORDERED.

_Paul A. Engelmayer_
PAUL A. ENGELMAYER
United States District Judge

Dated: September 30, 2022,
       New York, New York