UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION, | |
| Plaintiff, | 17 Civ. 2614 (PAE) (KHP) |
| -v- | |
| U.S. BANK NATIONAL ASSOCIATION, | OPINION & ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This case turns on the contractual and fiduciary duties defendant U.S. Bank National

Association ("U.S. Bank") allegedly owed as trustee to five trusts that closed in mid-to-late

2005. Each trust comprised thousands of residential mortgage-backed securities ("RMBS")

backed by home loans originated by Countrywide Home Loans, Inc. ("CHL"), whose shoddy

practices during that era infamously contributed to the collapse of the housing market and the

nation's 2008 economic crisis. Plaintiff Ambac Assurance Corporation ("Ambac") insured

certain classes of securities within the trusts. When many borrowers on the loans underlying

those securities failed to meet their payment obligations, Ambac became saddled with hundreds

of millions of dollars in claims by certificate holders. Ambac alleges here that those claims

could have been avoided had U.S. Bank fulfilled its contractual and fiduciary obligations to act

against CHL so as to protect the trusts' interests. Ambac seeks more than $340 million dollars

from U.S. Bank for its alleged breaches.

More than five years ago, the Honorable William H. Pauley III, to whom this case

originally was assigned, issued a decision granting in part and denying in part U.S. Bank's

motion to dismiss. *See Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141

(S.D.N.Y. 2018) ("*Ambac I*"). The case was transferred to this Court upon Judge Pauley's untimely death. After the parties had engaged in extensive discovery, the Court granted in part and denied in part U.S. Bank's motion for partial summary judgment and granted in full Ambac's motion for partial summary judgment. *See Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 632 F. Supp. 3d 517 (S.D.N.Y. 2022) ("*Ambac II*"). At the Court's instruction, the parties thereafter filed the pending cross-motions for partial summary judgment on a separate outstanding question.

That question is whether the term "Seller" in Subsection 14.01(ii) of the Master Mortgage Loan Purchasing & Servicing Agreement ("MMLPSA"), as amended and reconstituted, is ambiguous.[1] The meaning of "Seller" bears on whether the failure of CHL to fulfill its obligations under the MMLPSA constitutes an event of default ("EOD") that in turn triggers the post-EOD obligations of U.S. Bank to act as a prudent person. Ambac contends that "Seller" does in fact include CHL in its capacity as the loan originator and that, therefore, CHL's material failure to perform its obligation to deliver complete mortgage loan documents constituted an EOD triggering U.S. Bank's prudent-person obligations. U.S. Bank argues that, after CHL transferred its servicing rights to Countrywide Home Loans Servicing LP ("CHL Servicing"), the parties modified Subsection 14.01(ii) such that only CHL Servicing's material failures could trigger EODs. As some of Ambac's claims turn on CHL's failures in its role as seller/originator,

---

[1] In resolving the previous round of summary judgment motions, the Court assumed, *arguendo*, that "Seller" encompasses CHL. *See Ambac II*, 632 F. Supp. 3d at 523 n.8.

this question has the capacity to affect forthcoming expert discovery and the potential scope of relief available to Ambac.[2]

For the reasons below, the Court grants Ambac's motion for partial summary judgment on this point and denies U.S. Bank's motion for partial summary judgment. The case will now proceed to the completion of expert discovery, and, thereafter, to trial.

## I.     Factual Background[3]

---

[2] The question of whether any EOD(s) actually occurred will be decided at trial. U.S. Bank contends that this factual question will be "harder" for Ambac to prove as to servicer-based EODs, rather than originator-based EODs. Dkt. 335 (argument transcript or "Tr.") 25–26.

[3] This account draws upon *Ambac I*, *Ambac II*, and the parties' submissions in support of and opposition to the previous and pending round of summary judgment motions. The sources deriving from the previous round of summary judgment motions include: the parties' joint statement of facts, Dkt. 237 ("JSF"); Ambac's Local Rule 56.1 statement, Dkt. 242; U.S. Bank's Local Rule 56.1 statement, Dkt. 245; U.S. Bank's counterstatement to Ambac's 56.1 statement, Dkt. 248; Ambac's counterstatement to U.S. Bank's 56.1 statement, Dkt. 252; U.S. Bank's "responses to plaintiff's additional facts," Dkt. 261; Ambac's reply to U.S. Bank's counterstatement to Ambac's 56.1 statement, Dkt. 264; Peter Tomlinson's declaration in support of Ambac's motion for partial summary judgment and exhibits attached thereto, Dkt. 246; declarations in support of U.S. Bank's motion for partial summary judgment and exhibits attached thereto, submitted by Eve Kaplan, Dkt. 240, and Michael Marcucci, Dkts. 244 (initial declaration), 260 (supplemental declaration); Marcucci's declaration in support of U.S. Bank's opposition to Ambac's motion for partial summary judgment and exhibits attached thereto, Dkt. 249; and Henry Ricardo's declaration in support of Ambac's opposition to U.S. Bank's motion for partial summary judgment and exhibits attached thereto, Dkt. 253.

The sources deriving from the pending round of summary judgment motions include: (1) in support of its cross-motion for partial summary judgment, Ambac's memorandum of law, Dkt. 315 ("Ambac MSJ"), Rule 56.1 statement, Dkt. 316 ("Ambac Seller 56.1"), declaration, Dkt. 318, opposition and reply brief, Dkt. 324 ("Ambac Reply"), response to U.S. Bank's Rule 56.1 statement, Dkt. 325 ("Ambac Seller 56.1 Response"), and reply affidavit, Dkt. 326; and (2) in support of its cross-motion for partial summary judgment, U.S. Bank's memorandum of law, Dkt. 320 ("USB MSJ"), Rule 56.1 statement, Dkt. 321 ("USB Seller 56.1"), declaration, Dkt. 322, opposition and reply brief, Dkt. 330 ("USB Reply"), response to Ambac's Rule 56.1 statement, Dkt. 331 ("USB Seller 56.1 Response"), and reply affirmation, Dkt. 332.

As for key contract documents, this decision cites the MMLPSA, Dkt. 318-2 ("MMLPSA"); an exemplary Pooling and Servicing Agreement ("PSA"), Dkts. 318-3, 318-4 (together, "PSA"); an

The Court assumes familiarity with Judge Pauley's decision in *Ambac I*, which set out the factual background in detail, and this Court's decision in *Ambac II*, which resolved the parties' first round of summary judgment motions.   The Court here recounts the facts pertinent to the cross-motions for partial summary judgment.

### A.      The Parties and Securitization Process

U.S. Bank is a national bank that has continuously served as trustee for five trusts (the "trusts")[4] since they closed in mid-to-late 2005.[5] JSF ¶¶ 13–14, 23–27.

Ambac is a monoline insurer that issued financial guaranty insurance on several lines of financial products, including structured finance such as the RMBS making up the trusts at issue. *Id.* ¶ 66.

---

exemplary Reconstituted Servicing Agreement ("RSA"), Dkt. 318-5 ("RSA"); and the Prospectus Supplement ("ProSupp"), Dkt. 318-6 ("ProSupp").  All citations to contractual documents use the internal page numbers on the documents unless otherwise noted.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[4] The five trusts are the Harborview Mortgage Loan Trust ("Harborview") 2005-2, Harborview 2005-8, Harborview 2005-12, Harborview 2005-13, and Harborview 2005-16. JSF ¶ 13.

[5] The trusts closed on April 12, 2005 (Harborview 2005-2), July 29, 2005 (Harborview 2005-8), September 30, 2005 (Harborview 2005-12 and Harborview 2005-13), and November 30, 2005 (Harborview 2005-16). JSF ¶¶ 23–27.

Each trust comprises thousands of home loans originated by non-party CHL that have been "securitized" into residential mortgage-backed securities. *Id.* ¶ 15. Judge Pauley described the basics of the mortgage loan securitization process this way:

> In broad strokes, the process begins when a lender (the "Originator") originates mortgage loans and sells its interest in those loans to another financial institution (the "Sponsor"), which pools the loans and transfers the loan pools to a special purpose vehicle (the "Depositor"). The Depositor then conveys the loan pools to a trust, which subsequently issues certificates (*i.e.*, RMBS) backed by cashflows from payments made by borrowers of the underlying mortgage loans. Because investors who purchase the certificates essentially purchase entitlements to these payments, their rate of return ultimately turns on the creditworthiness of the loans and the borrowers' ability to repay them.

*Ambac I*, 328 F. Supp. 3d at 147 (citing *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581 (2015)).

The certificates, as Judge Pauley further explained, are "divided into tranches, or classes, that correspond to different payment priorities. To protect investors against the risk of insufficient payments by borrowers, insurers like Ambac issued policies guaranteeing payments on those certificates in exchange for a premium." *Id.* Specifically, Ambac issued Certificate Guaranty Insurance Policies to each trust. JSF ¶ 29. Those policies guaranteed payments to investors of certain classes of certificates within a trust, in the event that the trust lacked sufficient funds from its cashflows to pay those certificate holders. *Id.* ¶¶ 28–29.

### B.     The Contracts

On April 1, 2003, CHL sold its interest in the relevant underlying loans it had originated to the trusts' sponsor, Greenwich Capital Financial Products, Inc. ("Greenwich"). *Id.* ¶ 16. The MMLPSA governed that transaction. *Id.*; *see* Dkt. 318-2 ("MMLPSA"). Despite CHL's having sold its interest in the underlying loans to Greenwich, under the MMLPSA, CHL continued to exercise valuable servicing rights (including coordinating the process and handling of borrowers'

monthly mortgage payments, for consideration).  *See* JSF ¶ 18.  The MMLPSA expressly authorizes CHL to assign its servicing obligations to CHL Servicing, which was its indirect, wholly owned subsidiary.  MMLPSA § 13.05; JSF ¶ 31.

The MMLPSA required CHL to make certain representations and warranties about the quality of the loans, and to deliver complete "Mortgage Files" to the trusts' custodian.  JSF ¶¶ 19–20; *see* MMLPSA §§ 6.03, 7.02.  Mortgage Files comprise numerous documents, including, but not limited to, the original mortgage note, the original mortgage, and the original or certified copy of the lender's title insurance policy.  JSF ¶ 96.  Bank of New York Mellon ("BNYM") acted as custodian (the "Custodian")—U.S. Bank's "designated agent" for purposes of receiving and reviewing Mortgage Files for completion and compliance with each Custody Agreement entered into between U.S. Bank and BNYM.  *Id.* ¶¶ 18, 38, 95, 97–98.  Part of BNYM's responsibilities as the Custodian was to transmit to U.S. Bank an "exception report" that identified missing documents in Mortgage Files.  *Id.* ¶ 99.  Aside from those Mortgage Files identified in the schedule of exceptions listed in an exception report, BNYM was to confirm that complete Mortgage Files were delivered by CHL and in the proper form.  *Id.* ¶ 100.

In 2005, Greenwich securitized the loans it had acquired from CHL by pooling them together and transferring them to a depositor, which then conveyed the loans to the trusts.  A Pooling and Servicing Agreement ("PSA") governed each such transaction for a trust.  *See, e.g.*, Dkts. 318-3, 318-4 ("PSA"); JSF ¶¶ 13, 21–22.  Each trust's PSA, for all relevant purposes here, is identical.  JSF ¶ 22.[6]  They are the vehicles through which Greenwich assigned its rights against CHL to U.S. Bank, the trustee.  *Id.* ¶¶ 21–22.  The PSA governs the administration of the

---

[6] For simplicity, the Court will refer to a singular "PSA" and cite to the Harborview 2005-2 PSA.

trusts and sets forth U.S. Bank's obligations as trustee. *See id.* ¶ 32; PSA. Under the PSA,

Ambac is an express third-party beneficiary. JSF ¶ 30.

Between April and November 2005, CHL transferred its servicing functions to CHL

Servicing.[7] *Id.* ¶¶ 31–32. For each trust, Greenwich, CHL, and CHL Servicing entered into

agreements recognizing that transfer called Reconstituted Servicing Agreements (individually,

the "RSA"). *Id.*; Dkt. 318-5 ("RSA"). Each trust's RSA, for all relevant purposes here, is

identical. JSF ¶ 31.[8] The RSA effectively amends and restates certain provisions of the

MMLPSA to account for the transfer of servicing rights to CHL Servicing. *Id.* ¶ 32; *see also*

Dkt. 249-1, Ex. A (redlined version of MMLPSA demonstrating changes that Harborview 2005-

2 RSA made to MMLPSA).

### C.    Ambac's Allegations

U.S. Bank's relevant obligations as Trustee are provided by the PSA and common law.[9]

Principally here, U.S. Bank must take certain actions both before and after contractually defined

EODs occur. The PSA incorporates by reference the definition of an EOD contained in the

MMLPSA, as amended by the RSA. JSF ¶¶ 47–48; *see* PSA § 1.01; MMLPSA § 14.01 (EOD

provision); RSA, Ex. One (detailing changes RSA makes to MMLPSA's EOD provision).

---

[7] CHL Servicing later changed its name to "BAC Home Loans Servicing LP" after Bank of America acquired its parent company. JSF ¶ 33. On July 1, 2013, Nationstar Mortgage LLC succeeded BAC Home Loans Servicing LP as servicer. *Id.* ¶ 34.

[8] For simplicity, the Court will refer to a singular "RSA" and cite to the Harborview 2005-2 RSA.

[9] While Ambac also alleged state statutory duties under New York's Streit Act, *see* N.Y. Real Prop. Law §§ 124 *et seq.*, *Ambac I* dismissed those claims. *See* 328 F. Supp. 3d at 164–65.

Relevant here, an EOD occurs shortly after a contractually defined "Seller" of loans fails to fulfill one of *its* obligations under the MMLPSA.[10] *See, e.g.*, MMLPSA § 6.03 (committing "Seller" to deliver complete Mortgage Files). Subsection 14.01(ii) of the MMLPSA, entitled "Events of Default," provides that an EOD arises from:

> failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Seller set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller[.]

*Id.* § 14.01(ii). Section 1 of the MMLPSA defines "Seller" as "Countrywide Home Loans, Inc., or any successor to or assignee of the Seller under this Agreement as provided herein." *Id.* § 1.

U.S. Bank's general pre-EOD obligations—that is, obligations it owes regardless of whether an EOD occurs—include certifying that Mortgage Files are complete, PSA § 2.02; enforcing CHL's obligation to cure or repurchase certain defective loans, *id.* § 2.03(a); and enforcing the loans' servicers' obligations to properly service the loans, *id.* § 3.01. U.S. Bank's general post-EOD obligation—that is, an additional duty U.S. Bank owes after an EOD has occurred—is to act as a prudent person would. *Id.* § 8.01. The nomenclature of "pre-" and "post-" EOD captures only the point in time that a duty arises. U.S. Bank's pre-EOD obligations bind U.S. Bank whether or not an EOD actually occurs. And those pre-EOD obligations do not cease if and when an EOD does occur. Rather, after an EOD occurs, U.S. Bank is bound by both its pre- and post-EOD obligations.

Ambac here alleges that certain of U.S. Bank's pre-EOD obligations, *see id.* § 2.03(a), were triggered by, *inter alia*, CHL's failure to repurchase breaching loans in the Harborview

---

[10] EODs occur at the trust level, meaning, for example, that a failure to deliver a Mortgage File as to one loan would not trigger an EOD.

2005-8 Trust despite a demand being made, Dkt. 62 ("Amended Complaint" or "AC") ¶¶ 84–85, and CHL's failure to deliver complete Mortgage Files, *id.* ¶¶ 86–87. Ambac alleges that U.S. Bank's post-EOD obligations were triggered by, *inter alia*, CHL's failure to deliver complete Mortgage Files, *id.* ¶¶ 53–62, and CHL Servicing's widespread servicing misconduct, *id.* ¶¶ 63–71. Ambac claims that U.S. Bank had a conflict of interest that discouraged it from acting against CHL to protect the trusts as it should have. Like CHL and CHL Servicing, Ambac alleges, U.S. Bank both originated and serviced mortgage loans during the period preceding the financial crisis, and in so doing followed unlawful practices, with respect to which it has since entered into settlement agreements with federal regulators. *Id.* ¶¶ 89–90. Ambac alleges that U.S. Bank's legal interest in those cases disincented it from drawing attention to others' suspect origination and servicing practices, and led it not to act against CHL, notwithstanding U.S. Bank's duty to so act. *Id.* Ambac alleges that U.S. Bank's inaction allowed claims against CHL worth hundreds of millions of dollars to expire. *See id.* ¶ 82. As a result, it alleges, it has paid or accrued $343 million of claims under policies issued to the trusts. *Id.* ¶¶ 91–94.

## II. Relevant Procedural History

### A. General Case Management and Motions Practice

On April 11, 2017, Ambac filed the complaint. Dkt. 1. U.S. Bank moved for a stay or to dismiss, briefing for which completed on October 27, 2017. *See* Dkts. 37, 44, 48. On March 12, 2018, after argument on the motion and on the parties' stipulation, Ambac filed an Amended Complaint. Dkt. 62. On June 29, 2018, the Court, per Judge Pauley, issued an opinion and order granting in part and denying in part the motion to dismiss. It (1) denied U.S. Bank's motion for a stay; (2) dismissed Ambac's fiduciary-duty claims to the extent they were premised on U.S. Bank's duty to act prudently and in good faith; (3) dismissed Ambac's breach-of-contract claims

to the extent they were premised on U.S. Bank's obligation to certify that complete Mortgage Files had been delivered to the trusts; (4) dismissed Ambac's Streit Act claims; and (5) otherwise denied the motion. *See Ambac I*, 328 F. Supp. 3d 141.

On August 24, 2018, U.S. Bank answered the complaint. Dkt. 79. On January 7, 2020, after a hearing before Judge Pauley, U.S. Bank amended its answer. Dkt. 132; *see* Dkt. 131.[11]

On July 28, 2021, following Judge Pauley's July 6, 2021 death, the case was reassigned to this Court. On September 15, 2021, the Court held a pre-motion conference to discuss the parties' anticipated cross-motions for summary judgment. Between November 9, 2021 and April 8, 2022, the parties filed their cross-motions and supporting materials. Dkts. 238–50, 252–53, 259–61, 263–65, 272–73, 276. On June 28, 2022, the parties stipulated to dismiss certain claims regarding U.S. Bank's alleged failure adequately to distribute recoveries received by the trusts, following a Second Circuit summary order clarifying the provisions in question. Dkt. 285; *see* AC ¶¶ 95–101, 130–43. In early August 2022, the parties submitted letters regarding supplemental case authority. Dkts. 288, 290–92. On August 17, 2022, the Court heard argument on the cross-motions. Dkt. 300 (argument transcript). Between August 25 and September 2, 2022, the parties submitted supplemental letter briefing. Dkts. 297–99.

On September 30, 2022, the Court granted in part and denied in part U.S. Bank's motion for partial summary judgment and granted in full Ambac's motion for partial summary judgment. Dkt. 304. It (1) held timely Ambac's pre-EOD and post-EOD claims of breach of contract; (2) held timely and unwaived Ambac's post-EOD fiduciary duty claims; and (3) held that U.S. Bank's affirmative defenses of mutual mistake, estoppel, and waiver were untimely and/or failed

---

[11] Non-dispositive motion practice has included motions for contempt and numerous motions to compel, which the Honorable Katharine H. Parker, United States Magistrate Judge, has ably resolved. *See* Dkts. 88, 141, 191.

as a matter of law. *See Ambac II*, 632 F. Supp. 3d 517.  The Court directed the parties to file a

letter proposing an approach to resolve the outstanding question at issue here: the meaning of

"Seller" in Subsection 14.01(ii) of the MMLPSA.  *Id.* at 549.

On October 14, 2022, the parties jointly proposed filing cross-motions for summary

judgment as to the meaning of "Seller" in Subsection 14.01(ii).  Dkt. 306.  On October 18, 2022,

the Court set a briefing schedule for the proposed cross-motions.  Dkt. 307.

On November 8, 2022, Ambac filed the pending cross-motion for summary judgment,

Dkt. 315 ("Ambac MSJ"), and Rule 56.1 statement, Dkt. 316 ("Ambac Seller 56.1"), and

declaration in support, Dkt. 318.  On December 8, 2022, U.S. Bank filed its cross-motion for

summary judgment, Dkt. 320 ("USB MSJ"), and Rule 56.1 statement, Dkt. 321 ("USB Seller

56.1") and declaration in support, Dkt. 322.  On January 12, 2023, Ambac filed its brief in

opposition, Dkt. 324 ("Ambac Reply"), response to U.S. Bank's Rule 56.1 statement, Dkt. 325

("Ambac Seller 56.1 Response"), and reply affidavit, Dkt. 326.  On February 10, 2023, U.S.

Bank filed its brief in opposition, Dkt. 330 ("USB Reply"), response to Ambac's Rule 56.1

statement, Dkt. 331, and reply affirmation, Dkt. 332.

On June 5, 2023, the Court held argument.[12]  Dkt. 335 (argument transcript or "Tr.").

**B.      Status of Discovery**

On March 16, 2021, fact discovery closed.  Expert discovery has proceeded in two

phases.  Phase 1 consists of expert discovery on issues other than loan-level re-underwriting[13]

---

[12] On May 4, 2023, the Court denied a motion to intervene by Barbara Stephens, *see* Dkts. 302, 334, which Ambac had opposed, *see* Dkts. 308–310.  The Court found that Stephens's claims pertained to separate trusts not at issue in this litigation.  Dkt. 334.

[13] Re-underwriting is the process of reviewing a loan file to determine whether it breaches representations and warranties made in the trusts' governing contracts, and whether such a breach had a material and adverse effect.

and damages. Phase 1 expert discovery had initially completed on August 20, 2021. But on June 6, 2022, the parties filed a joint letter informing the Court that U.S. Bank would need to replace its corporate trust industry-custom-and-practice expert due to health issues. The parties submitted a revised schedule reopening Phase 1 expert discovery to allow for the exchange of new expert reports and depositions. Dkt. 278. On June 10, 2022, the Court approved the schedule, *see* Dkt. 279, and on October 18, 2022, it granted an extension to accommodate the scheduled deposition of U.S. Bank's replacement Phase 1 expert, Dkt. 307. Phase 1 expert discovery was completed on November 22, 2022.

Phase 2 expert discovery consists of expert testimony as to loan-level re-underwriting and damages. On January 26 and 28, 2022, the parties submitted letters regarding Ambac's proposed use of statistical sampling in connection with Phase 2 discovery. Dkts. 257–58. The issue on which the parties differed concerned the proper way to value the claims that, Ambac alleges, U.S. Bank should have brought against CHL pursuant to its post-EOD prudent-person obligations. On February 17, 2022, the Court held a conference on that issue. On February 24, 2022, guided by the Court, the parties stipulated (1) to stay Phase 2 expert discovery *sine die*; and, after the cross-motions for summary judgment were resolved, (2) to brief certain sampling issues germane to Phase 2 expert discovery; and (3) to propose a new schedule for Phase 2 expert discovery following the Court's decision on the sampling issue. *See* Dkts. 269–71. After the first round of cross-motions for summary judgment were decided, the parties jointly proposed further deferring briefing on Ambac's use of statistical sampling until after the pending motions were resolved, but before the start of Phase 2 expert discovery. Dkt. 306. On October 18, 2022, the Court granted the request. Dkt. 307.

## III.    Applicable Legal Standards

### A.    Governing Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**B.     Governing Contractual Interpretation**

Judgment as a matter of law "is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000).

13

Under New York law, a contract is unambiguous if on its face it is "reasonably susceptible of only one meaning[.]" *Selective Ins. Co. of Am. v. Cnty. of Rensselaer*, 26 N.Y.3d 649, 655 (2016) (citation omitted). A written contract that is unambiguous on its face is then enforced according to the plain meaning of its terms. *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). Conversely, a contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted). Whether a contract is ambiguous "is an issue of law for the courts to decide." *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008) (citation omitted). That the parties interpret a contract provision differently does not make it ambiguous. *CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*, 9 N.Y.S.3d 220, 224 (N.Y. App. Div. 2015).

"Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement." *L. Debenture Tr. Co. of N.Y. v. Maxerick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted). "The court should read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous." *Id.* at 468 (citations omitted); *see also Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 90–91 (2d Cir. 2015). "[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *L. Debenture*, 595 F.3d at 467 (citation omitted); *see, e.g., Hudson–Port Ewen Assocs., L.P. v. Chien Kuo*, 78

N.Y.2d 944, 945 (1991). "And where a term may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent, it may be treated as implied in the contract and supplied by the court." *Luitpold Pharms.*, 784 F.3d at 95 (citation omitted). Ultimately, "the intention of the parties should control, and the best evidence of intent is the contract itself." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (citation omitted); *see Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). "[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'" *L. Debenture*, 595 F.3d at 467 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

"If the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law." *Bank of N.Y. Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 275 (2d Cir. 2013); *see Luitpold Pharms.*, 784 F.3d at 95. Importantly, however, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) (quoting *Intercont'l Planning v. Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)). "[E]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *L. Debenture*, 595 F.3d at 466 (citation omitted). "Because facial ambiguity in a contract will require the factfinder to examine extrinsic evidence to determine the contract's effect, and because such extrinsic evidence is most often mixed, a court generally will not grant summary judgment on a contract claim when the operative language is ambiguous." *Luitpold Pharms.*, 784 F.3d at 87–88.

"Evidence as to [] custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized." *L. Debenture*,

595 F.3d at 466 (citing *Fox Film Corp. v. Springer*, 273 N.Y. 434 (1937)).  "When the parties

have used contract terms which are 'in common use in a business or art' and have 'a definite

meaning understood by those who use them,' but which 'convey no meaning to [t]hose who are

not initiated into the mysteries of the craft,' the parties, in order to have the court construe their

contracts, 'must furnish [the court] with the dictionaries they have used.'"  *Id.* (quoting *Fox Film*,

273 N.Y. at 436).  "In such circumstances, the court 'must be informed of the meaning of the

language as generally understood in that business, in the light of the customs and practices of the

business.'"  *Id.* (quoting *Fox Film*, 273 N.Y. at 437).

## IV.  Analysis

The parties agree that the amended version of Subsection 14.01(ii) of the MMLPSA is

the operative provision for the purposes of resolving these motions.  Ambac argues that the term

"Seller" in Subsection 14.01(ii), as amended, "unambiguously" encompasses CHL and that, by

extension, CHL's actions can trigger EODs and impose on U.S. Bank prudent-person duties.

Ambac MSJ at 1, 9.  U.S. Bank contends that, after CHL transferred its servicing rights to CHL

Servicing, the parties unambiguously modified Subsection 14.01(ii) such that only failures by the

servicer, CHL Servicing, could trigger EODs.  USB MSJ at 1, 8.  Accordingly, to prevail on

these motions, Ambac must establish as a matter of law that "Seller" in Subsection 14.01(ii)

necessarily includes CHL, while U.S. Bank must establish that "Seller" necessarily excludes

CHL.  If neither party fulfills their burden, the question of the meaning of "Seller" goes to the

jury.  *See, e.g.*, *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990).

Because each party's motion can succeed only if the other's fails, the Court addresses

their motions together, keeping in mind the parties' respective burdens on summary judgment.

The Court first recounts the evolution of Subsection 14.01(ii) and then analyzes whether the

provision is ambiguous, starting with the text and then turning to the context of the provision. For the following reasons, the Court holds that, on the face of the contractual documents, the term "Seller" in Subsection 14.01(ii) unambiguously encompasses CHL in its capacity as originator. The Court therefore denies U.S. Bank's motion and grants Ambac's motion.

### A.   Text of the Agreement

Subsection 14.01 of the MMLPSA, titled "Events of Default," outlines various EODs that can trigger U.S. Bank's prudent-person obligations. *See* MMLPSA § 1 (defining "EOD" as "[a]ny one of the conditions or circumstances enumerated in Section 14.01"). The dispute here turns on the meaning of "Seller" in Subsection 14.01(ii) of the MMLPSA, as amended by the RSA. To interpret the provision, the Court considers the entire integrated agreement, including the original text of the MMLPSA, the PSA, and the RSA. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) ("Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together.") (citation and alteration omitted). The Court also considers the Prospectus Supplement ("ProSupp") issued in connection with the amended agreement.[14] *See Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 21-70, 2021 WL 6060710, at *4 n.4 (2d Cir. Dec. 20, 2021) (affirming consideration of ProSupp in interpreting RMBS agreement).

### 1.   Use of "Seller" in the Original MMLPSA

---

[14] The parties agree that the ProSupp can be considered, but should not be interpreted so as to unilaterally alter the terms of the agreement. *See* Ambac MSJ at 17 n.9, 18 (arguing that ProSupp "cannot alter the plain terms of the parties' actual agreements"); USB MSJ at 20–21 (arguing that "ProSupp would alter or introduce ambiguity into Section 14.01(ii) only if its meaning were settled *before* considering the ProSupp").

The original MMLPSA defined "Seller" as "Countrywide Home Loans, Inc., or any successor to or assignee of the Seller under this Agreement as provided herein."[15]  MMLPSA § 1.  It did not provide a separate definition of "Servicer."  Instead, it used the term "Seller" to refer to both the entity that sells the loans and the entity that services the loans.  Thus, Section 11 ("Seller's Servicing Obligations") stated that "[t]he Seller, as servicer, shall service and administer the Mortgage Loans."[16]  *Id.* § 11.  And throughout the servicing-related provisions of the original MMLPSA, the "Seller" was named as the entity undertaking servicing obligations. *See, e.g., id.* § 13.03 (requiring Purchaser to "return to the Seller any document reasonably requested by the Seller to comply with its servicing obligations"); *see also id.* § 11.01.  That made sense because, at the time that the MMLPSA was enacted, CHL served as both originator and servicer. *See id.* at 1 (cover page, calling CHL "Seller and Servicer").  The MMLPSA contemplated that CHL would transfer its servicing obligations to another entity and, in fact, permitted transfer of its servicing obligations to CHL Servicing without Greenwich's approval. *See id.* § 13.05; *see also id.* § 1 (stating Servicing Addendum governs servicing obligations until "Seller enters into a Reconstitution Agreement").

Under the original MMLPSA, Subsection 14.01 set forth various EODs that allow the "Purchaser" to terminate the rights and obligations of the "Seller."  Subsection 14.01(ii), the provision at issue, outlined a rather broad EOD: the "Seller's" failure to perform "in any material respect any other of the covenants or agreements on the part of the Seller." *Id.* § 14.01(ii).

---

[15] It uses similar language for "Purchaser," which it defines as Greenwich "or its successor in interest or any successor to or assignee of the Purchaser."  MMLPSA § 1.

[16] The Court cites directly to Section 11, whose contents are contained in Exhibit 9 to the MMLPSA.

###### 2.   Use of "Seller" and Text of Subsection 14.01(ii) After Amendment of the MMLPSA

The MMLPSA was amended after the transfer of servicing obligations from CHL to CHL Servicing. As recounted above, the PSA and RSA, signed and/or acknowledged by U.S. Bank as "Trustee," reflect two shifts in obligations: (1) the assignment to U.S. Bank of "all rights" against CHL under the "Servicing Agreement," defined as the MMLPSA as reconstituted by the RSA, *see* PSA at 42, 49; RSA at 1; and (2) the assumption of servicing obligations by CHL Servicing, the "Servicer," PSA § 3.01; RSA at 1. The PSA refers to CHL as the "Originator." PSA at 15, 30. Both agreements refer to CHL Servicing as the "Servicer." *Id.* at 41; RSA at 1.

The PSA does not directly mention Subsection 14.01 of the MMLPSA or define "Seller" as used in Subsection 14.01(ii). It does, however, contain a section on EODs, which it defines "[a]s defined in the Servicing Agreement." PSA at 18. Subsection 7.01 of the PSA, titled "Event of Default," states that, upon the occurrence of an EOD, U.S. Bank "may . . . terminate all of the rights and obligations of the Servicer as servicer under this Agreement." *Id.* § 7.01.

The RSA, signed by Greenwich, CHL, and CHL Servicing "as servicer" on the same day as the PSA, directly updated the text of the MMLPSA. RSA at 1. Under the RSA, CHL Servicing agreed to service the contracted-for loans "subject to the rights of . . . the Trustee to terminate the rights and obligations of [CHL] Servicing," and assumed the "Seller's" obligations under the MMLPSA "with respect to the servicing of the Serviced Loans." *Id.* at 1–2. The provision reflecting the transfer states in full:

> [CHL] Servicing agrees, with respect to the servicing of the Serviced Loans, to perform and observe the duties, responsibilities and obligations that are to be performed and observed by the Seller (as such term is defined in the Servicing Agreement) under the provisions of the Servicing Agreement, except as otherwise provided herein and on Exhibit One hereto, and that the provisions of the Servicing Agreement, as so modified, are and shall be a part of this Agreement to the same extent as if set forth herein in full.

19

*Id.* at 2.  As to EODs, the RSA grants U.S. Bank, as Trustee, "the right to terminate the rights and obligations of [CHL] Servicing" upon the occurrence of an EOD.  *Id.*; *see also id.* at 3 (stating U.S. Bank may terminate rights and obligations of CHL Servicing "as provided in Section 14 (Default)").  Separately, the RSA provides for U.S. Bank to enforce, against both CHL and CHL Servicing, various non-EOD obligations under the MMLPSA.  *See id.* at 3.

Exhibit One of the RSA sets forth modifications to the MMLPSA, including updates to Subsection 14.01.  As relevant here, Subsection 14.01(ii) was modified to add, at the beginning of the provision, the words "subject to clause (ix) of this Subsection 14.01."  RSA, Ex. One. Furthermore, every reference in Subsection 14.01 to "the Purchaser" was replaced with "the Trustee."  *Id.*  The amended version of Subsection 14.01(ii), including Subsection 14.01's introductory language, Subsection (ii), and part of the concluding language, and with the amended language bolded, states:

> In case one or more of the following Events of Default by the Seller shall occur and be continuing . . .
>
> (ii) **subject to clause (ix) of this Subsection 14.01**, failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Seller set forth in this Agreement which continues unremedied for a period of thirty days (except that such number of days shall be fifteen (15) in the case of a failure to pay any premium for any insurance policy required to be maintained under this Agreement) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by **the Trustee** or by the Custodian . . .
>
> then, and in each and every such case, so long as an Event of Default shall not have been remedied **within the applicable cure period, the Trustee**, by notice in writing to the Seller may, in addition to whatever rights **the Trustee** may have at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Seller under this Agreement and in and to the Mortgage Loans and the proceeds thereof.

MMLPSA § 14.01 (emphasis added); RSA, Ex. One.

Subsection 14.01(ix), to which the amended Subsection 14.01(ii) refers, also includes a cross-reference: it provides for an EOD where "the Seller fails to duly perform . . . its obligations under Sections 11.25 and 11.26 of the Servicing Addendum." MMLPSA § 14.01(ix). Sections 11.25 and 11.26, in turn, impose requirements as to the provision of compliance certificates. *Id.* §§ 11.25, 11.26. The RSA modified each of these provisions as well.[17]

Other modifications to Section 14 included: the replacement of "Seller" with "Servicer" in Subsection 14.01(i), which pertains to untimely payments; and the addition of the words "within the applicable cure period" to describe the remedy period.[18] RSA, Ex. One. The RSA did not update the definition of "Seller" or "EOD," nor add a definition of "Servicer."

### 3.   ProSupp's References to EODs

---

[17] As amended, Subsection 14.01(ix) provides for an EOD where:

> (ix) the Seller fails to duly perform, within the required time period, its obligations under **Sections 11.25 or 11.26 of the Servicing Addendum, which failure continues unremedied for a period of fifteen (15) days** after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by any party to this Agreement or by any master servicer responsible for master servicing the Mortgage Loans pursuant to a securitization of such Mortgage Loans[.]

MMLPSA § 14.01(ix); RSA, Ex. One (amendments bolded). Section 11.25, as amended, requires the "Seller" to, *inter alia*, deliver to the Trustee and the Sarbanes-Oxley Act certifying party an annual compliance statement pursuant to an official review. *See* MMLPSA § 11.25; RSA, Ex. One. Section 11.26, as amended, requires the "Servicer" to procure a compliance statement from an independent accounting firm as to the servicing of the loans. *See* MMLPSA § 11.26; RSA, Ex. One.

[18] The RSA modifies other parts of the MMLPSA, including the representations-and-warranties clause in Section 7, some definitions in Section 1, and the Servicing Addendum. RSA, Ex. One.

21

The ProSupp also contains references to EODs. Like the PSA, it identifies CHL as the "Originator" and CHL Servicing as the "Servicer." ProSupp at S-4. In a section called "Events of Default," the ProSupp states:

> An event of default with respect to the servicer will consist, among other things, of:
>
> o   any failure by the servicer to make an advance and any other failure by the servicer to deposit in the distribution account the required amounts or to remit to the trustee any payment which continues unremedied for one business day following written notice to the servicer; or
>
> o   any failure by the servicer to observe or perform in any material respect any other of its covenants or agreements in the servicing agreement, which continues unremedied for 60 days after the date on which written notice of the failure is given to the servicer; or
>
> o   insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, and certain actions by or on behalf of the servicer indicating its insolvency or inability to pay its obligations.

*Id.* at S-75–76. It does not mention any EODs with respect to CHL as originator. As to EODs, the ProSupp states that U.S. Bank "has the right to terminate the servicer for certain events of default which indicate the servicer is not performing, or is unable to perform, its duties and obligations."[19] *Id.* at S-62; *see also id.* at S-64, 67, 76.

### B.    Is the Contract Ambiguous?

The parties dispute whether Subsection 14.01(ii), as reconstituted, imposes obligations on CHL such that its material failures provide grounds for an EOD. Reading the amended version of Subsection 14.01(ii) "in the context of the entire agreement," *L. Debenture*, 595 F.3d at 467 (citation omitted), the Court finds, with Ambac, that "Seller" in Subsection 14.01(ii)

---

[19] The Prospectus itself contains a section called "Events of Default; Rights upon Event of Default." Ex. 318-6 at 226. It lists the same EODs listed in the ProSupp, albeit in a slightly different format (four bullet points rather than three bullet points). *Id.* It states that U.S. Bank may terminate the "master servicer" when these EODs go unremedied. *Id.* at 219.

unambiguously encompasses CHL in its capacity as originator. In reaching this conclusion, the Court considers the text of the provision and its broader context. Read together, the contract documents indicate that the original MMLPSA envisioned that EODs under Subsection 14.01(ii) could flow from breaches by CHL as either originator or servicer, and that this broad definition of "Seller," which included CHL as originator, survived updates made to the MMLPSA by the RSA. This reading is reinforced by various contextual clues, including other updates made by the RSA within Section 14, the use of "Seller" in other contract provisions, and the consequential nature of EODs, which indicates that any limitation to EOD provisions would be explicit.

### 1.    Text of Subsection 14.01(ii)

At the threshold, the Court finds that the original version of Subsection 14.01(ii) pertained to material failures by CHL as both originator and servicer. As first drafted, the MMLPSA identified CHL as "Seller and Servicer" and broadly defined "Seller" as "Countrywide Home Loans, Inc., or any successor to or assignee of the Seller." MMLPSA § 1. Accordingly, all references to "Seller" in the original MMLPSA included CHL as originator and servicer, unless otherwise specified. This extended, logically, to Subsection 14.01(ii), which premised EODs on the "failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements." *Id.* § 14.01(ii). Nothing in the provision, as originally worded, suggested that "Seller" referred to CHL only as servicer.[20]

---

[20] At argument, U.S. Bank asserted that, even in its original form, the reference to "Seller" in Subsection 14.01(ii) included only CHL in its servicing capacity, in part because U.S. Bank could seek a separate, non-EOD remedy against CHL in its originating capacity. *See* Tr. 29–30, 33–35. The Court rejects this argument, which U.S. Bank did not meaningfully develop in its briefing and which strains the text of the contract. The most natural reading of the original version of Subsection 14.01(ii) is that EODs stemmed from material failures of the "Seller" as defined in the MMLPSA, rather than only from failures of the "Seller" in a servicing capacity.

The question then becomes whether the RSA modified Subsection 14.01(ii) so as to exclude liability for CHL's failures as originator. The text of the RSA and amended MMLPSA plainly indicate that no such modification was made. That is because the RSA preserved the broad definition of "Seller" so as to encompass CHL, except in provisions exclusively related to servicing, and Subsection 14.01(ii) is not such a servicing-focused provision.

Under the RSA, CHL Servicing "agree[d], with respect to the servicing of the Serviced Loans, to perform and observe the duties, responsibilities and obligations that are to be performed and observed by the Seller (*as such term is defined in the Servicing Agreement*)." RSA at 2 (emphasis added). Although Exhibit One of the RSA includes 10 additions or modifications to the MMLPSA's definitions, it notably does not alter the definition of "Seller." *See id.*, Ex. One; Ambac Reply at 15 n.7 ("[T]he term 'Seller' survived the RSAs, even in the Servicing Addendum."). It likewise does not add a definition of "Servicer." *See* RSA, Ex. One. The RSA thus retained the MMLPSA's meaning of the term "Seller" so as to encompass both the originating entity and the servicing entity—with the qualification that CHL Servicing assumed the "Seller's" obligations "with respect to the servicing of the Serviced Loans." *Id.* at 2. This means, at most, that references to the "Seller" in provisions "with respect to the servicing of the Serviced Loans" were narrowed to mean only CHL Servicing in its role as servicer.[21] It does not mean, however, that *all* references to "Seller" were so narrowed.

---

[21] U.S. Bank highlights the RSA's use of the phrase "as so modified" in the RSA provision transferring servicing obligations, arguing that it means that, "for MMLPSA provisions concerning loan servicing, Seller has been replaced with Servicer." USB MSJ at 9. But nothing in the RSA suggests such a wide-sweeping replacement of "Seller" with the term "Servicer." Instead, the RSA provides that CHL Servicing will assume the obligations of the "Seller" "as such term is defined in the Servicing Agreement," RSA at 2. That indicates that the agreement retained the word "Seller" and narrowed its meaning in some instances. Furthermore, as Ambac argues, the "as so modified" language may have served only to create contractual privity

Indeed, CHL had ongoing obligations under the agreement even after the transfer of servicing obligations to CHL Servicing. *See* RSA at 3 (reciting document-delivery requirements under Section 6.03 and representations and warranties under Section 7); Tr. 7–8. "Seller" therefore necessarily refers to CHL, as originator, in at least some instances of the amended MMLPSA—and certain references to "Seller" in the MMLPSA make sense only when read to mean CHL as originator. *See, e.g.*, MMLPSA § 7.01(iii) (discussing "acquisition or origination of the Mortgage Loans by the Seller"); *id.* § 7.02(xx) (discussing "origination and collection practices used by the Seller"); Ambac Reply at 5–6 (citing Subsection 13.01 and Section 16).

Therefore, the broad conception of "Seller," including CHL in its non-servicing role, persisted in the amended MMLPSA, except in (1) provisions in which the RSA expressly modified "Seller" and (2) provisions "with respect to the servicing of the Serviced Loans," RSA at 2, in which the RSA implicitly narrowed "Seller" to mean CHL Servicing. Extending this reading of "Seller" to the amended Subsection 14.01(ii), the Court holds that the RSA did not expressly or implicitly update "Seller" in Subsection 14.01(ii) to refer only to CHL Servicing.[22]

As to express modifications, the RSA made only one substantive update to Subsection 14.01(ii): the addition of the phrase "subject to clause (ix) of this Subsection 14.01." *See* MMLPSA § 14.01(ii); RSA, Ex. One. The term "Seller" appears in both the original and

---

between U.S. Bank and CHL Servicing, not to globally replace "Seller" with "Servicer." Ambac Reply at 10–11.

[22] Whether "Seller" refers *only* to CHL in its non-servicing capacity is not at issue. To prevail on summary judgment, Ambac must only establish that no reasonable factfinder could find that "Seller" in Subsection 14.01(ii) excludes CHL as originator, and U.S. Bank must establish that no reasonable factfinder could find that "Seller" includes CHL as originator.

amended version of the provision, and neither the PSA nor the RSA otherwise expressly modified "Seller" in the text.

As to implicit changes, the Court finds that Subsection 14.01(ii) is not a provision "with respect to the servicing of the Serviced Loans," RSA at 2, such that CHL Servicing assumed all obligations of the "Seller" thereunder. Subsection 14.01(ii) sets forth an expansive premise for an EOD: any "failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Seller set forth in this Agreement." MMLPSA § 14.01(ii). The text of the provision—the strongest evidence of its meaning, *see Gary Friedrich Enters.*, 716 F.3d at 313—lacks any indication that EODs can take place only upon the breach of servicing-related covenants or agreements or that it is otherwise concerned only with "the servicing of the Serviced Loans," RSA at 2. It does not at all mention the servicing entity, refer to loan servicing, or enumerate the covenants or agreements that provide the basis for an EOD. And neither party has established that the update to Subsection 14.01(ii), although implicating servicing-related Sections 11.25 and 11.26 through its reference to Subsection 14.01(ix), renders Subsection 14.01(ii) to be exclusively "with respect to the servicing of the Serviced Loans," RSA at 2, so as to preclude Ambac's interpretation of "Seller" from including CHL.[23] Indeed, Sections 11.25 and 11.26, even as amended, include references to both the "Seller" and the "Servicer." *See* MMLPSA §§ 11.25, 11.26; RSA, Ex. One. When read by its plain meaning, Subsection 14.01(ii) instead appears to be a "catch-all" provision for material failures as to any covenants and agreements not addressed by Subsection 14.01(i) . *See* Ambac Reply at 16. Interpreting "Seller" in Subsection 14.01(ii) so as to exclude CHL as

---

[23] Ambac posits, reasonably, that the added language instead served to prevent Subsection 14.01(ii) from superseding Subsection 14.01(ix), which set forth a shorter cure period. Tr. 15.

originator would unduly limit the provision's "force and effect." *E.g.*, *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (2017) ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect.") (citation omitted).

Subsection 14.01(ii)'s reference to the Custodian reinforces this reading of "Seller" to include CHL as originator. The provision premises EODs on material failures for which the "Seller" receives written notice "by the Trustee or by the Custodian." MMLPSA § 14.01(ii); RSA, Ex. One. The Custodian, however, primarily interacts with the originator, not the servicer. In particular, the Custodian manages the retention of mortgage documents and is the entity to which the "Seller" was to deliver and make available various loan documents prior to the closing of the agreement. *See, e.g.*, MMLPSA §§ 1, 5, 6.03; *see also id.*, Ex. 4. Subsection 14.01(ii)'s reference to the Custodian thus strongly suggests that "Seller" necessarily includes CHL in its capacity as originator. *See* Ambac MSJ at 9, 12–13; Ambac Reply at 7–8. U.S. Bank's citations to the MMLPSA and PSA[24] as proof of the Custodian's interactions with the servicer are unavailing.[25] Although the Servicing Addendum of the MMLPSA mentions the custodial

---

[24] Ambac suggests that the Court should focus on the obligations to the Custodian as stated in the original MMLPSA, but not the PSA. Ambac Reply at 7–8. That is overly restrictive, as the PSA formed a part of the agreement updating the MMLPSA to reflect the transfer of CHL's servicing obligations. *See TVT Records*, 412 F.3d at 89 (in interpreting contract, court should consider all writings that form single transaction). Furthermore, the RSA explicitly incorporates obligations set forth in the PSA. *See, e.g.*, RSA at 2, 5; *see also* USB Reply at 7–8 (Court should focus on post-securitization agreements). Thus, the Court considers the obligations outlined in the PSA.

[25] U.S. Bank asserts that the Custodian did in fact have "regular, even monthly, contact" with the servicer in connection with foreclosures and therefore could learn of material failures by the servicer. USB MSJ at 16–17 (citing Sections 2.01 and 3.03(b) of the PSA and Section 16 of the MMLPSA); *see also* Tr. 31–32; USB Seller 56.1 ¶ 1 (disputing that Custodian has no role "related to the servicing of mortgage loans").

27

account created under the agreement, *see, e.g.*, *id.* §§ 11.03–.13, 11.23, it does not mention the Custodian, reflecting the Custodian's relatively minimal involvement with the servicer. And even if these provisions suggest that the Custodian would be aware of material failures of the *servicer*, this does not preclude Ambac's proposed interpretation of the term "Seller" to include CHL as originator—it only suggests that "Seller" also encompasses CHL Servicing as servicer.

To the extent that U.S. Bank contends that, because the Trustee could notify the "Seller" of its material failures, "Seller" in Subsection 14.01(ii) could refer exclusively to the servicer notwithstanding the Custodian reference, this argument fails. USB MSJ at 17. That another entity could alert the "Seller" of material failures does not detract from the fact that the Custodian is named as a notifying entity, and that the RSA preserved the Custodian's ability to give notice of material failures. The Custodian reference supports Ambac's interpretation: that Subsection 14.01(ii) necessarily encompasses failures by the "Seller" in a non-servicing capacity, as the bulk of the failures to which the Custodian would be privy concern the "Seller's" non-servicing duties. Reading Subsection 14.01(ii) otherwise would render the Custodian reference "'superfluous or meaningless,' an interpretation that [the Second Circuit] 'avoid[s] if

---

But these references denote largely "incidental," Ambac Reply at 7, interactions between the servicer and Custodian, rather than obligations that could provide the basis for a material-failure EOD. Section 2.01 of the PSA, for instance, requires that all original documents "that are not delivered to the Custodian on behalf of the Trust . . . be held by the Servicer in trust for the Trustee, for the benefit of the Trust and the Certificateholders." PSA § 2.01. This provision appears to primarily outline an obligation of the servicer to the *Trustee*, not to the Custodian. Section 3.03 sets forth meatier obligations, requiring the "Servicer" to, upon full payment of a mortgage loan, "promptly furnish to the Custodian, on behalf of the Trustee," a certification of such payment and "request that the Trustee or the Custodian on behalf of the Trustee deliver to the Servicer the related Mortgage File." *Id.* § 3.03(a). The provision further requires that the "Servicer" "return the Mortgage File to the Custodian" at the end of foreclosure proceedings. *Id.* § 3.03(b). Still, these obligations are incidental to the primary obligations of the servicer to monitor loan payments and conduct foreclosure proceedings.

possible.'" *Ambac Assurance Corp.*, 2021 WL 6060710, at *3 (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)); *see, e.g.*, *S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 4 N.Y.3d 272, 278 (2005) (rejecting construction that renders provision superfluous); *Roc Nation LLC v. HCC Int'l Ins. Co., PLC*, 523 F. Supp. 3d 539, 564–66 (S.D.N.Y. 2021) (same); *In re Lehman Bros. Inc.*, 478 B.R. 570, 586 (S.D.N.Y. 2012) (same).

Accordingly, the Court finds that the term "Seller" in Subsection 14.01(ii), by the provision's plain language, unambiguously includes CHL in its capacity as originator.

### 2.   Contextual Indicators of the Meaning of Subsection 14.01(ii)

Reading Subsection 14.01(ii) in the context of the broader agreement confirms this interpretation of "Seller." *See, e.g.*, *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." (citation and alteration omitted)); *In re Coudert Bros.*, 487 B.R. 375, 390 (S.D.N.Y. 2013) (finding provision's meaning "confirmed by various other provisions in the Agreement"). In particular, in light of changes made by the RSA to other parts of the MMLPSA, the decision not to modify "Seller" in Subsection 14.01(ii) is notable.

For instance, the RSA made a wholesale replacement of references to "Purchaser" with "Trust Fund" in the MMLPSA and a wholesale replacement of references to "Purchaser" with "Trustee" in Subsection 14.01. *See* RSA at 3; *id.*, Ex. One. This suggests that, had the drafters intended for all or a set of references to "Seller" to mean only "Servicer"—either throughout the MMLPSA or within Subsection 14.01—they would have made such a substitution.[26] Similarly,

---

[26] U.S. Bank argues that a replacement of "Seller" with "Servicer" differs from the replacement of "Purchaser" with "Trust Fund" since "the Trust Fund assumed no duties, and Greenwich

the RSA replaced certain references to "Seller" with the term "Servicer," including in Subsection 15.01, which provided for the termination of the servicer's obligations, and in Subsection 14.01(i), which was modified such that only failures of the servicer to remit timely payments could provide the basis for an EOD. *See* RSA, Ex. One. These substitutions of "Seller"— especially in the provision immediately before Subsection 14.01(ii)—indicate that, had the drafters intended for "Seller" in Subsection 14.01(ii) to refer only to the servicer, they would have updated the provision accordingly.

Considered together, these changes reinforce that the drafters intentionally preserved the broad conception of "Seller" in Subsection 14.01(ii) so as to encompass both servicing and non-servicing conduct. Although the drafters of the RSA left unchanged Subsection 14.01(ii)'s reference to the "Seller," they added prefatory language to the subsection. This suggests they at least gave attention to that provision in amending the MMLPSA. In such circumstances, where the drafting parties inserted a condition in some provisions but not to the provision at issue, the plain language of the provision controls, and the provision is best read such that the condition does not apply. *Cf., e.g., W.W.W. Assocs.*, 77 N.Y.2d at 162–63 (finding contract unambiguously granted cancellation right to both purchaser and seller where contract "explicitly allow[ed] both buyer and seller to cancel" in provision at issue but "expressly bestowed certain options on the purchaser alone" in surrounding provisions); *L. Debenture*, 595 F.3d at 469 (finding contract

---

retained none," while CHL Servicing assumed servicing obligations, and CHL maintained its origination duties. USB Reply at 5. But this difference does not explain why the drafters of the RSA opted to make an across-the-board replacement as to one key term but did not do so with respect to "Seller," an equally or arguably more relevant term. In fact, the enormity of the obligations assumed by CHL Servicing and the fact that CHL maintained certain duties suggest that the drafters may have been more likely to explicitly replace "Seller" with "Servicer" in the appropriate instances for clarity as to ongoing and future obligations.

unambiguously excluded certain share from common stock where parties "defined more than 100 terms . . . and made explicit reference to" that share in definition of capital stock, but did not do so in definition of common stock); *In re Lehman Bros.*, 478 B.R. at 588 (finding contract unambiguously used broad meaning of term in provision at issue where parties "add[ed] . . . specificity" to term in separate provision, but did not do so in provision at issue); *see also* Ambac MSJ at 14 (drafters made "conscious choice to leave Section 14.01(ii) intact").

Further supporting this reading is "the relation of the parties and the circumstances under which [the agreement] was executed." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998); *see also In re Coudert Bros.*, 487 B.R. at 393. The MMLPSA, PSA, and RSA consummated high-stakes, high-dollar transactions between sophisticated business entities represented by counsel. Subsection 14.01(ii), as both parties agree, is a consequential provision, and its applicability to originator-related breaches greatly affects the extent of Ambac's potential recovery.[27] *See, e.g.*, Tr. 11, 26–27. It follows that the drafters of the RSA—although none directly represented the investors whose interests are being advocated here, *see id.* 17–18, 24—had good reason to be attentive to any changes to Subsection 14.01(ii) and had the capability to effectuate such changes. Under these circumstances, the Court declines to find that Subsection 14.01(ii) was modified to apply only to servicer-related conduct, as the drafting parties "easily could have included language" to do so, but did not. *Lockheed Martin*, 639 F.3d at 70–71 (finding contract unambiguously permitted transfer of business where parties did not explicitly preclude transfer); *see, e.g.*, *Schron*, 20 N.Y.3d at 437 ("[H]ad these sophisticated business entities, represented by counsel,

---

[27] Other provisions of the MMLPSA also enable Ambac to pursue relief against U.S. Bank—namely, in relation to the enforcement of CHL's obligation to repurchase loans. *See* Tr. 9–11. But Subsection 14.01 is the only provision that triggers U.S. Bank's prudent-person obligations.

intended to make the $100 million loan payment a condition to the enforceability of the option, they easily could have included a provision to that effect." (footnote omitted)); *L. Debenture*, 595 F.3d at 469 (finding contract unambiguously excluded certain shares where parties "could easily have included" definition encompassing shares but did not do so); *In re Lehman Bros.*, 478 B.R. at 588 (if parties intended to use term in "specific sense," "they could have—and should have—said so"); *Matter of Trs. Established under the Pooling & Serv. Agreements*, 375 F. Supp. 3d 441, 449 (S.D.N.Y. 2019) ("If these sophisticated parties, represented by counsel, intended to make the bringing of a Certificateholder action conditioned upon holding 25% of the Voting Rights at the time of filing, they easily could have included a provision to that effect."); *see also* Tr. 42 (U.S. Bank: Drafting parties modified MMLPSA through RSA "where they had substantive changes in the obligations.").

The Court therefore holds that any "reasonably intelligent person who has examined the context of the entire integrated agreement," *Olin Corp.*, 704 F.3d at 99 (citation omitted), would interpret "Seller" in Subsection 14.01(ii) to necessarily include CHL in its capacity as originator.

### 3.   U.S. Bank's Counterarguments

U.S. Bank makes a range of counterarguments based on the text of the amended MMLPSA, the PSA, and the ProSupp. These highlight certain imperfections in the drafting of the contract documents. In particular, there is no explicit description in the agreement of the applicability of Subsection 14.01, and the RSA made only piecemeal updates to the term "Seller" through the MMLPSA, without consistently updating "Seller" references in all provisions exclusively focused on the servicer. *See, e.g.*, Tr. 12 (Ambac: "[T]he language could have been clearer for either side, obviously."), 36 (U.S. Bank: Interpretive task would be "easier" if drafters had replaced "Seller" with originator where applicable.). The resulting lack of immediate clarity gave rise to this round of briefing and has called upon the Court to draw the above inferences,

based on a close reading, as to what "Seller" means throughout the contract. In the end,

however, none of these imperfections or minor inconsistencies sufficiently undermines Ambac's

showing that, by the plain language of the agreement, "Seller" in Subsection 14.01(ii)

unambiguously encompasses CHL as originator. Still less do these meet U.S. Bank's burden to

prove, as a matter of law, that "Seller" in Subsection 14.01(ii) necessarily excludes CHL.

Indeed, courts may find a particular provision unambiguous even where a contract is

otherwise vague or inconsistent. *See, e.g., Lockheed Martin*, 639 F.3d at 71 (finding contract

unambiguous as to whether plan eligible for transfer even where one provision did not list plan

as transfer-eligible, given other "clear expressions of intention to transfer the business"); *Roc

Nation LLC*, 523 F. Supp. 3d at 564, 567 (finding provision unambiguous even where contract

was "far from a model of draftsmanship" and provision "considered alone, does not yield the

clear, unambiguous meaning . . . attribute[d]," because "in light of the parties' entire

agreement[,] . . . that definition's ambiguity disappears"); *In re Coudert Bros.*, 487 B.R. at 391

(finding provision unambiguous as to whether contract covered lobbying services even where

lobbying was not explicitly excluded, given limited nature of catch-all clause and "imponderable

questions" raised by alternative construction); *Blue Citi, LLC v. 5Barz Int'l Inc.*, No. 16 Civ.

9027 (VEC), 2017 WL 11568966, at *3 (S.D.N.Y. Aug. 28, 2017) (finding terms unambiguous

even where contract documents were "certainly not a model of clarity"); *Androb Jewelry Serv.,

Inc. v. Malca-Amit USA, LLC*, No. 16 Civ. 5171 (AJN), 2017 WL 4712422, at *8 (S.D.N.Y Sept.

25, 2017) (finding forum selection clause unambiguous and adopting "imperfect, but clearly

reasonable interpretation of the clause" over "unreasonable" contrary interpretation); *Gibbs &

Soell, Inc. v. Armstrong World Indus., Inc.*, No. 04 Civ. 5103 (HB), 2005 WL 615688, at *4

(S.D.N.Y. Mar. 17, 2005) (finding provision unambiguous even where its language was "not a

model of clarity"). A mere "omission or mistake in a contract does not constitute an ambiguity[.]" *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (citation omitted) (finding contract's failure to address contingency "does not, of itself, create an ambiguity"). And "[c]omplexity does not necessarily create ambiguity." *Instinet Inc. v. Ariel (UK) Ltd.*, No. 08 Civ. 7141 (JFK), 2010 WL 779324, at \*6 (S.D.N.Y. Mar. 5, 2010) (finding contract unambiguous even though its drafters "were averse to the use of punctuation and their liberal use of defined terms cause the contract to read like a coded message").

With these principles in mind, the Court addresses U.S. Bank's counterarguments, to the extent they are not already addressed in the above analysis, in turn.

*First*, U.S. Bank argues that the drafters of the RSA implicitly replaced the term "Seller" with "Servicer" at various points of the contract, including in Subsection 14.01(ii). USB MSJ at 1–3, 9–10; USB Reply at 2–3. In its view, because the parties understood that "Servicer" replaced "Seller" in all servicing-related provisions of the MMLPSA, Exhibit One of the RSA purposely did not list every replacement of "Seller" in servicing-related provisions. USB MSJ at 5, 10. Instead, it argues, the parties added the term "Servicer" in drafting new or replacement provisions, but, if a provision was not subject to any other update, the parties did not update "Seller" to "Servicer." *Id.* U.S. Bank contends that the reference to "Seller" in Subsection 14.01(ii) was similarly updated, arguing that the fact that Exhibit One replaced "Seller" with "Servicer" in Subsection 14.01(i) but did not redline "Seller" to "Servicer" in the remainder of Subsection 14.01 was consistent with the "contractual context." *Id.* at 12; *see also id.* at 2.

It is true that "where a term may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent, it may be treated as implied in the contract and supplied by the court." *Luitpold Pharms.*, 784 F.3d at 95 (citation omitted). But courts should be "extremely

reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Matter of Trs.*, 375 F. Supp. 3d at 449 (quoting *ACE Secs. Corp.*, 25 N.Y.3d at 597) (applying to PSA); *see, e.g.*, *Kennedy v. Basil*, 531 F. Supp. 3d 828, 842–43 (S.D.N.Y. 2021) (rejecting argument that obligation to assign trademarks was "implied" by contract absent supporting contractual language); *Nissho Iwai Eur. PLC v. Korea First Bank*, 99 N.Y.2d 115, 124 (2002) (declining to construe "implicit understanding" in transaction as prerequisite as such "would require us to read into the letter of credit something which is not there and to condition unambiguous, explicit terms with an unwritten requirement" (citation omitted)); *Reiss*, 97 N.Y.2d at 199 ("[W]e will not necessarily imply a term since courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (citations omitted)).

Here, the RSA updated only some references of "Seller" to "Servicer" and did not make such updates in provisions that unmistakably refer only to the servicer. *See* USB MSJ at 11 (citing various servicing-related provisions in Sections 11 and 16 of MMLPSA). This inconsistency leaves open the possibility that any given reference to "Seller" was silently narrowed to mean only "Servicer." But U.S. Bank does not prove that such an implicit replacement necessarily extended to the reference to "Seller" in Subsection 14.01(ii). As recounted above, the balance of the evidence strongly favors the opposite interpretation: that Subsection 14.01(ii)'s reference to "Seller" encompasses CHL as originator.

To the extent that U.S. Bank argues that the RSA globally replaced references to "Seller" with "Servicer" in Subsection 14.01 as a whole, nothing in the section suggests that it exclusively pertains to servicing. *See* MMLPSA § 14.01; Ambac Reply at 11–14. The section's introductory and concluding language, titled "Events of Default" and describing how the

Purchaser/Trustee can act on an EOD, do not reflect any focus on servicing, and Subsection 14.01 is not included in the servicing-focused Section 11. Moreover, Subsection 14.01 contains subsections that relate to servicing, *see* MMLPSA § 14.01(vi), (vii), as well as those that do not explicitly relate to servicing, *see id.* § 14.01(iii), (iv), (v) (providing for EODs where, *inter alia*, order of conservator or receiver entered against "Seller" or "Seller" admits inability to pay debts); Tr. 47–48. Although the RSA updated Subsection 14.01(i)'s reference to "Seller" to "Servicer," *see* USB MSJ at 12; RSA, Ex. One, this modification, standing alone, does not carry U.S. Bank's burden to demonstrate that such a replacement carried over to distinct provisions within Subsection 14.01. There is good reason to allow, per Ambac's interpretation of "Seller," the trustee to enforce these provisions against *both* the originator and servicer, rather than assuming that the presence of some servicing-specific subsections means that the entire section applies only to the servicer. Globally redefining "Seller" in Subsection 14.01 to mean only CHL Servicing would risk running contrary to the text of certain subsections. *See Matter of Trs.*, 375 F. Supp. 3d at 447 (court must construe contract to accord full meaning and effect to terms).

To the extent U.S. Bank relies on the theory that the drafters expressly replaced "Seller" only in provisions subject to other changes, this argument is also fruitless. The RSA did update Subsection 14.01(ii), but did not alter its reference to "Seller." And there is no other indication that Subsection 14.01(ii) was "with respect to the servicing of the Serviced Loans," RSA at 2, such that the RSA silently replaced "Seller" with "Servicer." *See supra* section IV.B.1.

The Court thus rejects U.S. Bank's theory that the RSA effected an across-the-board, implicit replacement of "Seller" to "Servicer" within Section 14 and/or Subsection 14.01(ii). Accepting such a theory would require drawing significant inferences with little basis in the text of the contract. A more faithful reading of the agreement is that the RSA expressly replaced

references to "Seller" with "Servicer" in provisions like Subsection 14.01(i), which did not otherwise appear to relate to servicing, and implicitly replaced references to "Seller" with "Servicer" in all other provisions "with respect to the servicing of the Serviced Loans," RSA at 2. Because Subsection 14.01(ii) does not fall in either of these categories, interpreting the provision to unambiguously encompass CHL's material failures as originator best "conform[s] to the parties' reasonable expectations." *Bank of N.Y. Tr. Co.*, 726 F.3d at 279.

*Second*, U.S. Bank argues that Subsection 14.01(ii)'s reference to "any other of the covenants or agreements" can mean only those covenants "distinct[]" from the covenant referenced in Subsection 14.01(i). USB MSJ at 12. Because, it argues, Subsection 14.01(i) was modified by the RSA so as to predicate EODs on the *servicer's* failure to remit timely payments, Subsection 14.01(ii) likewise pertains only to the servicer. *Id.* at 12–13. Ambac counters that the "any other" language was "a vestige of the original MMLPSA and that, as originally drafted, subsection (i) applied to both capacities." Tr. 7. In its view, the drafters simply failed to delete "any other" from Subsection 14.01(ii). *Id.*

Neither party's reading is entirely satisfying. But U.S. Bank's reading "strain[s] [] the contract language beyond its reasonable and ordinary meaning." *L. Debenture*, 595 F.3d at 467 (citation omitted). As Ambac persuasively argues, if the drafters intended to limit Subsection 14.01(ii) to servicer-related conduct, it would be "awfully backhanded" for them to accomplish that goal by altering the previous provision and assuming that update carried over to Subsection 14.01(ii). *See* Tr. 7. The provision is more naturally read to supplement the MMLPSA's other remedies against the originator, *see* MMLPSA §§ 7.01–.03 (requiring originator to cure, substitute, and repurchase defective mortgage loans), to enable recovery based on the originator's material failure to perform any other covenants or agreements. Interpreting the

37

provision so as to pertain only to servicing-related failures would improperly remove its "force and effect," *Nomura Home Equity Loan, Inc.*, 30 N.Y.3d at 581, despite other "clear expressions," *Lockheed Martin*, 639 F.3d at 71, that the provision sweeps more broadly.

*Third*, U.S. Bank notes that the discussions of EODs in the PSA[28] and ProSupp mention only the servicer and that the PSA and ProSupp permit the Trustee to terminate the *servicer*, rather than also or only the originator, after an EOD. *See* USB MSJ at 2, 13, 20. These documents, U.S. Bank argues, establish that CHL's actions, as originator, could no longer form the basis for EODs after the reconstitution of the agreements, as no servicer would agree that its servicing rights "could be jeopardized by the non-servicing conduct of another party." *Id.* at 13.

This point is well taken. It is notable that these documents do not expressly mention EODs with respect to the originator, especially given that they describe the enforcement of other obligations of the originator. *See, e.g.*, RSA at 3. And it would be strange for a servicer to submit to a clause permitting its termination based on the failures of a distinct entity. But, reading the pertinent clauses in context, none of the documents state—or even imply—that *only* CHL Servicing's actions can trigger EODs. Instead, the agreements use inclusive language, with respect both to outlining potential EODs and discussing the servicer-termination remedy.

For instance, the PSA states that, upon the occurrence of an EOD "described in a Servicing Agreement," the Trustee may "terminate all of the rights and obligations of the

---

[28] Ambac anticipated, and rebutted, an argument that the PSA's sole remedy provision bars the classification of CHL's origination-related failures as EODs. Ambac MSJ at 19–20. To the extent that U.S. Bank pursues this argument, the Court finds that the provision, which describes enforcement of the originator's obligation to cure and repurchase loans as the "sole remedy" for document defects, *see* PSA § 2.03(a), does not preclude the interpretation of Subsection 14.01(ii) to provide for the trustee's distinct prudent-person obligations—and the possibility of servicer termination—upon the originator's material failures.

Servicer as servicer under this Agreement." PSA § 7.01. It is silent as to whether the originator's actions can trigger EODs, but it does not state at any point that originator-related failures cannot provide the basis for an EOD.

Similarly, the RSA states that the Trustee has "the right to terminate the rights and obligations of [CHL] Servicing upon the occurrence and continuance of an Event of Default." RSA at 2; *see also id.* at 3 (U.S. Bank "shall be entitled to terminate the rights and obligations of [CHL] Servicing under this Agreement, as provided in Section 14 (Default) of the Servicing Agreement."). As to remedies against CHL as originator, the RSA states that the Trustee may enforce the obligations of CHL, including, "without limitation," its document-delivery obligations under Section 6.03 and representations and warranties under Section 7. *Id.* at 3. While the RSA does not expressly mention originator-based EODs, the use of the phrase "without limitation" leaves open the possibility that the agreement encompasses such EODs.

Likewise, the ProSupp states that U.S. Bank "has the right to terminate the servicer for certain events of default which indicate the servicer is not performing, or is unable to perform, its duties and obligations under the servicing agreement." ProSupp at S-62; *see also id.* at S-64, 67. It explicitly lists EODs "with respect to the servicer," and one of the enumerated EODs mirrors the language of Subsection 14.01(ii), except that it describes the EOD as arising out of "any failure *by the servicer*," rather than by the "Seller." *Id.* at S-75–76 (emphasis added); *see also* USB MSJ at 13–14. Again, however, the ProSupp does not state anywhere that EODs cannot be premised on failures of the originator. Its list of EODs is non-exhaustive, excludes various EODs that exclusively pertain to servicing, and departs from the language in Subsection 14.01 in various ways, including to insert the word "servicer." *See* ProSupp at S-75–76; *see also* Ambac MSJ 17 & n.10; Ambac Reply at 13; Tr. 21–22. U.S. Bank's argument that the ProSupp would

have mentioned as a "selling point" the potential for originator-based EODs if such were possible, *see* Tr. 39, has some force.  But the fact remains that the ProSupp, as a summary offering document, cannot be relied on as a comprehensive restatement of the parties' agreement.

Therefore, while the omissions of originator-related EODs in the PSA, RSA, and ProSupp are curious, these do not sufficiently overcome other evidence that Subsection 14.01(ii) encompassed material failures of CHL as originator.  "General canons of contract construction require that where two seemingly-conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect."  *In re Lehman Bros. Inc.*, 478 B.R. at 589 (quoting *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002)).  Here, such a reconciliation is possible by interpreting "Seller" in Subsection 14.01(ii) to include both originator and servicer EODs and reading the servicing-focused descriptions of EODs in the PSA, RSA, and ProSupp to be non-exhaustive.  *Cf., e.g.*, *Lockheed Martin*, 639 F.3d at 70 (finding provision listing plans eligible for transfer did not create ambiguity as to whether un-listed plan's transfer because "nothing in [the provision] indicates that it was intended to be exhaustive"); *In re Lehman Bros.*, 478 B.R. at 589 (finding provision describing contracts did not create ambiguity when read as an "including but not limited to" clause (citation omitted)).

Similar logic applies to the servicer-termination terms in these documents.  These terms are compatible with the possibility of originator-based EODs.  It is reasonable that the drafters would highlight only CHL Servicing's susceptibility to termination upon the occurrence of an EOD, as these documents were drafted in part to recognize the transfer of responsibilities to CHL Servicing.  Furthermore, as Ambac argues, CHL and CHL Servicing were affiliated at the time of the RSA.  This makes it "entirely rational" to include an affiliate cross-default provision to endow the Trustee with leverage following an originator-related EOD—especially since, at that

juncture of the parties' transactions, there would be little reason to terminate the originator. Ambac Reply at 12–13; *see also* Tr. 14, 46–47 (noting that CHL profited from CHL Servicing's performance under contract and that PSA provided for U.S. Bank to be default successor servicer). That the servicing duties were ultimately assigned to an unaffiliated servicer does not render the EOD provision ambiguous at the time of its drafting. Ultimately, none of these documents render Subsection 14.01(ii) ambiguous, let alone establish, as a matter of law, that the provision extends only to servicer-related conduct.

*Fourth*, U.S. Bank argues that the word "or" in the MMLPSA's definition of "Seller" means that "Seller" refers to either CHL *or* its successor or assignee. USB MSJ at 17–18; Tr. 31. This makes sense, U.S. Bank asserts, because the nature of successions and assignments is that the successor or assignee would take CHL's place. USB MSJ at 18. Ambac rebuts that "or" is commonly used to communicate inclusion, and that "Seller," as amended in Subsection 14.01(ii), by extension includes *both* CHL and its assignee, CHL Servicing. *See* Ambac Reply at 4 & n.2 (citing, *inter alia*, dictionary definition of "or," and inclusive use of "or" in Subsection 14.01(v)). Ambac also asserts that the word "or" served to avoid the need for amendment of the MMLPSA in the event that, as anticipated, CHL assigned its servicing duties. *See* Ambac MSJ at 11, 16.

Once again, neither party's interpretation of "Seller" proves fully consistent or workable, as the drafters of the RSA did not clarify in the vast majority of instances whether "Seller" means CHL as originator and/or CHL Servicing as servicer. But, regardless of whether "or," as a general matter, conveys inclusion, Ambac has the more coherent interpretation. Under U.S. Bank's reading of "or" as exclusively disjunctive, "Seller" could not simultaneously refer to CHL and CHL Servicing. Yet, as noted above, the assignment of servicing obligations to CHL Servicing did not eliminate CHL's duties under the agreement. *See* RSA at 3 (citing CHL's

document-delivery and representations-and-warranties obligations). And as Ambac points out, at least some provisions of the MMLPSA necessarily encompass both CHL and its servicing assignee. *See* MMLPSA §§ 13.01, 16; RSA, Ex. One; *see also* Ambac Reply at 4–6; Tr. 20;. These provisions indicate that the drafters envisioned the definition of "Seller" to include both the originator and servicer in at least some instances. In interpreting a contract, "the intention of the parties should control, and the best evidence of intent is the contract itself," *Gary Friedrich Enters., LLC*, 716 F.3d at 313 (citation omitted). The Court thus declines to adopt U.S. Bank's interpretation of "or" because the text of Subsection 14.01(ii) and other provisions in the amended MMLPSA instead favor of Ambac's originator-inclusive reading of "Seller."

In sum, U.S. Bank's counterarguments are defensible in light of apparent inconsistencies and omissions in the drafting of the amended MMLPSA. But none of its arguments sufficiently take away from the provision's express language and compelling clues as to its meaning based on other changes made to the MMLPSA, and these, on balance, support Ambac's interpretation. Despite imperfections in the contract, this is not a case where the agreement "was written so blindly and imperfectly that its meaning is doubtful." *Nissho Iwai Eur. PLC*, 99 N.Y.2d at 122 (quoting *Trs. of Freeholders & Commonalty of Town of Southampton v. Jessup*, 173 N.Y. 84, 90 (1903)). Nor is it one in which Ambac's construction creates "an absurd result." *Matter of Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995). Indeed, given that, at the time of the RSA, CHL had ongoing obligations as originator and was affiliated with the CHL Servicing, there is little reason to assume that the parties would eliminate the possibility of originator-based EODs, let alone do so tacitly or implicitly.

The Court therefore finds that "Seller" in Subsection 14.01(ii) unambiguously includes CHL in its capacity as originator.[29] Because the meaning of the term is unambiguous, the Court does not have occasion to consider the parties' extrinsic evidence.[30] *See, e.g.*, *In re Coudert Bros.*, 487 B.R. at 390 (not reaching extrinsic evidence where contract yielded one interpretation); *In re Lehman Bros.*, 478 B.R. at 590 ("[O]nly if a court *finds* ambiguity does the extrinsic evidence become relevant."); *S. Rd. Assocs., LLC*, 4 N.Y.3d at 278 (same).

## CONCLUSION

For the foregoing reasons, the Court grants Ambac's motion for partial summary judgment and denies U.S. Bank's motion for partial summary judgment. The parties shall file, within one week of this opinion, a joint letter as to their proposed schedule for briefing on Ambac's use of statistical sampling. Following the Court's resolution of the briefing regarding the sampling issue, the parties shall propose a schedule for Phase 2 discovery.

The Clerk of Court is respectfully directed to terminate all pending motions.

---

[29] This decision does not bear on the interpretation of "Seller" in other parts of the MMLPSA. Any interpretation of "Seller" in other instances would require analysis akin to that undertaken in this decision, including determining whether the RSA expressly modified the provision, whether the provision is one "with respect to the servicing of the Serviced Loans," RSA at 2, and how the provision is best understood in context.

[30] The parties were unable to marshal classic extrinsic evidence bearing on this issue—that is, negotiator's notes, contract drafts, or testimony about the drafting process from those involved in it. Instead, they relied on, *inter alia*, the servicers' course of performance and custom and practice in the RMBS industry.

Ambac also cites a case in this District, *NCUA v. Wells Fargo*, in which an RMBS trustee did not dispute that CHL's breaches as seller triggered EODs under Subsection 14.01(ii) of an identical MMLPSA in a lawsuit involving the same provision. Ambac Reply at 24–25; Ambac Seller 56.1 Response ¶¶ 36–44. Although the litigation position taken by the trustee in that case may reflect its agreement with the analysis above, the trustee's acquiescence there does not control the outcome here.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: September 21, 2023
        New York, New York